**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| VECTRIX CORPORATION, | Case No. 09-13347 |
| Debtor. | |

**DECLARATION OF MICHAEL J. BOYLE IN SUPPORT OF**
**THE DEBTOR'S CHAPTER 11 PETITION AND FIRST-DAY MOTIONS**

      I, Michael J. Boyle, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

      1.     I am the President and Chief Executive Officer of Vectrix Corporation (the **"Debtor"**), a high performance, zero emission electric scooter company incorporated in, and formed under the laws of, the State of Delaware with offices in Rhode Island and a facility in Massachusetts. I have been acting as President and Chief Executive Officer of the Debtor since April 23, 2008.

      2.     I submit this declaration (the **"Declaration"**) to assist the Court and other interested parties in understanding the circumstances underlying the commencement of this chapter 11 case and in support of the Debtor's (i) petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the **"Bankruptcy Code"**) filed on September 28, 2009 (the **"Petition Date"**), and (ii) the relief sought in certain motions and applications filed concurrently with this Declaration (the **"First Day Motions"**). This Declaration is intended to provide an overview of the Debtor and this chapter 11 case. Section I of this Declaration provides an overview of the Debtor's corporate history, organization and capital structure as they existed as of the Petition Date. Section II describes the circumstances giving rise to the

commencement of this chapter 11 case. Section III describes the relief that the Debtor seeks in its First Day Motions.

3. I am generally familiar with the Debtor's day-to-day operations, business, and financial affairs as they existed prior to and, where applicable, as they are likely to continue to exist after the Petition Date. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's current or former senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtor and the electronic scooter and vehicle industry as a whole.

4. While I have made every reasonable effort to ensure that the information contained herein is accurate and complete based upon information that was available at the time of preparation, the subsequent receipt of information may result in material changes to financial data and other information contained herein. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5. The Debtor's Board of Directors has passed a resolution authorizing the Debtor to file its chapter 11 petition and for me to submit this Declaration and take any other actions necessary in this bankruptcy case.

**I.**
**Background of the Debtor's Business**

**A.      Corporate History**

6. The Debtor was founded and incorporated in Delaware in 1996 by former-Chairman and Chief Executive Officer Andrew MacGowan as Breeze Acquisition Corporation to develop, manufacture and distribute advanced, commercially viable electric vehicles. On November 18, 1997, the Debtor changed its name to Vectrix Corporation.

7.     The Debtor designs, develops, assembles and sells high performance, zero emission, power two-wheel electric vehicles (the "**Business**").  The Debtor's first design to be mass produced and commercially marketed was the "MAXI Scooter," which has a top speed of 62 mph, a range of over 60 miles and acceleration of 0-50 mph in 6.8 seconds.  The MAXI Scooter incorporates a number of innovative design features and leading edge technology, including a long lifecycle battery, a multi-function throttle and digital controls.  The throttle controls a regenerative braking system, which recharges the scooter's battery during breaking, and provides the ability to reverse at low speed, thereby assisting maneuverability and parking. The technologies incorporated in the key features of the MAXI Scooter have international patent protection, as described below.  In recognition of the Debtor's achievement in developing its MAXI Scooter, the Debtor was awarded the 2006 Frost & Sullivan Award for Technology Innovation and Leadership in Alternative Vehicle Technologies.

8.     The Debtor has offices in Middletown, Rhode Island, and has an engineering, testing and distribution facility in New Bedford, Massachusetts.  The Debtor's scooters are produced primarily by an indirect manufacturing subsidiary with a modern production facility leased by that indirect subsidiary in Wrocław, Poland, as further described below.

9.     Since its inception, the Debtor devoted its efforts primarily to research and technology development, securing private financing and business planning.  In 2006, the Debtor completed final tooling and set-up assembly operations for the MAXI Scooter at its New Bedford facility, where most product design and testing was carried out.  To this end, the Debtor constructed 13 "test-bed" prototypes and 8 pre-production fully-styled demonstration scooters. The Debtor also produced 42 pilot production scooters to perfect the assembly procedures and

quality management system, which were used for testing, dealer development and marketing campaigns.

10. In March 2007, the Debtor received certification for its MAXI Scooter for the European Union and American markets.

11. By mid-April 2007, commercial production began at the Polish manufacturing facility for distribution to the Debtor's target markets. In order to ensure a smooth ramp-up in production, the facility was not initially operated at full capacity. Although the Debtor intended to raise production levels at the facility, the Debtor was unable to do so. As a result of the lower volume of goods produced, the fixed overhead expenses of the Polish facility were not fully absorbed into the cost of production, which increased the Debtor's net loss.

12. In 2008, the Debtor transitioned from its research and development stage to full commercialization, but remained cash flow negative and therefore had to rely solely on equity financing for its working capital. Specifically, for the fiscal year ended September 30, 2008, the Debtor sold 1,167 scooters to dealers, of which 715 were then sold to end customers, generating $6.4 million in revenue from sales to end-customers and $5.5 million in deferred revenue from sales to dealers. During this same period, the Debtor had approximately $76 million in expenses, resulting in a net loss of approximately $61 million.

13. In 2008, the Debtor also expanded its product line to develop a "Family of Products." The Debtor's original MAXI Scooter was refreshed and re-branded as the VX-1 model, and developed a less-expensive VX-1E model and a new entry-level VX-2 model. The VX-1E model was designed for the urban commuter driver, using the same platform and drive train as the VX-1 but with slightly less acceleration and a lower top speed, while the VX-2 model utilized a new platform and was designed as a high-end, smaller and more compact two-wheel

electric vehicle. Both the VX-1E and VX-2 were introduced in 2009 at various trade shows, but neither was ever officially launched for full commercialization. In early 2009, the Debtor also launched a line of new accessories, from seats and windshields to rearview mirrors.

14.     In light of the widespread acceptance of power two-wheel vehicles in Italy and the pressure to use more environmentally friendly vehicles in Italian cities, the Debtor's original marketing strategy focused on the Italian market. Unfortunately, this Italian-centric strategy proved unsuccessful. As a result, in 2008, the Debtor re-focused its strategy to emphasize dealer development in both the American and wider European markets. To implement its new strategy, the Debtor reorganized its management team, including its Chief Executive Officer, finance, sale and marketing positions. Additionally, the Debtor consolidated its European operations under a single management umbrella, which was responsible for supporting the existing dealer base in all of Europe and with expanding distribution through aggressive dealer development programs. This re-focused strategy proved to be more successful, and the Debtor increased sales in the second half of its 2008 fiscal year.

## B.     Foreign Direct and Indirect Subsidiaries

15.     Vectrix Europe Ltd., a holding company incorporated in Ireland on February 19, 2005 ("**Vectrix Ireland**") is a wholly-owned subsidiary of the Debtor. On information and belief, Vectrix Ireland owns (i) 100% of the stock of Vectrix Europe Limited, a limited liability company incorporated in England on April 4, 2005 under the original name of Pointwest Limited ("**Vectrix UK**"); (ii) 100% of the stock of Vectrix Europe S.r.l, a limited liability company incorporated in Italy on March 2, 2005 ("**Vectrix Italy**"); and (iii) 99% of the stock of Vectrix Sp.z.o.o., a Polish limited liability company registered in Wrocław, Poland ("**Vectrix Poland**").

16.     Vectrix UK is the exclusive sales, marketing and distribution company for the Debtor's products in the United Kingdom and the Republic of Ireland. On May 23, 2005, the

name of Vectrix UK was changed from Pointwest Limited to Vectrix (UK) Limited. In 2009, the name of Vectrix UK was changed from Vectrix (UK) Limited to Vectrix Europe Ltd. Despite sharing the same name, Vectrix UK and Vectrix Ireland remain separate and distinct entities.

17.     Vectrix Italy was a sales, marketing and distribution company for the Debtor's products in Europe, and in Italy specifically. It is the direct parent company of VectrixRoma S.r.l, an Italian limited liability company incorporated on November 21, 2006 ("**Vectrix Rome**"), which was a retail sales company operating two of the Debtor's flagship stores in Rome. Vectrix Italy and Vectrix Rome were both placed into voluntary liquidation in October 2008 and remain in voluntary liquidation as of the filing of this Declaration.

18.     Vectrix Poland is a manufacturing company, which leased and operated a facility in Wrocław, Poland that manufactured the Debtor's VX-1 model. Due to provisions of Polish law that restrict a company that is itself a subsidiary from incorporating its own wholly-owned subsidiary, Vectrix Poland was initially wholly-owned by Mr. Wolfgang Gohl, an employee of the Debtor. On July 22, 2005, Mr. Gohl transferred 99 of the 100 issued shares of Vectrix Poland to Vectrix Ireland and the remaining 1 share to Vectrix Italy. On April 23, 2009, Vectrix Poland was placed into bankruptcy reorganization under Polish law and remains subject to such proceedings as of the date of the filing of this Declaration.

19.     The Debtor's foreign direct and indirect subsidiaries are not part of this chapter 11 filing.

**C.     Supplier Network**

20.     The Debtor's MAXI Scooter has been designed for ease of assembly, and the Debtor has pushed the complexity of manufacturing down to its suppliers. While all of the components for Debtor's products are sourced from outside suppliers, the Debtor owns all of the

tooling associated with the fabrication of the VX-2 model, while Vectrix Poland owns all of the tooling associated with the fabrication of the VX-1 and VX-1E models.

21.     An integral part of the Debtor's product development strategy was the entry into agreements with strategic suppliers to (i) provide a significant portion of the overall effort required to design, develop and prototype the key engineered components of the Debtor's scooters, and (ii) continue supplying components for volume manufacturing.  As a result of this strategy, the Debtor has developed partnerships with a network of high-quality suppliers, including Gold Peak Industries (Holdings) Limited (**"Gold Peak"**), Parker Hannifin Corporation (**"Parker Hannifin"**) and E-max ev's Germany Holdings Ltd. (**"E-max"**).

### a.     Gold Peak Industries (Holdings) Limited

22.     Gold Peak develops, manufactures and distributes a broad range of batteries and battery products worldwide.  The Debtor has worked with Gold Peak since 2002, during which time Gold Peak customized a GP 30Ah, Nickel Metal Hydride (**"NiMH"**) battery for the Debtor's MAXI Scooter.

23.     In May 2006, the Debtor formed a joint venture with GP Batteries International Limited, a subsidiary of Gold Peak (**"GP Batteries"**), and EVB Technology (HK) Limited, a wholly-owned subsidiary of GP Batteries (**"EVB"**, and together with GP Batteries, **"GP"**), to supply NiMH batteries for the Debtor's MAXI Scooter.  The joint venture company, called EVB Vectrix (Hong Kong) Limited, would be managed by EVB.  The Debtor committed $7.9 million to the joint venture, consisting of $2.94 million in capital in exchange for a 49% interest and a $5 million loan to be used for capital expenditures.   Per the GP Agreement (described below), the joint venture was to be dissolved, with GP responsible for arranging the dissolution and the parties splitting the cost of such dissolution.  As of the Petition Date, the Debtor has not received confirmation that the joint venture has, in fact, been dissolved.

24.     In March 2008, the Debtor and GP entered into a strategic agreement whereby GP would develop and supply lithium ion batteries for future models of the Debtor's scooter, and pursuant to which the Debtor and GP agreed to release each other from existing obligations to purchase and develop NiMH batteries (collectively, the "**GP Agreement**").  Per the GP Agreement, the Debtor received the exclusive right to purchase lithium ion batteries, which GP was to develop by the end of 2008, in exchange for 15 million shares of the Debtor's restricted stock and the release of GP's outstanding obligation to supply 447 NiMH batteries for which the Debtor had pre-paid.  Additionally, in exchange for forgiving the Debtor's outstanding obligation to purchase 770 NiMH batteries for an aggregate price of $2,695,000.00, GP was to receive 130 scooters, valued at $1,118,500, as of September 30, 2008, for distribution in China, Taiwan, Macau and Singapore.  As of the Petition Date, the Debtor has a balance of $791,200.00 in accrued liabilities representing the value of the scooters not yet delivered to GP under the GP Agreement.

### b.     Parker Hannifin Corporation

25.     Parker Hannifin is one of the world's leading diversified manufacturers of motion and control technologies and systems, providing precision-engineered solutions for a wide variety of commercial, mobile, industrial and aerospace markets.  It has worked closely with the Debtor since 2003 on the development of the MAXI Scooter and is the primary supplier for drive train components.

26.     In April 2003, Parker Hannifin acquired a 50% interest in the Debtor's patent for fuel cell hybrid technology for $1 million.  Under the terms of the patent purchase agreement, the Debtor is obliged to pay Parker Hannifin a royalty on future sales of scooters incorporating this fuel cell technology.  As of the Petition Date, none of the Debtor's scooters utilized this technology, and no such royalties have accrued or been payable to Parker Hannifin.  In

November 2004, Parker Hannifin made a $5 million equity investment in the Debtor, which enabled the Debtor to commence developing its tooling and assembly design. Parker Hannifin has historically been the Debtor's supplier of the motor and the motor controller components for the MAXI Scooter, pursuant to an agreement with Vectrix Poland.

         **c.**     **E-Max ev's Germany Holdings Limited**

27. With the development of the VX-2 model in 2008, the Debtor entered into a Manufacturing and Supply Agreement, dated September 18, 2008, with E-max (the "**E-max Agreement**"), pursuant to which E-max would manufacture the Debtor's VX-2 model at its facility in Wuxi, China. Specifically, the E-max Agreement provided that E-max would supply, and the Debtor would purchase, a minimum of 2,500 VX-2 model scooters in the twelve months following February 28, 2009, by which date E-max was obligated to deliver ten pre-production/functional build sample scooters to the Debtor. Assembly of the Debtor's VX-1 and VX-1E models was to continue at the Vectrix Poland facility, but was eventually expected to be transferred to E-max's facility in China.

28. Pursuant to the E-max Agreement, the Debtor was required to make four (4) milestone pre-payments to E-max of $494,375.00 each. The first and second pre-payments were due prior to and upon execution of the E-max Agreement, respectively. The third pre-payment was due upon completion of developing the tooling necessary for manufacturing the VX-2 model, and the fourth pre-payment was due upon delivery and acceptance of the pre-production scooters. These pre-payments were to be offset against 50% of the purchase price of the first VX-2 scooters ordered by the Debtor. E-max is required to repay the full amount of the pre-payments if it fails to deliver the pre-production scooters by the Start Date, defined in the E-max Agreement as February 28, 2009. The Debtor made the first and second milestone pre-payments of $494,375.00 each in September and October 2008, and $150,000 of the third milestone

payment in or around April 2009.  The tooling for the VX-2 was completed in early 2009; however, the Debtor never received the pre-production scooters and, therefore, did not make the fourth pre-payment.  As of the Petition Date, the Debtor had paid E-max milestone pre-payments totaling $1,138,750.00.

## D.     **Dealer Network**

29.     The Debtor's commercial strategy was built around the concept of opening flagship stores in key target countries and creating networks in major cities through a Store-in-Store program.  Flagship stores established is major cities sell the Debtor's products exclusively, but are generally operated and owned by independent dealers.  Dealers in major cities also created networks through the Store-in-Store program, which entails dedicating a specific area within a multi-franchise shop to the Debtor's products and displays.

30.     Every domestic dealer within the Debtor's dealer network is a party to a standard Vectrix Dealer Agreement, which controls the relationship between the parties.  Foreign dealers entered into similar agreements with Vectrix Italy, prior to its liquidation, and Vectrix UK.  As of the Petition Date, the Debtor's domestic dealer network consisted of approximately 90 dealers.

31.     In 2008, the Debtor entered into a Floor Plan Financing Agreement, dated January 29, 2008  (the **"Floor Plan Financing Agreement"**), with GE Commercial Distribution Finance Corporation (**"GE"**), pursuant to which GE agreed to provide inventory financing to the Debtor's domestic dealers.  As of the Petition Date, almost all of the Debtor's domestic dealers utilized the floor financing provided by GE.  Floor plan financing permits a domestic dealer to purchase scooters from the Debtor, with GE financing the purchase and paying the Debtor upon the sale of each scooter to the dealer.  GE is then repaid by the dealer upon the sale of a scooter to an end-customer.  If a dealer fails to repay GE for any inventory it purchases using GE's floor plan financing, the Debtor is required to re-purchase the inventory and re-pay GE.

32. In exchange for providing the Debtor's domestic dealers with inventory financing, GE required the Debtor to secure a Letter of Credit equal to the value of any inventory purchased through such financing (the "**Letter of Credit**"). The Debtor secured the Letter of Credit from the Bank of America, which in turn required an amount equal to the Letter of Credit to be deposited into a restricted cash account (the "**BOFA Account**"). Originally, the Debtor placed $2.5 million into the BOFA Account. However, as the amount of inventory financed by GE decreased and the cash in the BOFA Account became unrestricted, the Debtor drew down on the account. As of the Petition Date, $1.6 million remained in the BOFA Account.

## E. Intellectual Property

33. The Debtor places significant value on its intellectual property, and has taken appropriate steps to protect its rights. The Debtor has been granted six patents covering the key features of its scooters. All of the Debtor's United States patents have been duplicated with applications under the Patent Co-operation Treaty, which includes the European Union, China and India, and with independent applications in Taiwan, Mexico, Hong Kong, Japan and Brazil, as follows:

- Regenerative Braking System for an Electric Vehicle (US Patent No. 6,724,165). The Debtor has also received a patent for this invention in Taiwan and has applied for a patent in Europe, Hong Kong, India, Japan and Mexico.

- Electric Scooter with On-board Charging System (US Patent No. 6,326,765). This patent is co-owned with Parker. The Debtor and Parker have also received patents for this invention in China, Mexico and Taiwan and have applied for a patent in Europe, Hong Kong, India, Japan and South Korea.

- Vehicle Drive Wheel Assembly (US Patent No. 6,199,652). The Debtor has also received patents for this invention in Belgium, China, Europe, France, Germany, Ireland, India, Italy, the Netherlands, Portugal, the United Kingdom and Taiwan.

- Electric Vehicle and Frame Therefore (US Patent No. 6,047,786). The Debtor has also received a patent for this invention in China, India and Taiwan and has applied for a patent in Europe.

- Vehicle Drive Wheel Assembly (US Patent No. 6,199,651). The Debtor has also received patents for this invention in China, India and Taiwan and has applied for a patent in Europe.

- Electrical Scooter having an Equalization Circuit for Charging Multiple Batteries (US Patent No. 5,965,996).

- Composite Construction Vehicle Frame (US Patent No. 7,255,191). The Debtor has applied for a patent in Bahamas, Canada, Europe, Hong Kong, India, Japan, Mexico, Singapore, and Taiwan.

- Scooter Body (US Patent No. 4,039,90). The Debtor has also received patents for this invention in Brazil, Germany, Spain, France, and Macau.

- Lockable Tilt System for a Three-Wheeled Vehicle (PCT Patent pending).

- Vehicle Propulsion System Activation Device. The Debtor has applied for a patent for this invention in Taiwan.

- Electric Vehicle Air Cooling System (US Patent pending). The Debtor has also applied for a patent for this invention in Taiwan.

- Vehicle with Lockable Tilt System (US Patent pending). The Debtor has also applied for a patent for this invention in Europe and Taiwan.

- Vehicle with Contactless Throttle Control (US Patent pending). The Debtor has also applied for a patent for this invention in Canada, China, Europe, Singapore, and Taiwan.

34. The Debtor has also applied to register and obtained trade mark registration for

the following trade marks:

- "DAaRT" for an accelerating and decelerating device in Italy and the European Union. This mark is registered in the European Union and is pending in Italy.

- "COOL PEOPLE RIDE ELECTRIC" for motorized scooters and related structural and non-structural parts in Albania, Australia, the European Union, and Singapore.

- "COOL PEOPLE RIDE ELECTRIC" for a variety of merchandise including helmets, clothing, footwear, jewelry, watches, bags and luggage in New Zealand.

- "V" logo for motorized scooters and related structural and non-structural parts in the United States, Albania, Australia, Chile, Croatia, European Union, Japan, New Zealand, Norway, Singapore and Switzerland. The Debtor has applied to register this mark in Argentina, Bosnia and Herzegovina, Brazil, Bulgaria, Israel,

Macedonia, Russian Federation, Serbia and Montenegro, South Africa, Turkey and Venezuela.

- "V" logo for a variety of merchandise including helmets, clothing, footwear, jewelry, watches, bags and luggage in Australia, Chile, the European Union, Japan, Mexico and New Zealand. The Debtor has applied to register this mark in the United States, Argentina, Brazil, Canada and Venezuela.

- "VECTRIX" for retail store services, mail order services and repair and maintenance services in the European Union. An application for this mark is pending in Australia.

- "VECTRIX" for motorized scooters and related structural and non-structural parts. The Debtor has obtained registrations for this mark in 20 countries including the European Union and several countries in Asia. The Debtor has applied to register this mark in 12 additional countries including Canada and several countries in the southeast of Europe.

- "VECTRIX" for clothing, eyewear, retail store services, mail order services, and repair and maintenance of motor scooters. An application for this mark is pending in the United States.

- "VECTRIX" for a variety of merchandise including helmets, clothing, footwear, jewelry, watches, bags and luggage in Australia, Japan, Mexico, New Zealand and Singapore. The Debtor has applied to register this mark in Argentina, Brazil, Chile, and the European Union.

- "VECTRIX" for motorized scooters, franchising and technical consultation and research in the United States.

- "FROG (AND DESIGN)" for vehicles in Italy.

- "GREEN GO!" for vehicles and hybrid and electric powered motorcycles in Argentina, Bermuda, Chile, China, the European Union, Hong Kong, India, Indonesia, Japan, Mexico, Norway, Singapore, South Korea, Switzerland, Taiwan, Thailand, Venezuela and Vietnam.

**F.** **Capital Structure, Summary of Liabilities and Pre-Petition Indebtedness**

35. From its inception, the Debtor raised capital through equity financing by selling shares of its common stock to investors in various private placements. The Debtor originally invested approximately $85 million in the research and development of its scooter designs, production engineering, tooling, production set-up, the battery joint venture, and marketing. In

2007, the Debtor raised approximately $51.2 million in additional equity capital through a private placement.

36.     On May 24, 2007, the Debtor was admitted to the AIM, the London Stock Exchange's international market for smaller, growing companies, under the symbol "VRX."  On the same date, the Debtor placed 72,000,000 shares of the Debtor's common stock on the AIM, raising approximately $66.8 million, net of offering costs, which was used for working capital, research and development, and capital expenditures.  All of the shares of Debtor's common stock are considered "restricted securities" under U.S. securities laws and are subject to various restrictions on their resale.  On March 31, 2009, as a result of the Debtor's failure to publish its Report and Accounts as required by the AIM Rules for Companies and Nominated Advisers (the "**AIM Rules**"), trading of Debtor's common stock was suspended.

37.     Pursuant to its Articles of Incorporation, the Debtor is authorized to issue 435,000,000 shares of stock.  As of the Petition Date, the Debtor had 283,313,473 shares of common stock outstanding, of which 114,108,071 were restricted.  As of the Petition Date, there were over 300 record holders of the Debtor's stock.

38.     Other than secured debt on and in connection with certain vehicles, machinery and other discrete assets, the Debtor has no outstanding pre-petition secured loan facilities and no other secured debt.  In addition, and without limiting the generality of the foregoing, there are no pre-petition liens or other encumbrances, including security interests held by any party, on any of the Debtor's cash, deposit account or other operational accounts.

39.     The Debtor's pre-petition indebtedness consists primarily of unsecured obligations incurred in the operation of the Debtor's business.   As of the Petition Date, the Debtor had outstanding principal unsecured indebtedness totaling approximately $26,000,000.00.[1]

## II.
## Events Leading to this Chapter 11 Bankruptcy Case

40.     Until the latter part of 2008, the Debtor had been able to raise sufficient capital to meet its working capital requirements through the series of private investments and its AIM placement, described above.   However, starting in late 2008, the Debtor began experiencing a significant lack of working capital resulting from challenging market conditions, including fluctuations in gasoline prices, as well as difficulty in raising additional capital as financing for green technology disappeared.   At the same time, there was an unexpected decline in sales resulting from the global credit crisis, which lead to a drop in consumer spending on bigger-ticket retail purchases and a decline in dealer orders as dealers reacted to curtailed credit lines and tighter approval standards for credit purchases by lowering order activity.

41.     As a result of this unexpected decline in sales, the Debtor had to accelerate its next round of fund raising.   Starting in 2008, the Debtor explored funding alternatives, and found banks reluctant to offer any form of trade financing or finance alternatives to emerging companies like the Debtor.   Unable to raise funds through loans, the Debtor decided that additional equity capital was necessary to its refinancing success.   Thus, throughout 2009, the Debtor made efforts to secure new equity funding while also pursuing government-based loan or grant support.   The Debtor engaged in discussions with existing shareholders and other potential

---

[1]    The foregoing amount is an approximation only and includes, without limitation, those unsecured claims against the Debtor which are subject to setoff, dispute, liquidation and/or may be contingent as of the date of the filing of this Motion.  The Debtor reserves all of its rights to dispute any and all claims included in this calculation.

investors about temporary financing for operations and new equity financing for working capital. The Debtor also engaged advisors to introduce it to potential investors.

42.     While it endeavored to raise funds, on March 31, 2009, the Debtor announced it would not be able to publish its Report and Accounts for the year ending September 30, 2008, as required by the AIM Rules. As a result, trading of the Debtor's common stock on the AIM market was suspended.

43.     Ultimately, due to its inability to raise new working capital, the Debtor began seeking out other strategic alternatives, including a merger or a sale of the Debtor's assets. In and after December 2008, the Debtor consulted with various advisors about marketing the company and seeking strategic alternatives to its financing problems..

44.     At the same time, the Debtor implemented cost saving measures to conserve working capital for continuing operations. For example, in April 2009, the Debtor made drastic cuts to its work force that affected 60 employees, and on July 13, 2009, the Debtor laid off all but essential staff. Additionally, the Debtor's Board of Directors ceased all salary payments to themselves as of January 2009 and the Debtor ceased payments to myself as Chief Executive Officer as of July 13, 2009, which cessation has continued through the Petition Date.

**Negotiation of Asset Purchase Agreement and Debtor-in-Possession Financing**

45.     By mid-July 2009, the Debtor had failed to raise working capital and began to prepare for a possible bankruptcy, while still searching for strategic alternatives, including a potential purchaser for its assets. Specifically, over the past six months, the Debtor has approached and been involved in preliminary talks with several parties, including suppliers of the Debtor and other parties with similar products and potential synergies, in its search for a potential purchaser. Certain parties showed interest and then would abruptly terminate their

discussions, while others continued to show interest and eventually put in bids for the Debtor's assets.

46.     In August, the Debtor began negotiations for the sale and purchase of its assets with GH Venture Partners, LLC ("**GHV**").  While negotiations with GHV continued, the Debtor received serious and viable expressions of interest from other parties.  Ultimately, the Debtor set September 2, 2009 at 5:00 p.m. as the deadline for all potential purchasers to submit final bids to act as a "stalking horse" purchaser for the Debtor's assets, and received bids from two entities, including GHV.  On September 3, 2009, and after consideration of all options, the Debtor's Board of Directors held a meeting and voted to accept GHV's bid to purchase the Business and Purchased Assets (as defined in the asset purchase agreement between the parties, described below) through New Vectrix, LLC (the "**Buyer**"), a Delaware limited liability company in which each of EVB, an affiliate of Gold Peak, and GHV hold interests, which was formed for the purpose of purchasing the Debtor's assets, as the best and highest bid.

47.     Once the Buyer had been chosen as the stalking horse bidder, the Debtor and the Buyer entered into further negotiations regarding the terms of the Buyer's proposed transaction documents, including the terms for the final asset purchase agreement and for provision of a debtor-in-possession loan from the Buyer, the amount of which would be considered fully repaid, to the extent drawn down upon, and credited against the purchase price as of the closing date under and pursuant to the asset purchase agreement executed by the parties on September 24, 2009 (the "**Purchase Agreement**").  Negotiations of the Purchase Agreement and the definitive loan documentation, both of which are further described below, continued with the Buyer up until the Petition Date.

### III.
### Summary of First-Day Motions

48.     The Debtor is filing, for the Court's approval, a number of motions and applications, which the Debtor believes are necessary to enable it to operate in chapter 11 and consummate an orderly and efficient sale of substantially all of its assets, including (i) a *Motion For Order (I) Authorizing Debtor to Obtain Interim Postpetition Financing and to Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); and (II) Modifying the Automatic Stay Pursuant to 11 U.S.C § 362; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "**DIP Financing Motion**"), and (ii) a *Motion of the Debtor for Orders (I)(A) Approving Sale of Certain of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests Pursuant to Sections 105, 363(b), (f), and (m) of the Bankruptcy Code, and (B) Authorizing the Assumption, Assignment, and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Sections 363 and 365 of the Bankruptcy Code; (II) Approving Bidding Procedures, Break-Up Fee, and Other Protections in Advance of Sale; and (III) Granting Related Relief* (the "**Sale Motion**").  The Debtor respectfully requests that the relief sought in each of these motions and other First Day Motions be granted.   A description of the relief requested and the facts supporting each of the pleadings filed contemporaneously herewith is set forth below.

### A.     The Sale Motion

49.     In the Sale Motion, the Debtor seeks an order (i) approving the sale of certain of the Debtor's assets (the "**Purchased Assets**"), free and clear of all liens, claims, encumbrances, and other interests, except as explicitly provided for in the Purchase Agreement, pursuant to sections 105, 363(b), (f), and (m) of the Bankruptcy Code; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases pursuant to sections 365 of the

Bankruptcy Code; and (iii) approving the Debtor's proposed bidding procedures, break-up fee, and other protections in advance of the sale.

50.　　Specifically, the Debtor seeks approval of the sale of the Purchased Assets in exchange for an aggregate purchase price of approximately $5,056,000.00 (the "**Purchase Price**"), consisting of (i) cash consideration in the amount of $1,750,000.00, including a credit bid for the amounts drawn-down under the DIP Loan (as defined below) as of the Closing Date (as defined in the Purchase Agreement), release of a $200,000 good faith deposit made by the Buyer pursuant to the Purchase Agreement, and cash to be delivered on the closing date of the sale, and (ii) the assumption of certain of the Debtor's liabilities in an aggregate amount of up to $3,306,000.00, including without limitation, up to $2,000,000 in warranty liability for the Debtor's products sold pre-petition by the Debtor (the "**Warranty Cap**") and all cure amounts associated with any Assigned Contracts (as defined in the Purchase Agreement).  Any remaining pre-petition debt, including any amounts above and beyond the Warranty Cap for products sold pre-petition, will remain as claims against the Debtor's estate.   The principal terms of the Purchase Agreement are further summarized and highlighted in the Sale Motion.

51.　　A quick sale of the Business and substantially all of the assets of the Debtor Business is necessary to maximize available value for the benefit of all creditors and parties in interest.  The Debtor anticipates that the estate will quickly run out of money and that the value of the Purchased Assets will rapidly diminish if a sale is not quickly consummated.  Thus, the Debtor believes that the competitive bidding process for and sale of the Purchased Assets must take place on an expedited schedule to ensure that the value thereof is maximized, and that value will be maximized by closing the sale of the Purchased Assets on the terms proposed in the Purchase Agreement.

**B.    The DIP Financing Motion**

52.     In the DIP Financing Motion, the Debtor seeks, pursuant to sections 105(a), 361, 362, 364, and 507 of the Bankruptcy Code, an order authorizing the Debtor to (i) enter into a senior secured superpriority debtor-in-possession term loan in the aggregate principal amount of $300,000 (the "**DIP Loan**") substantially on the terms set forth in the Secured Super-Priority Debtor-in-Possession Credit Agreement between the Debtor and New Vectrix LLC (the "**DIP Loan Agreement**" and, together with any and all schedules thereto and other related documents and agreements entered into in connection with or related to the DIP Loan, the "**DIP Documents**"), and (ii) continue its use of cash on hand to fund the administration of its bankruptcy case post-petition.

53.     The DIP Loan Agreement will provide the Debtor with up to $300,000 in additional liquidity to fund operations and the administration of the bankruptcy case through the closing date on the sale of the Debtor's assets.   The Debtor requires working capital financing, beyond the small amount of cash available to it from current operations, in order to preserve and maintain its Business during the bankruptcy case.   Without access to post-petition financing, the Debtor will be unable to operate the Business as a going concern, which would, in turn, significantly impair the value of the Debtor's assets and jeopardize the Debtor's ability to sell its assets pursuant to the Sale Motion to the detriment of all creditor constituencies.

54.     Pursuant to the DIP Documents, the Debtor will use the proceeds of the DIP Loan to pay fees and expenses related to the bankruptcy case, to provide working capital to the Debtor and for other general corporate purposes of the Debtor as set forth in the Debtor's proposed DIP Budgets (as defined in the DIP Motion).   In exchange, the Buyer will receive a valid and perfected first-priority lien on all Collateral, which includes (each as defined in the DIP Loan Agreement) (i) all Documents; (ii) all Equipment; (iii) all Intellectual Property, subject to certain

conditions outlined in the DIP Loan Agreement; (iv) all Inventory; (v) all Goods; (vi) all books and records pertaining to the collateral; and (vii) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing. Additionally, all of the Debtor's obligations under the DIP Documents constitute allowed super-priority administrative expense claims in the bankruptcy case with priority over all administrative expenses other than the Carve-Outs (as defined in the DIP Documents).

55.    In making the decision to sell its assets and seek financing as a part of that transaction, the Debtor considered many factors. First, in order to complete a sale of its assets and create value for the Debtor's creditors, the Debtor needs financing, The only parties willing to discuss and negotiate the terms of financing for the continued operation of the Debtor's Business and to fund the administration of a bankruptcy case so as to preserve value for creditors were those parties who had an interest in purchasing the Debtor's assets. Prior to and simultaneously with exploring the possibility of selling its assets, the Debtor sought additional financing without having to sell assets. The Debtor was not able to secure any such "stand-alone" financing. Second, the Debtor was unable to obtain alternative post-petition financing proposals from other lenders that were not required to be treated as administrative expenses or through credit on an unsecured basis or secured by liens on the Debtor's assets junior to any pre-petition liens. As such, the Debtor does not believe that any lender would be willing to loan new money to the Debtor other than on terms similar to (or worse than) those contained in the DIP Loan Agreement.

56.    The Debtor believes that a consensual DIP Loan with the proposed Buyer will save expense, time, and costly valuation litigation at the outset of this chapter 11 case, thereby

allowing the Debtor to preserve value and focus on the sale of its assets in an effort to provide a distribution to those creditors who are not otherwise satisfied as part of the assumption of liabilities by the Buyer pursuant to the Purchase Agreement. It is vital to the success of the bidding process outlined under the Sale Motion and confirmation of a plan that the Debtor obtain approval to immediately access the DIP Loan, on an interim and final basis, as contemplated by the DIP Loan Agreement. As such, the Debtor believes that the DIP Loan offered by the Buyer as part of its overall bid for the Debtor's assets is the best and only option for post-petition financing.

## C. The Utilities Motion

57.     In the *Debtor's Motion for Interim and Final Orders Pursuant to Sections 366 and 105(a) of the Bankruptcy Code for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving Debtor's Proposed Form of Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Objections by Utility Companies* (the **"Utilities Motion"**), the Debtor seeks, pursuant to sections 366 and 105(a) of the Bankruptcy Code, entry of interim and final orders (i) approving the Debtor's proposed adequate assurance for payment of post-petition Utility Services (defined below); (ii) establishing procedures for resolving objections raised by Utility Companies (defined below) relating to the adequacy of the proposed adequate assurance; and (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtor solely on the basis of the commencement of this chapter 11 case or a debt that is owed by the Debtor for services rendered prior to the Petition Date.

58.     In connection with the operation of its business, the Debtor obtains electricity, natural gas, oil, water, telephone, trash collection and other utility services (collectively, the **"Utility Services"**) from a number of companies (collectively, the **"Utility Companies"**, and

each, a "**Utility Company**"). The Debtor intends to pay all post-petition obligations owed to the Utility Companies in a timely manner and anticipates sufficient funds from its proposed debtor-in-possession financing available to permit it to do so.

59.     In the Utilities Motion, the Debtor proposes to provide adequate assurance of payment to each Utility Company in the form of a cash deposit (the "**Adequate Assurance Deposit**") that equals two weeks of Utility Services, calculated based on the historical average over the past 12 months (the "**Estimated Usage Amount**"). The Debtor's Estimated Usage Amounts are based on an average of each Utility Company's bills during the past twelve months, which were typical of the semi-monthly expenses generally incurred by the Debtor. The Debtor proposes to provide an Adequate Assurance Deposit to each Utility Company on or before October 28, 2009, which date is thirty days after the Petition Date, provided that the Utility Company is not currently paid in advance for its Utility Services.

60.     The Debtor respectfully asserts that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services in the ordinary course of business under the proposed DIP Loan (collectively, the "**Proposed Adequate Assurance**"), constitutes adequate assurance of payment. As such, the Debtor proposes that any Utility Company not satisfied with the Proposed Adequate Assurance be required to object to the Utilities Motion. The Debtor will negotiate with any Utility Company that timely files an objection, but if the Debtor and the objecting Utility Company cannot resolve any objection prior to the hearing set by the Court on the Utility Motion, the Debtor proposes that the Court determine the adequacy of the Proposed Adequate Assurance to such Utility Company at the final hearing on the Utilities Motion.

61.     Upon entry of a final order granting the relief sought in the Utilities Motion, the Debtor requests that any Utility Company that failed to timely file an objection to the Motion, will (i) be deemed to have been provided with adequate assurance of payment as required by section 366 of the Bankruptcy Code, and (ii) be prohibited from discontinuing, altering, or refusing to provide Utility Services, including as a result of any unpaid charges for pre-petition Utility Services or the Debtor's failure to provide additional adequate assurance of payment other than the Adequate Assurance Deposit.

## D.     **The Employee Wage Motion**

62.     In the *Debtor's Motion for an Order (I) Authorizing the Debtor to Pay Certain PrePetition Wages, Expense Reimbursements and Related Items, and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Funds Transfer Requests Made by the Debtor* (the "**Employee Wage Motion**"), the Debtor seeks, pursuant to sections 105(a) and 507(a)(4) of the Bankruptcy Code, an order (i) authorizing, but not directing, the Debtor to pay prepetition employee wages, expense reimbursements and related items, as applicable, and (ii) directing any of the Debtor's banks and other financial institutions to honor and pay all checks, transfers and any other payment requests with respect to the foregoing.

63.     As of the Petition Date, the Debtor had only two employees: (i) Mr. John McGuinness, Chief Financial Officer, and (ii) Mr. Dana Decosta, employed to maintain the Debtor's remaining inventory (the "**Employees**").   The Employees possess the knowledge, experience and skills necessary to support the Debtor's business and inventory during the chapter 11 process and to complete the sale of substantially all of the Debtor's assets pursuant to the Sale Motion.

64.     Mr. McGuinness possesses knowledge of the Debtor's business and records which is integral to the sale of the Debtor's assets, and is being asked to commit his time and energy to the Debtor's sale efforts and to maintaining the Debtor's business during the pendency of the Debtor's bankruptcy case for the benefit of all of the Debtor's creditors.

65.     Mr. Decosta is charged with maintaining the Debtor's inventory, a valuable asset of the Debtor's estate, in order to maximize its value for the benefit of all of the Debtor's creditors as an asset being conveyed pursuant to the Purchase Agreement.  Specifically, because the inventory is comprised of electric vehicles which are required to be charged in order to operate, Mr. Decosta provides a necessary and vital service to the Debtor.

66.     In the ordinary course of business, the Debtor incurs payroll obligations to the Employees for the performance of services.  The Debtor remits salary to the Employees bi-weekly every other Wednesday for the two-week pay period ending on the previous Friday.  The Debtor is also required by law to (i) withhold from an Employee's wages amounts related to federal, state and local taxes, social security and Medicare taxes (collectively, the **"Taxes"**); (ii) match from its own funds the social security and Medicare taxes, together with additional amounts for state and federal unemployment insurance calculated thereon (collectively, the **"Employer Payroll Taxes**," and together with the Taxes, the **"Payroll Taxes"**); and (iii) remit the Payroll Taxes to the appropriate taxing authorities.

67.     The Debtor uses the services of Automatic Data Processing, Inc. (**"ADP"**), its payroll processor, to satisfy its payroll obligations to the Employees and to pay the Payroll Taxes.  Specifically, the Debtor calculates the gross payroll due to the Employees and informs ADP of such payroll obligations for a given pay period.  Thereafter, ADP calculates the Taxes due and remits the net payroll obligations to the Employees from the Debtor's deposit account at

Bank of America. ADP then withdraws the requisite payments for Taxes and Employer Payroll Taxes, based on its calculations, from the Debtor's deposit account and remits them to the appropriate taxing authorities. The Debtor pays ADP a monthly fee for its services, which is directly deducted by ADP from the Debtor's deposit account.

68. Prior to the Petition Date, the Debtor, in the ordinary course of business, maintained various plans and policies to provide employees with paid time off, as well as medical, dental, vision, life, long term disability and accidental death and dismemberment insurance. Each of these plans and policies were terminated prior to the Petition Date, except for the Debtor's 401(k) plan, which was in the process of termination prior to the Petition Date. The Debtor will continue the process of terminating its 401(k) plan pursuant to the Bankruptcy Code and/or applicable law as part of the bankruptcy process.

69. On September 30, 2009, payroll will be due for the pay period September 14, 2009 through and including September 25, 2009 (the **"Prepetition Payroll Obligation"**). The Debtor estimates that its outstanding gross Prepetition Payroll Obligation will total $8,125.00, which is comprised of $7,067 in gross payroll to be paid to Employee John McGuinness, and $1,058 in gross payroll to be paid to Employee Dana Decosta.

70. In the ordinary course of business, the Debtor also reimburses the Employees for actual, reasonable and proper business and travel expenditure incurred in the normal course of their employment (the **"Reimbursable Expenses"**). The Debtor believes that there are no Reimbursable Expenses outstanding for the prepetition period.

71. In order to avoid any disruption to the sale process and to maximize return for all creditors and ensure a plan can be proposed and confirmed subject to Court approval, it is critical that the Debtor be authorized to pay each of the Employees all compensation amounts that have

been earned up to the Petition Date and continue to pay the Employees all compensation amounts due post-petition in the ordinary course of business and on an uninterrupted basis. If amounts owed are not paid, it may become difficult to induce the Employees to continue working for the Debtor, and the bankruptcy process could be severely disrupted and frustrated.

E.    **The Insurance Obligation Motion**

72.    In the *Debtor's Motion for an Order (I) Authorizing the Debtor to Pay Certain Prepetition Insurance Policy Premiums, and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Funds Transfer Requests Made by the Debtor* (the "**Insurance Obligation Motion**"), the Debtor seeks, pursuant to sections 105(a) and 503(b)(1) of title 11 of the Bankruptcy Code, for entry of an order (i) authorizing, but not directing, the Debtor to pay prepetition insurance policy premiums, and (ii) directing any of the Debtor's banks and other financial institutions to honor and pay all checks, transfers and any other payment requests with respect to the foregoing.

73.    In connection with the operation of its business, the Debtor maintains various property, casualty, and management liability related insurance programs, which provide the Debtor with insurance coverage for liabilities relating to, among other things, general commercial claims, property damage, automobile damage, general foreign liability, directors' and officers' liability, fiduciary liability, employers' liability, excess umbrella, and various other product and property related and general liabilities (collectively, the "**Insurance Policies**") through several insurance companies (the "**Insurance Companies**", and each, an "**Insurance Company**").

74.    The Debtor is required to pay premiums under the Insurance Policies based upon fixed rates established by the applicable Insurance Company (the "**Insurance Premium Obligations**"). In most instances, the Debtor pays the Insurance Premium Obligations annually

at the commencement of the respective policies. As of the Petition Date, except as described below, the Debtor is not aware of any outstanding Insurance Premium Obligations due under the Insurance Policies.

75. The Debtor maintains an excess umbrella policy with Chubb Group of Insurance Companies under policy number 79932481, which expires on April 26, 2010 (the "**Umbrella Policy**"). The Debtor is required to pay premiums under the Umbrella Policy quarterly at the commencement of each upcoming quarter. On July 26, 2009, the quarterly premium payment for the quarter August 2009 through and including October 2009 became due (the "**Prepetition Insurance Premium Obligation**"). The Prepetition Insurance Premium Obligation totals an aggregate amount not less than $27,807.73. Although the continuation of the Umbrella Policy is essential to the operation of the Debtor's business, the Debtor did not have sufficient working capital to pay the Prepetition Insurance Premium Obligation prior to the Petition Date.

76. Additionally, on October 1, 2009, several of the Insurance Policies will expire unless the Debtor pays the Insurance Premium Obligations under such policies. The Debtor intends to pay such post-petition Insurance Premium Obligations in the ordinary course of business, and in accordance with pre-petition practice.

77. The successful sale of the Debtor's business depends on the retention of the Insurance Policies during this critical time in the Debtor's chapter 11 case. The Insurance Policies protect the Debtor's assets and provide the Debtor with insurance coverage for liabilities relating to, among other things, general commercial claims, property damage, automobile damage, general foreign liability, directors' and officers' liability, fiduciary liability, employers' liability, excess umbrella, and various other product and property related and general liabilities.

Moreover, the maintenance of the Insurance Policies is necessary to ensure the Debtor complies with the covenants under the Purchase Agreement.

78.     The Debtor respectfully asserts that in order to avoid any violation of the Purchase Agreement or disruption to the sale process, to maximize return for all creditors and to ensure a plan can be proposed and confirmed subject to Court approval, it is critical that it be authorized to pay the undisputed Prepetition Insurance Premium Obligation as requested in the Insurance Obligation Motion (and continue to pay the Insurance Premium Obligations post-petition) in the ordinary course of business and on an uninterrupted basis.  If the Prepetition Insurance Premium Obligation is not paid as soon as possible, the Debtor's Umbrella Policy may be terminated, exposing the Debtor to liability and jeopardizing the Debtor's sale process.

**F.     The Sheppard Mullin Retention Application**

79.     In the *Application of the Debtor Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014(a) for an Order Authorizing the Retention and Employment of Sheppard, Mullin, Richter & Hampton LLP as Counsel for the Debtor Effective as of the Petition Date* (the **"Sheppard Mullin Retention Application"**), the Debtor seeks, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Rule 2014 of the Bankruptcy Rules, an order authorizing the retention and employment of Sheppard, Mullin, Richter & Hampton LLP (**"Sheppard Mullin"**) as Debtor's bankruptcy counsel in connection with the commencement and prosecution of its chapter 11 bankruptcy case, for the duration of the Debtor's bankruptcy case.

80.     Specifically, the Debtor requires Sheppard Mullin to render the following types of professional services as the Debtor's general insolvency counsel:

      a.     To advise the Debtor regarding matters of bankruptcy law, including the rights, power and duties of the Debtor with regard to its assets and with respect to the claims of its creditors;

b.     To advise and assist the Debtor with respect to compliance with the requirements of the United States Trustee;

c.     To advise the Debtor concerning the requirements of the Bankruptcy Code and the applicable federal and local rules, and their effect on the Debtor, its estate and its operations;

d.     To represent the Debtor in any proceedings or hearings before the Bankruptcy Court and in any action in any other court where the Debtor's rights under the Bankruptcy Code may be litigated or affected;

e.     To conduct examinations of witnesses, claimants, or adverse parties, if necessary;

f.     To prepare and assist in the preparation of motions, applications, orders, reports, accounts, and other pleadings related to the Debtor's chapter 11 case;

g.     To represent the Debtor in all negotiations and proceedings involving the Debtor, its property, its creditors, and other parties-in-interest;

h.     To assist the Debtor in the formulation, negotiation, confirmation, and implementation of a chapter 11 plan;

i.     To assist the Debtor with an auction or sale of its assets;

j.     To make any court appearances on behalf of the Debtor; and

k.     To take such other action and perform such other services as the Debtor may require of Sheppard Mullin in connection with this chapter 11 case.

81.     The Debtor does not anticipate any duplication of the services to be rendered to it by Sheppard Mullin and the services rendered and to be rendered to the Debtor by any of the Debtor's other bankruptcy, special or other professionals retained in this bankruptcy case, including without limitation, the services provided by Debtor's proposed Delaware counsel, Bifferato Gentilotti LLC ("**Bifferato Gentilotti**").  It may, however, be necessary from time to time for Sheppard Mullin to coordinate its efforts with these professionals.

82.     The Debtor understands that Sheppard Mullin intends to charge the Debtor for the services rendered in this chapter 11 case based on its current hourly rates for such services.  The current scheduled hourly rates for Sheppard Mullin attorneys generally ranges from $285.00 to

$815.00, and $100.00 to $300.00 for paraprofessionals. The Debtor understands that these hourly rates are Sheppard Mullin's current guideline hourly rates, and are set at a level designed to fairly compensate Sheppard Mullin for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses. The Debtor understands that Sheppard Mullin is being retained on reasonable terms and conditions, and on the same terms and conditions as those agreed upon and charged by Sheppard Mullin to other clients on a daily basis in a competitive market.

83. The Debtor also understands that, in addition to Sheppard Mullin's professional fees, Sheppard Mullin's billing statements will include charges for reasonable and necessary third-party and staff services employed in the course of its representation of the Debtor, as well as expenses incurred with respect to postage, messenger services, photocopying, filing fees, travel, computerized legal research, and facsimile transmission. The Debtor shall reimburse Sheppard Mullin for such direct expenses incurred in connection with Sheppard Mullin's retention in this chapter 11 case and the performance of the services set forth in the Engagement Letter (as defined in the Sheppard Mullin Retention Application), subject to Court approval.

84. Based upon the Declaration of Edward H. Tillinghast, III, a partner of Sheppard Mullin, dated September 28, 2009 (the **"Tillinghast Declaration"**), the Debtor believes that Sheppard Mullin is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code. To the best of the Debtor's knowledge, other than as discussed in the Debtor's application to retain Sheppard Mullin and the Tillinghast Declaration, Sheppard Mullin and all of the attorneys comprising or employed by it are disinterested persons who do not hold or represent an interest adverse to the estate and who do not have any connection either with the Debtor, its creditors, or any other party-in-interest in this case or with their respective attorneys or accountants, or with any judge

of the United States Bankruptcy Court for the District of Delaware or any person employed in the Office of the United States Trustee.

85. According to the Tillinghast Declaration, Sheppard Mullin has represented certain creditors of the Debtor in matters unrelated to the Debtor. The Debtor believes that Sheppard Mullin's current or prior representation of these creditors or parties-in-interest in matters unrelated to the Debtor does not create a conflict with respect to its current representation of the Debtor. The Debtor further believes that representation of such parties who are adverse, or potentially adverse, to its creditors does not create a conflict with respect to Sheppard Mullin's representation of the Debtor.

86. Given the numerous issues that Sheppard Mullin may be required to address in the performance of its services hereunder, Sheppard Mullin's commitment to the variable level of time and effort necessary to address all such issues as they arise and the market prices for Sheppard Mullin's services for engagements of this nature, the Debtor believes that the terms and conditions of the Engagement Letter (as defined in the Sheppard Mullin Retention Application) and the current rates as provided for therein, are fair, reasonable and market-based, and that the retention and employment of Sheppard Mullin is necessary and appropriate, and in the best interests of the Debtor, its estate, and its creditors.

## G.     The Bifferato Gentilotti Retention Application

87. In the *Application of the Debtor Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014(a) for an Order Authorizing the Retention and Employment of Bifferato Gentilotti LLC as Delaware Counsel for the Debtor Effective as of the Petition Date* (the **"Bifferato Gentilotti Retention Application"**), the Debtor seeks, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Rule 2014 of the

Bankruptcy Rules, an order authorizing the retention and employment of Bifferato Gentilotti as Debtor's Delaware counsel.

88.     Specifically, the Debtor requires Bifferato Gentilotti to render the following types of professional services as the Debtor's Delaware counsel:

      a.     To advise the Debtor concerning the requirements of the Local Rules, and their effect on the Debtor, its estate and its operations;

      b.     To represent the Debtor in any proceedings or hearings before the Bankruptcy Court;

      c.     To assist the Debtor's bankruptcy counsel, Sheppard, Mullin, in the filing of motions, applications, orders, reports, accounts, and other pleadings related to the Debtor's chapter 11 case; and

      d.     To take such other action and perform such other services as the Debtor may require of Bifferato Gentilotti in connection with this chapter 11 case.

89.     The Debtor does not anticipate any duplication of the services to be rendered to it by Bifferato Gentilotti and the services rendered and to be rendered to the Debtor by its bankruptcy counsel, Sheppard Mullin, or any of the Debtor's other bankruptcy, special or other professionals retained in this bankruptcy case.  It may, however, be necessary for Bifferato Gentilotti to coordinate its efforts with the Debtor's other professionals, including Sheppard Mullin, in connection with the role of Bifferato Gentilotti as Debtor's Delaware counsel.

90.     The Debtor understands that Bifferato Gentilotti intends to charge the Debtor for the services rendered in this chapter 11 case based on its current hourly rates for such services. The current scheduled hourly rates for Bifferato Gentilotti attorneys generally ranges from $175.00 to $325.00. The Debtor understands that these hourly rates are Bifferato Gentilotti's current guideline hourly rates, and are set at a level designed to fairly compensate Bifferato Gentilotti for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses.  The Debtor understands that Bifferato Gentilotti is being retained on reasonable terms

and conditions, and on the same terms and conditions as those agreed upon and charged by Bifferato Gentilotti to other clients on a daily basis in a competitive market.

91.     The Debtor understands that, in addition to Bifferato Gentilotti's professional fees, Bifferato Gentilotti's billing statements will include charges for reasonable and necessary third-party and staff services employed in the course of its representation of the Debtor, as well as expenses incurred with respect to postage, messenger services, photocopying, filing fees, travel, computerized legal research, and facsimile transmission.  The Debtor shall reimburse Bifferato Gentilotti for such direct expenses incurred in connection with Bifferato Gentilotti's retention in this chapter 11 case and the performance of the services set forth in the Engagement Letter  (as defined in the Bifferato Gentilotti Retention Application), subject to Court approval.

92.     Based upon the Declaration of Garvan F. McDaniel, a member of Bifferato Gentilotti, dated September 28, 2009 (the "**McDaniel Declaration**"), the Debtor believes that Bifferato Gentilotti is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.  To the best of the Debtor's knowledge, Bifferato Gentilotti and all of the attorneys comprising or employed by it are disinterested persons who do not hold or represent an interest adverse to the estate and who do not have any connection either with the Debtor, its creditors, or any other party-in-interest in this case or with their respective attorneys or accountants, or with any judge of the United States Bankruptcy Court for the District of Delaware or any person employed in the Office of the United States Trustee for the District of Delaware.   The Debtor believes that Bifferato Gentilotti's representation of any parties who are adverse, or potentially adverse, to its creditors does not create a conflict with respect to Bifferato Gentilotti's representation of the Debtor.

93.     Given the numerous issues that Bifferato Gentilotti may be required to address in the performance of its services hereunder, Bifferato Gentilotti's commitment to the variable level of time and effort necessary to address all such issues as they arise and the market prices for Bifferato Gentilotti's services for engagements of this nature, the Debtor believes that the terms and conditions of the Engagement Letter (as defined in the Bifferato Gentilotti Retention Application) and the current rates as provided for herein, are fair, reasonable and market-based, and that the retention and employment of Bifferato Gentilotti is necessary and appropriate, and in the best interests of the Debtor, its estate, and its creditors.

I respectfully request that the Court grant all relief requested in the First-Day Motions and such other and further relief as may be just.

Dated:    September 28, 2009

Michael J. Boyle
President and Chief Executive Officer,
Vectrix Corporation