| | |
|---|---|
| In re: | Chapter 11 |
| VECTRIX CORPORATION, | Case No. 09-13347 |
| Debtor. | Hearing Date: TBD<br>Objection Deadline: TBD |

**MOTION OF THE DEBTOR FOR ORDERS (I)(A) APPROVING SALE OF
CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS PURSUANT TO
SECTIONS 105, 363(b), (f), AND (m) OF THE BANKRUPTCY CODE, AND
(B) AUTHORIZING THE ASSUMPTION, ASSIGNMENT, AND SALE OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT
TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE; (II) APPROVING
BIDDING PROCEDURES, BREAK-UP FEE, AND OTHER PROTECTIONS IN
ADVANCE OF SALE; AND (III) GRANTING RELATED RELIEF**

Vectrix Corporation, the above-captioned debtor and debtor-in-possession (the "**Debtor**" or "**Seller**"), by and through its undersigned counsel, hereby moves the Court (the "**Motion**") for entry of an order (i) approving the sale of certain of the Debtor's assets (the "**Purchased Assets**"), free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), and (m) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), except as explicitly provided herein; (ii) authorizing the assumption, assignment, and sale of certain executory contracts and unexpired leases pursuant to sections 363 and 365 of the Bankruptcy Code; (iii) approving bidding procedures, break-up fee, and other protections in advance of sale; and (iv) granting related relief. In support of this Motion, the Debtor respectfully states as follows:

## Jurisdiction and Venue

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. § 1408.  This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief sought herein are sections 105, 363, and 365 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## Background

3.      On the date hereof (the "**Petition Date**"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 the Bankruptcy Code.

4.      The Debtor has continued in possession of its properties and is operating and managing its businesses as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

6.      The Debtor is a public entity incorporated in the State of Delaware, with offices in Middletown, Rhode Island, and an engineering and testing facility in New Bedford, Massachusetts.  The Debtor is engaged, directly and through its affiliates, in developing, inventing, manufacturing, testing, assembling and selling mechanical and electronic, high performance, zero emission, power, two-wheel electric vehicles (the "**Products**"), which are then used, sold, leased or otherwise distributed to dealers in domestic and international markets for resale (the "**Business**").

7.      The Debtor is also the sole shareholder of Vectrix Europe Limited, an Irish company ("**Vectrix Ireland**"), which in turn holds interests in various other foreign affiliates,

including Vectrix Europe S.r.l., Vectrix Roma S.r.l., Vectrix Europe Ltd. (f/k/a Vectrix (UK) Limited), and Vectrix Sp. z.o.o., each of which plays a role in the manufacturing and development of the Products. These foreign direct and indirect subsidiaries are not a part of this chapter 11 bankruptcy case.

8.      In connection with this bankruptcy case and this Motion, the Debtor is seeking debtor-in-possession financing under, and subject to Court approval of, the *Debtor's Motion for Order (I) Authorizing Debtor to Obtain Interim Postpetition Financing and to Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c) and 364(d); (II) Modifying the Automatic Stay Pursuant to 11 U.S.C § 362; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "**DIP Financing Motion**"), filed contemporaneously herewith.

9.      A more detailed factual background of the Debtor's businesses and operations, as well as the facts and circumstances underlying the commencement of this chapter 11 case, is more fully set forth in the *Declaration of Mike Boyle in Support of the Debtor's Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## The Asset Purchase Agreement

10.      The Debtor has determined that an expeditious sale of the operating assets of the Debtor's Business is necessary to maximize available value, and that a reorganization is not a viable option due to the Debtor's liquidity constraints and failing business model.

11.      As outlined in the First Day Declaration, when the Debtor began experiencing a significant lack of working capital resulting from an unexpected decline in sales, challenging market conditions and a difficulty in raising additional capital, the Debtor had to accelerate its next round of fund raising. Starting in 2008, the Debtor explored funding alternatives and found

banks reluctant to offer any form of trade financing or finance alternatives to emerging companies like the Debtor. Unable to raise funds through loans, the Debtor decided that additional equity capital was necessary to its refinancing success. Thus, throughout 2009, the Debtor made efforts to secure new equity funding, while also pursuing government-based loan or grant support. The Debtor engaged in discussions with existing shareholders and other potential investors about temporary financing for operations and new equity financing for working capital. The Debtor also engaged advisors to introduce it to potential investors.

12.     While the Debtor endeavored to raise funds, on March 31, 2009, the Debtor announced it would not be able to publish its Report and Accounts for the year ending September 30, 2008, as required by the AIM Rules for Companies and Nominated Advisers for the AIM, the London Stock Exchange's international market for smaller, growing companies. Accordingly, trading of the Debtor's common stock on the AIM market was suspended.

13.     Ultimately, due to its inability to raise new working capital, the Debtor began seeking out other strategic alternatives, including a merger or a sale of the Debtor's assets. In and after December 2008, the Debtor consulted with various advisors about marketing the company and seeking strategic alternatives to its financing problems.

14.     At the same time, the Debtor implemented cost saving measures to conserve working capital for continuing operations. For example, in April 2009, the Debtor made drastic cuts to its work force that affected 60 employees and on July 13, 2009, the Debtor laid off all but essential staff. Additionally, the Debtor's Board of Directors ceased all salary payments to themselves as of January 2009 and the Debtor ceased payments to its Chief Executive Officer as of July 13, 2009, which cessation has continued through the Petition Date.

15.    By mid-July 2009, the Debtor had failed to raise working capital and began to prepare for a possible bankruptcy, while still searching to strategic alternatives, including a potential purchaser for its assets.   Specifically, over the past six months, the Debtor has approached and been involved in preliminary talks with several parties, including suppliers of the Debtor and other parties with similar products and potential synergies, in its search for a potential purchaser.   Certain parties showed interest and then would abruptly terminate their discussions, while others continued to show interest and eventually put in bids for the Debtor's assets.

16.    In August, the Debtor began negotiations for the sale and purchase of its assets with GH Venture Partners, LLC ("**GHV**").  While negotiations with GHV continued, the Debtor received serious and viable expressions of interest from other parties.  Ultimately, the Debtor set September 2, 2009 at 5:00 p.m. as the deadline for all potential purchasers to submit final bids to act as a "stalking horse" purchaser for the Debtor's assets, and received bids from two entities, including GHV.   On September 3, 2009, and after consideration of all options, the Debtor's Board of Directors held a meeting and voted to accept GHV's bid to purchase the Business and Purchased Assets (as defined in the asset purchase agreement between the parties, described below) through New Vectrix, LLC (the "**Buyer**"), a Delaware limited liability company, in which EVB Technology (HK) Limited, an affiliate of Gold Peak Industries (Holdings) Limited, and GHV hold interests, and which was formed for the purpose of purchasing the Debtor's assets, as the best and highest bid.

17.    Once Buyer had been chosen as stalking horse bidder, the Debtor and Buyer entered into further negotiations regarding the terms of Buyer's proposed transaction documents, including the terms for the final asset purchase agreement and for provision of a debtor-in-

possession loan from Buyer, the amount of which would be considered fully repaid, to the extent drawn down upon, and credited against the purchase price as of the closing date under and pursuant to the asset purchase agreement executed by the parties on September 24, 2009 (the "**Purchase Agreement**").  Negotiations of the Purchase Agreement and the definitive loan documentation (collectively, the "**DIP Loan Agreement**" and, together with any and all schedules thereto and other related documents and agreement entered in connection with or related to the DIP Loan Agreement, the "**DIP Documents**") in connection with the debtor-in-possession loan in the aggregate amount of $300,000 (the "**DIP Loan**") continued with Buyer up until the Petition Date.  A copy of the fully executed Purchase Agreement is attached as hereto as Exhibit A and is incorporated herein by reference.

18.     Other than secured debt on and in connection with certain vehicles, machinery and other discrete assets, the Debtor has no outstanding pre-petition secured loan facilities and no other secured debt.  In addition, and without limiting the generality of the foregoing, there are no pre-petition liens or other encumbrances, including security interests held by any party, in or to any of the Debtor's cash, deposit account or other operational accounts.

19.     The Debtor anticipates that the estate will quickly run out of money and that the value of the Purchased Assets will rapidly diminish if a sale is not quickly consummated.  Thus, the Debtor believes that the competitive bidding process for and sale of the Purchased Assets must take place on an expedited schedule to ensure that the value thereof is maximized.  The Debtor has negotiated with Buyer as lender under the DIP Loan Agreement and pursuant to the Purchase Agreement to present this Motion on a consensual basis in order to expedite this process and achieve the highest value possible for creditors.

20.    The principal terms of the Purchase Agreement are summarized and highlighted as follows:[1]

| (A) **Transaction**: | The Buyer would acquire certain assets of the Seller as defined in the Purchase Agreement. *See* Section 1.1 of the Purchase Agreement. |
| --- | --- |
| (B) **Purchase Price**: | The total consideration to be paid by Buyer under the Purchase Agreement is equal to approximately $5,056,045 (the "**Purchase Price**").  The Purchase Price is made up of cash consideration and the assumption of certain liabilities of the Seller.  The Cash Consideration to be paid to the Seller for the Purchased Assets shall be equal to $1,750,000, including a credit bid for the amounts drawn-down under the DIP Loan as of the sale closing date, release of the $200,000 Good Faith Deposit made by Buyer under the Purchase Agreement and cash to be delivered on the Closing Date thereunder.  In addition, the Buyer will assume specified pre-petition liabilities of up to $3,306,045, including without limitation, $2,000,000 in warranty liability for Products sold pre-petition by the Debtor and other liabilities thereunder. The Buyer shall also be responsible for all cure amounts pursuant to sections 365(f)(2) and 365(b)(1)(a) of the Bankruptcy Code associated with any Assigned Contracts (as defined in the Purchase Agreement).  Any remaining pre-petition debt, including any amounts above and beyond the Warranty Cap for Products sold pre-petition shall remain a claim against the Debtor's estate. *See* Sections 1.3 and 2.1 of the Purchase Agreement. |
| (C) **Purchased Assets**: | All of Seller's rights, title and interest in and to the following assets summarized below to the extent transferable, free and clear of all Encumbrances (as such term is defined in the Purchase Agreement), except for Assumed Liabilities thereunder and specifically excluding the Excluded Assets: |

---

[1]  To the extent there is any inconsistency between the description of the Purchase Agreement in this Motion and the terms of the Purchase Agreement itself, the Purchase Agreement shall control.  The principal terms set forth herein are highlighted in accordance with Rule 6004 of the Bankruptcy Rules and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

W02-EAST:7BXL1\200257799.1

(a) all of Seller's patents and patent applications, including but not limited to the patents and patent applications listed on Exhibit A thereto (the "**Patents**");

(b) all licenses (including all governmental registrations), permits and pending applications therefor, including but not limited to those listed in Schedule 1.1(b) thereto as such Schedule may be amended, revised or supplemented from time to time prior to the thirtieth day after the Closing Date (the "**Licenses**"), and all rights of Seller under express or implied warranties from suppliers or contractors with respect to the Purchased Assets;

(c) the contracts and leases and all rights pursuant thereto, designated by the Buyer for assumption and assignment to Buyer pursuant to section 365 of the Bankruptcy Code, which are set forth in Schedule 1.1(c) thereto as such Schedule may be amended, revised or supplemented from time to time prior to the thirtieth day after the Closing Date, including without limitation grant applications for technical and/or financial support with any governmental entity and various dealer contracts set forth thereon;

(d) all contracts or agreements (and all causes of action, claims, demands and rights ("**Claims**")) of Seller, whether arising on, before or after the Closing Date, between Seller, on the one hand, and any other person (including all former employees or consultants), on the other hand, relating to such other person's non-disclosure, non-competition and/or assignment of discoveries or inventions (such contracts, the "**NDA Contracts**"). The form of the NDA Contracts and the list of all persons who are parties to the NDA Contracts to be assigned to Buyer are set forth on Schedule 1.1(d) thereto as such Schedule may be amended, revised or supplemented from time to time prior to the thirtieth day after the Closing Date. The contracts, leases and licenses listed on Schedule 1.1(b), Schedule 1.1(c) and Schedule 1.1(d) therein, each as may be amended, revised or supplemented from time to time prior to the thirtieth day after the Closing Date are collectively referred to as the "**Assigned Contracts**";

(e) all of Seller's trademarks and trademark applications, trade names, and related websites and

URLs (collectively, the "**Trademarks**");

(f) the tools, machinery, furniture, fixtures, computer systems, trucks, trailers and other motor vehicles listed on Schedule 1.1(f) thereto (collectively, the "**Fixed Assets**");

(g) all inventories of any kind and nature of Seller, including work-in-progress, raw materials, spare parts, supplies, finished goods, packaging materials, samples and other material held for sale or use related to the operation of the Business and the Purchased Assets wherever located (collectively, "**Inventory**"), including the Inventory set forth on Schedule 1.1(g) thereto;

(h) all accounts receivable and other rights to payment from customers of Seller and the full benefit of all security for such accounts receivable or rights to payment, including those consisting of all accounts receivable in respect of goods shipped or products sold or services rendered to customers by Seller, any other miscellaneous accounts receivable of Seller, and any Claim of Seller related to any of the foregoing (the "**Accounts Receivable**");

(i) all rights of Seller to the funds deposited with Bank of America up to an amount securing Seller's repurchase obligations (the "**Bank of America Deposit**") as collateral security for the Letter of Credit (the "**Letter of Credit**") issued in support of the Floor Plan Financing Agreement, dated January 29, 2008, between the Seller and GE Commercial Distribution Finance Corporation (the "**Floor Plan Financing Agreement**"); and, in connection with any draw-down of the Letter of Credit by GE Commercial Distribution Finance Corporation, any resulting right of Seller to receive payment for, or to demand the return of, the Inventory that is the subject of the Letter of Credit, from all applicable dealers and other third parties; provided, however, that Seller and Buyer agree that the value of the Letter of Credit shall not be reduced below $1,475,000 prior to Closing, notwithstanding that additional amounts thereunder may become unrestricted in the ordinary course between the Execution Date and the Closing Date;

(j) all worldwide rights, title and interest of Seller in and to all Intellectual Property (as in the Purchase

Agreement), as well as all websites, motor vehicle code identifications, software programs and programming protocols and methods, databases and information and/or financial or enterprise management systems relating to the design, development, testing, manufacture, regulatory compliance, and sale and use of Systems or Products or otherwise relating to the Business, including, but not limited to, the source codes, scripts, HTML versions, disks, files and all of the text related thereto and the literary content thereof, and Seller's copyright ownership therein (collectively, the "**Software Assets**");

(k) the name "Vectrix" and any other legal names of Seller, together with copies of all books, tax returns, financial and other records and information which has been reduced to written, recorded or encoded form, including but not limited to those related to Warranty Claims, filings or applications made with any governmental agency relating to the Products being tested to comply with safety or environmental standards or Seller's authority to manufacture, sell or distribute Products in any jurisdiction; dealer lists and leads and originals (to the extent such originals are in Seller's possession or reasonable control) of all NDA Contracts, in each case to the extent related to the Purchased Assets, but in all cases excluding the Attorney Communications (collectively, the "**Books and Records**");

(l) all rights of Seller in the shares of capital stock in Vectrix Europe Limited (the "**Subsidiary Shares**");
(m) all Claims of Seller against third parties relating to warranties for the Inventory or any other Purchased Assets, regardless of whether such causes of action, claims, demands, rights, credits, and privileges arose prior to, on, or after the Closing Date (the "**Warranty Claims**");

(n) all Claims of Seller against third parties relating to the Purchased Assets arising prior to the Closing Date, which have not been asserted by Seller prior to the Closing Date (the "**Unasserted Claims**");

(o) all Claims of Seller (the "**Foreign Subsidiary Claims**"), whether arising on, before or after the Closing Date against any of Vectrix Europe Limited, Vectrix Europe S.r.l., Vectrix Roma S.r.l., Vectrix (UK) Limited, and Vectrix Sp. z.o.o. (the "**Polish**

<table>
<tr>
<td></td>
<td><strong>Subsidiary</strong>") (collectively, the "<strong>Foreign Subsidiaries</strong>"); provided, however, that Seller shall retain all rights and defenses under section 502(d) of the Bankruptcy Code with respect to any Claims which Seller could assert against any Foreign Subsidiary under chapter 5 of the Bankruptcy Code;

(p) all security deposits belonging to Seller and held by third parties in connection with the Purchased Assets and Assumed Liabilities;

(q) all rights to proceeds under all insurance policies of Seller relating to any Purchased Asset or Assumed Liability up to the amount of any damages incurred by Buyer in connection therewith; provided, however, that the Purchased Assets shall not include (i) any director and officer insurance policies of Seller or rights to proceeds thereof (except in connection with any damages incurred by Buyer with respect to any director or officer of Seller) or (ii) any rights to proceeds payable to Seller for matters arising prior to the Closing Date and not otherwise constituting an Assumed Liability hereunder (except to the extent Buyer incurs any losses related to product liability claims in connection with Purchased Assets produced, or products of the Seller sold, prior to the Closing Date, in which case, Buyer will be entitled to the proceeds thereof up to the amount of such losses); and

(r) all goodwill associated with the Business.

*See* Section 1.1 of the Purchase Agreement.</td>
</tr>
<tr>
<td>(D) <strong>Excluded Assets</strong>:</td>
<td>The Excluded Assets shall include:

(a) all cash and cash equivalents of Seller;

(b) all contracts of Seller other than the Assigned Contracts and the Floor Plan Financing Agreement;

(c) except for the Warranty Claims, the Unasserted Claims and the Foreign Subsidiary Claims, all Claims of Seller against third parties relating to Excluded Assets and Excluded Liabilities, or solely related to the Purchased Assets or to the extent related to the Assumed Liabilities that have already been asserted by Seller with respect to the Purchased Assets for periods prior to the Closing Date;

(d) any books and records of Seller (other than the Books and Records described in Section 1.1(k) of the</td>
</tr>
</table>

| | |
|---|---|
| | Purchase Agreement); |
| | (e) other than as may be related to and necessary for the ownership and maintenance of the Purchased Assets and/or relates to any Claims or actions in connection with any Assumed Liabilities, any communications between Seller and any of its attorneys that are subject to the attorney-client privilege and attorney work-product privilege (the "**Attorney Communications**"), including without limitation advice relating to bankruptcy or insolvency, the sale or other disposition of the Seller's assets, the Bankruptcy Case, the Auction, the Excluded Assets, the Purchased Assets and the Excluded Liabilities; provided, that the non-delivery to Buyer of any such Attorney Communications shall have no effect on Buyer's title to any Purchased Assets or on Buyer's ability to prosecute any claims that it may have relating to the Purchased Assets or Assumed Liabilities, or otherwise limit Buyer's defense against any claim asserted against it in connection with the Purchased Assets or Assumed Liabilities; |
| | (f) any assets owned by Seller that are unrelated to ownership of the Purchased Assets; |
| | (g) any tax refunds attributable to the Business for taxable years and periods ending on or prior to the Closing Date; and |
| | (h) all rights of Seller under the Purchase Agreement. |
| | (i) The Debtor is not selling and does not have any customer lists as it sells such Products through dealerships and not directly to consumers. |
| | *See* Section 1.2 of the Purchase Agreement. |
| (E) **Assumed Liabilities**: | Buyer shall assume from Seller and agree to pay, perform, discharge or otherwise satisfy, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following liabilities, responsibilities, obligations, costs and expenses of the Seller (collectively, but in all cases excluding the Excluded Liabilities, the "**Assumed Liabilities**"), and no others: |
| | (i) any registration fees relating to the renewal of the Patents; |
| | (ii) all liabilities, responsibilities, obligations, costs and expenses of Seller under the Assigned Contracts |

| | |
|---|---|
| | incurred from and after the Closing Date, including, but not limited to, those liabilities, obligations, costs and expenses arising from acts or omissions of Buyer from and after the Closing Date; |
| | (iii) the amounts required to be paid pursuant to sections 365(f)(2) and (b)(1)(A) of the Bankruptcy Code, in the amount set forth in Schedule 1.1(b), Schedule 1.1(c) and Schedule 1.1(d) of the Purchase Agreement for each Assigned Contract or as may be ordered by the Bankruptcy Court (the "**Cure Amounts**"); |
| | (iv) any liabilities and obligations of Seller relating to warranties for the Inventory or any other Purchased Assets whether existing and asserted or unasserted prior to, on or from and after the Closing Date, in an aggregate amount not to exceed $2,000,000 (the "**Warranty Cap**"); |
| | (v) all accounts payable listed on Schedule 1.3(a)(v) of the Purchase Agreement; |
| | (vi) any liabilities incurred in the ordinary course of Business that are identified in writing by the Buyer and notified to Seller three (3) business days prior to the Closing Date as liabilities that the Buyer wishes to assume in the ordinary course; and |
| | (vii) the obligation to make retention payments to Catherine Meier and John McGuinness pursuant to key employee retention agreements that are acceptable to Buyer in its sole discretion, in an aggregate amount not to exceed $110,000, as set forth on Schedule 1.3(a)(vii) to the Purchase Agreement (the "**KERP Payments**"). |
| | *See* Section 1.3 of the Purchase Agreement. |
| **(F) Excluded Liabilities**: | All liabilities other than Assumed Liabilities. Without limiting the generality of the preceding sentence, the Excluded Liabilities include (except to the extent constituting Assumed Liabilities): |
| | (i) liabilities, obligations and commitments for taxes of Seller (whether relating to the Purchased Assets or otherwise) and any and all taxes of any other person that Seller is liable for as a result of joint and several liability, transferee liability, successor liability, contractual liability, pursuant to any law, or otherwise; |
| | (ii) liabilities, obligations and commitments of Seller |

| | and its affiliates in respect of transaction costs with respect to this Agreement or the Proposed Transactions; |
|---|---|
| | (iii) except as otherwise provided in Section 3.6 of the Purchase Agreement, any taxes, fees, assessments, or similar costs of any kind arising out of, relating to, or in connection with the Purchase Agreement; |
| | (iv) subject to Section 1.3(a)(iv) of the Purchase Agreement, any claim of liability for injury or damage to person or property caused by the use or operation of products engineered, designed, manufactured, sold, installed, monitored, shipped, delivered or serviced by or on behalf of Seller prior to the Closing; |
| | (v) liabilities of Seller resulting from any litigation involving the Australian subsidiary (as defined in the Purchase Agreement); |
| | (vi) any liabilities of Seller to E-Max ev's Germany Holdings Ltd., E-Max ev's Germany Ltd., E-Max ev's Ltd. or any of its affiliates (collectively, "**E-Max**") and |
| | (vii) liabilities, obligations and commitments of Seller arising from the Excluded Assets or from Excluded Liabilities. |
| | *See* Section 1.3 of the Purchase Agreement. |
| **(G) Assigned Contracts**: | Those contracts, leases, licenses and other agreements listed on Schedule 1.1(b), Schedule 1.1(c) and Schedule 1.1(d) to the Purchase Agreement that the Buyer may designate no more than thirty (30) days after Closing of the transactions under the Purchase Agreement. Buyer shall pay all Cure Amounts associated with the Assigned Contracts. |
| | *See* definition of "Assigned Contracts" in Section 1.1 of the Purchase Agreement, and *see also* Sections 1.3(b) and 1.5 of the Purchase Agreement. |
| **(H) Deposit**: | Buyer deposited $200,000 on the Execution Date of the Purchase Agreement, which is maintained in an interest bearing escrow account. |
| | *See* Section 2.3 of the Purchase Agreement. |
| **(I) Sale As-Is**: | Sale is on an "as is," "where is," and "with all faults" basis. |
| | *See* Section 7 of the Purchase Agreement. |
| **(J) Buyer's Conditions to Closing**: | (a) Seller shall have performed and complied in all material respects with the covenants and obligations |

required by the Purchase Agreement to be performed or complied with by Seller at or prior to the Closing Date (except that those covenants and obligations which are qualified as to materiality, Material Adverse Change or similar expressions shall have been performed and complied with in all respects);

(b) All of the representations and warranties of Seller contained in the Purchase Agreement shall have been true and correct in all material respects when made and shall continue to be true and correct on the Closing Date in all material respects (except that those representations and warranties which are qualified as to materiality, Material Adverse Change or similar expressions shall have been true and correct in all respects or shall continue to be true and correct on the Closing Date in all respects, as applicable); provided, that representations and warranties that are confined to a specified date shall speak only as of such date;

(c) Each of the deliveries required to be made to Buyer pursuant to Section 3.3 of the Purchase Agreement shall have been so delivered;

(d) Seller shall have executed and delivered to Buyer the Escrow Agreement;

(e) Seller shall have delivered possession of all physical assets which constitute Purchased Assets, and have delivered passcodes and other information that would allow for Buyer to use and possess and protect any Software Assets, together with all other documents reasonably requested by Buyer or required of Seller to be delivered on the Closing Date, including but not limited to all consents by third parties that may be required in order to transfer good and marketable title to the Purchased Assets;

(f) No action, suit or other proceedings shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by the Purchase Agreement, seeking to obtain relief in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction; and

(g) The Bankruptcy Court shall have issued the Sale Order, in form and substance reasonably acceptable to

| | |
|---|---|
| | Buyer, which shall be a Final Order. |
| | *See* Section 4.2 of the Purchase Agreement. |
| (K) **Agreements with Managers or Directors**: | No agreements exist between the Buyer and existing managers or directors of the Debtor. |
| (L) **Closing**: | Shall be the third business day following satisfaction or waiver of the closing conditions in Sections 4.1 and 4.2 of the Purchase Agreement, but in no event later than November 9, 2009, unless extended by mutual agreement of the Buyer and Debtor. |
| | *See* Sections 3.1 and 3.2 of the Purchase Agreement. |
| (O) **Record Retention**: | Books and records appurtenant to the operations of the Purchased Assets will be sold with the Purchased Assets, except for Attorney Communications, with copies of any such books and records transferred to Buyer to be maintained by the Debtor. |
| | *See* Sections 1.1(k) and 1.7 of the Purchase Agreement. |
| (P) **Free and Clear**: | The Sale will be free of all Encumbrances (as defined in the Purchase Agreement), except for the Assumed Liabilities and as otherwise specifically provided in the Purchase Agreement. |
| | *See* Section 1.1 of the Purchase Agreement. |
| (Q) **No Stay**: | Relief from the ten-day stay of Bankruptcy Rule 6004(h) is requested. |
| | *See* Section 3.5 of the Purchase Agreement. |
| (R) **Relationship of Parties**: | There is no relationship between the Buyer and Debtor. The transaction is an arm's length transaction, negotiated in good faith. |

21.     The full terms and conditions of the proposed transaction are set forth in the Purchase Agreement annexed as <u>Exhibit A</u> hereto and reference should be made to the Purchase Agreement for additional terms. To the extent there is any inconsistency between the summary of the transaction set forth in this Motion and the terms in the Purchase Agreement, the Purchase Agreement shall control.

22.     As set forth in the First Day Declaration, which is incorporated herein by reference, the Debtor believes that value will be maximized by closing the sale of the Purchased

Assets as soon as is practicable, and on the terms proposed in the Purchase Agreement, unless there is a higher and better offer. Accordingly, the Debtor respectfully requests an expedited hearing to consider this Motion.

## The Assumption, Assignment, and Sale of Executory Contracts

23. In accordance with the Purchase Agreement, the Debtor seeks to assume, assign, and sell to the Buyer certain executory contracts and unexpired leases to be designated by the Buyer (the "**Assigned Contracts**"). The Buyer shall identify the Assigned Contracts in accordance with the terms of the Purchase Agreement, and shall pay any and all cure amounts (the "**Cure Amounts**") associated with such Assigned Contracts.

24. In order to set the Cure Amounts for each of the Assigned Contracts, the Debtor proposes the following procedure. In accordance with the Purchase Agreement, the Buyer has until 30 days after the Closing Date of the Purchase Agreement to designate Assigned Contracts to be assumed by the Debtor and assigned to the Buyer pursuant to and in connection with the sale. However, in order to facilitate an expeditious sale and closing on the transactions underlying the Purchase Agreement, the Debtor intends to file and serve a "Notice of Proposed Cure Amounts" (the "**Cure Notice**") on the non-Debtor parties to Assigned Contracts (the "**Contract Parties**") to be designated by the Buyer upon entry of the Bidding Procedures Order (as defined below), and to provide additional Cure Notices as additional Assigned Contracts are designated by the Buyer thereafter. The proposed form of Cure Notice is attached hereto as Exhibit B and would set forth the amounts the Debtor believes are owed to each Contract Party in order to cure any defaults that exist under such Assumed Contract.

25. Thereafter, the Debtor proposes that the deadline for the Contract Parties to object to the Debtor's proposed Cure Amounts as listed in a Cure Notice(s) should be set on that date which is 10 days after the filing of each such Cure Notice. Any objections to the Cure Amounts

which are timely filed and served by any Contract Parties in accordance with the Cure Notice, and which are not otherwise resolved by the parties, prior to the Sale Hearing (as defined below) shall be heard by the Court at the Sale Hearing. Any objections timely filed to Cure Notices for which the objection deadline falls on a date after the Sale Hearing, shall be heard by the Court on a date or dates to be set by the Court after the Sale Hearing. Pursuant to the Purchase Agreement, Buyer shall be responsible for satisfying any Cure Amounts as may be agreed upon or otherwise set by final order of the Court and providing adequate assurance of future performance pursuant to section 365(b) of the Bankruptcy Code in connection with the proposed assumption and assignment of any Assigned Contract.

## Bidding Procedures

26.     In connection with the sale of the Purchased Assets, the Debtor seeks the approval of (i) certain bidding procedures and protections, and related dates and deadlines described below in respect of the sale; (ii) the procedures and related dates and deadlines described below in respect of the assumption and assignment of the Assigned Contracts; and (iii) the form of Cure Notice thereof set forth in Exhibit B hereto.

27.     The Debtor also proposes that the Court approve the following specific bidding procedures (the "**Bidding Procedures**") and certain bid protections, as further described below, for the Buyer (the "**Bid Protections**"), which the Debtor, in consultation with its advisors, believe are necessary to induce the Buyer to enter into the Purchase Agreement:

      a.     **Due Diligence**.   Parties interested in conducting due diligence in contemplation of making a bid for the purchase of some or all of the Purchased Assets will be required to execute a confidentiality agreement in form and substance acceptable to the Debtor, prior to gaining access to the due diligence materials.

      b.     **Deadline for Submission of Bids**.  The deadline for submitting any and all competing bids shall be no later than October 27, 2009 at 5:00 p.m. EST or, such other date as is established by the Court (the "**Bid Deadline**").

c.    **Advertising Sale and Auction**.  The Debtor shall place an advertisement giving public notice of the sale of the Purchased Assets and the Auction in a nationwide publication upon entry of the Order approving these Bidding Procedures.

d.    **Submission of Bids**.  In order to qualify as a potential Qualified Bidder (as defined below) of the Purchased Assets, an interested bidder must timely submit a written bid (a "**Qualified Bid**") for the Purchased Assets that:

i.    exceeds the Purchase Price by at least $500,000, representing (a) the amount of the Break-Up Fee and Expense Reimbursement as outlined in the Purchase Agreement, plus (b) an additional $50,000, and is accompanied by a cash deposit in an amount equal to 10% of the aggregate value of such Qualified Bid;

ii.    is accompanied by an executed Purchase Agreement in substantially the form of the Purchase Agreement attached hereto as <u>Exhibit A</u> and a blackline showing any such modifications the bidder is proposing, and that:

(a)    indicates which of the Purchased Assets such bidder proposes to acquire pursuant to the Purchase Agreement;

(b)    indicates which of the Debtor's executory contracts and unexpired leases such bidder intends to take assignment of pursuant to the Purchase Agreement and/or that the bidder will have up to 30 days after the closing date to designate or remove Assigned Contracts from the requisite Schedules; and

(c)    does not contain any conditions to closing which are not contained in the Purchase Agreement (including financing and due diligence) or is based on terms or conditions any less favorable, or otherwise more burdensome or conditional than those set forth in the Purchase Agreement;

iii.    includes financial statements of such entity (or the entity that will furnish the funding required to consummate and perform under the Purchase Agreement) establishing such entity's financial wherewithal to timely close the transactions contemplated thereunder;

iv.    contains written evidence demonstrating adequate assurance of future performance by the acquiring entity to the non-Debtor parties under the unexpired leases and executory contracts to be assumed and assigned pursuant to

the Purchase Agreement, which may include, without limitation, a representation as to the solvency of the bidder post-Closing;[2]

      v.     contains a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereby; and

      vi.    is delivered to the following parties such that they are received by the close of business on the Bid Deadline: (i) the Debtor's President and Chief Executive Officer, Michael J. Boyle, Vectrix Corporation, 55 Samuel Barnet Boulevard, New Bedford, MA 02745; (ii) the Debtor's counsel, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Malani J. Cademartori, Esq., 30 Rockefeller Plaza, 24th Floor, New York, New York 10112; (iii) counsel for the DIP lenders, Latham & Watkins LLP, Attn: Michael Immordino, Esq. and Michael Riela, Esq., 885 Third Avenue, New York, New York 10022.

      e.    **Qualification of Bid**.  After a potential bidder has delivered a bid, the Debtor, in consultation with any official Committee (if one is appointed), will determine whether (i) the potential bidder has demonstrated the financial capacity to consummate the purchase of the Purchased Assets; (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions; and (iii) has otherwise timely satisfied the requirements described above.  If so, the Debtor shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**."  Promptly after making such determination, the Debtor will advise such bidder of this determination and, if a bid is not designated as a Qualified Bid, provide a brief statement as to why it is not a Qualified Bid.

      f.    **Auction**.  In the event that competitive Qualified Bids are received, the Debtor will conduct an auction to determine the highest or best bid for the Purchased Assets on October 29, 2009 or, such other date as may be established by the Court, at the law offices of Sheppard Mullin Richter & Hampton LLP, 30 Rockefeller Plaza, 24th Floor, New York, New York 10112, beginning at 10:00 a.m. EST.  The Auction will be transcribed.  The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

      g.    **Auction Procedures**.  Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction.  At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids.  The bidding at the Auction shall begin with the highest and best offer for the Purchased Assets received by

---

[2] Such information may be made available to the non-Debtor parties to the Debtor's unexpired leases and executory contracts, to assist such parties in analyzing the financial wherewithal of the potential bidder.

the Bid Deadline and continue in increments of no less than $100,000 in excess of the preceding highest or best offer for the Purchased Assets at the Auction. The Buyer shall have the right, but not the obligation to participate in the Auction. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of other party making the then highest or best bid. The Debtor may conduct the Auction in the manner they determine will maximize the value of the Purchased Assets. If the only Qualified Bidder is the Buyer, the Auction may be cancelled and the Buyer be declared the Winning Bidder.

      h.    **Successful Bid**. At the conclusion of the bidding, the Debtor shall announce its determination as to the Qualified Bidder or Qualified Bidders (which may include the Buyer) making the highest or otherwise best offer at the Auction for the Purchased Assets and such Qualified Bidder or Qualified Buyer shall be declared by the Debtor to be the "**Winning Bidder**" or "**Winning Bidders**". The Winning Bid(s) shall be determined by the Debtor in consultation with any Committee. The Debtor may designate the next highest or best bidder or bidders for the Purchased Assets at the Auction as the "**Backup Bidder**" or "**Backup Bidders**".

      i.    **Sale Hearing**. The Court will hold a hearing to approve the Sale of the Purchased Assets to the Winning Bidder or Winning Bidders (the "**Sale Hearing**") in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware, 19801, on or before October 30, 2009, or such other date as is established by the Court. Each of the Winning Bidder or Winning Bidders and the Backup Bidder or Backup Bidders must produce a competent witness at the Sale Hearing (and any subsequent hearing) to provide testimony, if necessary, to establish adequate assurance of future performance by each such bidder under the unexpired leases and executory contracts to be assigned to such bidder, to the extent required by sections 365(b)(1)(c) and 365(f)(2)(b) of the Bankruptcy Code. At the Sale Hearing, the Debtor will request that the Court approve the sale of the Purchased Assets to the Backup Bidder or Backup Bidders in the event the contemplated sale to the Winning Bidder or Winning Bidders does not timely close; in which case such Backup Bidder or Backup Bidders shall become the Winning Bidder or Winning Bidders without further order of the Court. The Winning Bidder (if other than the Buyer) should be substituted for the Buyer under the Purchase Agreement (as amended to reflect terms of the Winning Bidder's bid) and the proposed Sale Order.

      j.    **Closing.** Closing shall take place promptly after the Sale Hearing and entry of the Sale Order and in no event later than November 9, 2009, subject to extension as provided in the Purchase Agreement.

      k.    **Return of Deposits**. The Debtor shall return the deposit of any Qualified Bidder that is not declared a Winning Bidder two business days after the Closing of the sale or sales of the Purchased Assets. In the event a declared Winning Bidder fails to timely perform any material obligation under its Purchase Agreement, the declared Winning Bidder shall forfeit all deposits made, without regard to the Debtor's ultimate

damages occasioned by such failure; such deposits shall be applied to the Debtor's damages, if any, and shall not constitute liquidated damages; and, notwithstanding the foregoing, the Debtor and the bankruptcy estates shall retain all other rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief. Notwithstanding the foregoing, the Deposit made by the Buyer under the Purchase Agreement shall be dealt with and returned as provided in the Purchase Agreement.

l. **Reservation of Rights**. The Debtor reserves the right, in consultation with its professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as they may determine reasonably appropriate to maximize the value realized by the estates.

m. **Damages for Controlling of Sales Price**. The proposed form of Notice of Bidding Procedures shall advise potential bidders that, under section 363(n) of the Bankruptcy Code and applicable law, the Debtor and/or its estate may avoid a transaction and recover damages (actual and possibly punitive) if the sale price for the Purchased Assets was controlled by an agreement among the potential bidders, Qualified Bidders or Winning Bidder(s).

n. **Bid Protections**. The Buyer shall, if outbid, and if the Bankruptcy Court approves a competing transaction with a Qualified Bidder and the Debtor consummates such transaction, be entitled to reimbursement of reasonable, documented expenses (the "**Expense Reimbursement**"), not to exceed the amount of $325,000 incurred in connection with the transaction contemplated by the Purchase Agreement, including amounts in connection with the Buyer's legal and advisory fees. The Buyer shall also be entitled to the payment of a break-up fee (the "**Break-Up Fee**") of $125,000 upon the closing of an alternative transaction with an entity other than the Buyer. The terms and payment of the Expense Reimbursement and Break-Up Fee are governed by the Purchase Agreement. In addition, the Buyer would be entitled to the Break-Up Fee and the Expense Reimbursement in the event of a material breach of any representation or warranty, or covenant or agreement to be performed or complied with by Seller pursuant to the terms of the Purchase Agreement or any other agreement contemplated hereby, which breach would result in a condition to closing becoming incapable of fulfillment or cure (and which condition has not been waived by Buyer in writing) prior to November 9, 2009. Moreover, the Buyer would be entitled to the Break-Up Fee and the Expense Reimbursement if the Debtor's chapter 11 case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller and such trustee rejects the transactions contemplated by the Purchase Agreement.

28. To ensure that all parties-in-interest receive adequate notice of the sale, not later than three days after the entry of an Order approving the portion of this Motion relating to Bid Procedures (in substantially the form attached hereto as Exhibit D, the "**Bidding Procedures Order**"), the Debtor will cause a notice of Bid Procedures and Auction, substantially in the form

attached to this Motion as <u>Exhibit C</u>, to be sent by first-class mail postage prepaid to (i) the United States Trustee for the District of Delaware (Attn: Richard Schepacarter Esq.); (ii) counsel for the Committee, if any; (iii) the Buyer; (iv) counsel for the Buyer; (v) all of the Debtor's known creditors; (vi) all entities known to have expressed a *bona fide* interest in acquiring the assets being sold; (vii) federal, state and local regulatory authorities (including taxing authorities) with jurisdiction over the Debtor; (viii) the Office of the United States Attorney for the District of Delaware; (ix) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002); and (x) shall publish notice of the Auction and Sale in a nationally distributed newspaper publication. Accordingly, the Debtor submits that all parties in interest will have adequate notice of the Auction and Sale.

## Summary Timeline

29.     As set forth below, the Debtor has formulated the following timeline to effectuate the Sale contemplated herein, and seek hearings and deadlines to be set as follows:

| **Case Day** | **Calendar Date** | **Activity/Deadline** |
|---|---|---|
| Day 15 | October 12 | • Objections due to bid procedures |
| Day 19 | October 16 | • Hearing on bid procedures |
| Day 30 | October 27 | • Last day to object to sale |
| Day 30 | October 27 5:00 pm | • Qualified bid deadline |
| Day 32 | October 29 | • Auction |
| Day 35 | October 30 | • Sale hearing |
| Day 45 | November 9[3] | • Last day to close sale |

---

[3] As provided in the Purchase Agreement, the Sale must close by November 9, 2009 (the "**Drop Dead Date**"), unless Seller and Buyer or Winning Bidder, as the case may be, agree to a further extension of such Drop Dead Date.

## Relief Requested

30.     By this Motion, the Debtor requests the entry of certain orders:

(I)(A) approving the sale of substantially all of the Debtor's assets, identified herein as the Purchased Assets, to the Buyer, in accordance with the terms of the Purchase Agreement, free and clear of all liens, claims, encumbrances, and other interests pursuant sections 105, 363(b), (f), and (m) of the Bankruptcy Code, and (B) authorizing the assumption, assignment, and sale of certain executory contracts and unexpired leases, identified as the Assigned Contracts, to the Buyer, in accordance with the terms of the Purchase Agreement, pursuant to sections 363 and 365 of the Bankruptcy Code;

(II) approving the Bidding Procedures including the Break-Up Fee, Expense Reimbursement and other protections in advance of sale; and

(III) granting related relief as the Court shall deem just and proper.

31.     In addition, the Debtor requests that the Court's order approving the Bidding Procedures provide that the Buyer shall be deemed a Qualified Bidder for all purposes thereunder.

## Basis for Relief Requested

### A.     Sale of the Purchased Assets Pursuant to the Purchase Agreement is Authorized by Section 363(b) of the Bankruptcy Code

32.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(l). Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

33.     A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business justification exists for doing so. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386,

390 (6th Cir. 1986); *In re Titusville Country Club*, 128 B.R. 396, 399 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-76 (D. Del. 1991). The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the assets; and whether the asset is decreasing or increasing in value.

124 B.R. at 176.

34.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id.*

35.     The Debtor has proposed the sale of the Purchased Assets after thorough consideration of all viable alternatives, and have concluded that the sale is supported by a number of sound business reasons. The Debtor has determined that a reorganization rather than a sale is not a viable option due to the Debtor's liquidity constraints and other business issues. Hence, the Debtor has determined that a sale of the Purchased Assets as requested herein provides the best and most efficient means for the Debtor to maximize the value of its estate, and avoid further deterioration in value.

36.     As explained above, the Debtor has extensively marketed the Debtor's assets and proposes to conduct the sale process (including the Auction) in accordance with this Motion, which proposes to implement procedures designed to maximize the value that will be realized from the sale of the Purchased Assets.

37.     As a result of the Debtor's efforts to date, the Debtor believes that the Buyer's offer is reasonable, will constitute fair and reasonable consideration for the Purchased Assets, and will maximize value.  In the event that upon the competitive bidding process, as set forth in the Purchase Agreement and in the proposed order hereon, a Qualified Bidder offers a Competing Bid that is deemed higher and/or better, such Winning Bidder shall become the Buyer under the Purchase Agreement and shall be required to close and comply therewith.

38.     Based on the foregoing, the sale of the Purchased Assets is justified by sound business reasons and is in the best interests of the Debtor and its estate.  Accordingly, pursuant to section 363(b) of the Bankruptcy Code, the Debtor requests approval of the sale to the Buyer as set forth herein.

**B.     The Sale of the Purchased Assets Free and Clear of Liens, Claims, and Interests is Authorized Under Section 363(f) of the Bankruptcy Code**

39.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such Purchased Assets;

(4)     such interest is in a bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

40.     As quoted above, section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests."  The term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258 (3d Cir. 2000).  In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest."  *Id.*  The court observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property."  *Id.* (citing 3 COLLIER ON BANKRUPTCY 363.06[1]).

41.     As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of section 363(f) of the Bankruptcy Code is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell its assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute."  *Folger Adam*, 209 F.3d at 258.

42.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale of the Purchased Assets free and clear of all interests, except with respect to any interests that are Assumed Liabilities under the Purchase Agreement.  *See Citicom Homeowners Servs., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988).

43.     The Debtor submits that each interest that is not an Assumed Liability satisfies at least one of the five conditions in section 363(f) of the Bankruptcy Code.  The Debtor accordingly requests authority to convey the Purchased Assets to the Buyer, free and clear of all

such interests and Encumbrances (as defined in the Purchase Agreement) other than Permitted Encumbrances and except as otherwise provided in the Purchase Agreement.

44. The Debtor has conducted a UCC search to determine possible holders of any liens against the Debtor's assets in conjunction with the proposed sale of the Purchased Assets. The Debtor has served such purported lienholders notice of this Motion, and will serve such parties with notice of any Order approving the relief requested by this Motion.

45. Accordingly, this Court should approve the sale of the Purchased Assets – excluding the Excluded Liabilities -- to the Buyer, free and clear of interests and Encumbrances under section 363(f) of the Bankruptcy Code.

## C. The Bidding Procedures Provided Herein Are Consistent and Appropriate in the Context of Bankruptcy Sales

46. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See, e.g.*, *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R, 650, 656-57 (Bankr. S.D.N.Y. 1992). The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 (same); *Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Products, Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) (same).

47. In that regard, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re Montgomery*

*Ward Holding Corp.,* Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); *In re Fruehauf Trailer Corp.,* Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26, 1997); *Integrated Resources,* 147 B.R. at 659.

48.     The Bidding Procedures proposed herein will provide a framework for the Debtor to entertain Qualified Bids for the Purchased Assets and, if they receive such Qualified Bids, to conduct the Auction in a fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  This should increase the likelihood that the Debtor will receive the greatest possible consideration for the Purchased Assets.  The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious manner, balancing the Debtor's desire to maximize recovery for the benefit of the estates, with the need to move quickly to avoid any further deterioration in value.

**D.     Approval of the Break-Up Fee and Expense Reimbursement is Appropriate**

49.     The Debtor and Buyer believe that the Break-Up Fee and request for a maximum Expense Reimbursement are reasonable, given the benefits to the Debtor's estates of having a "stalking horse" under a fully negotiated and executed Purchase Agreement upon which all other Qualified Bids will be based, and to compensate the Buyer for its risk in the event that a Competing Transaction may ultimately be accepted.  The Debtor further asserts that approval of the Break-Up Fee and Expense Reimbursement under the terms of the Purchase Agreement are necessary to preserve and enhance the value of the Debtor's estate.

50.     Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with debtors and perform the necessary due diligence attendant to the acquisition of a debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee, under the "business judgment rule," which proscribes judicial second-guessing of the

actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

51.     The Third Circuit has established standards for determining the appropriateness of bidding incentives and Bid Protections in the bankruptcy context. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc*., 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates. *See id*. at 535.

52.     The *O'Brien* court identified at least two instances in which bidding incentives and protections such as break-up fees and expense reimbursements may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*.

53.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Debtor respectfully submits that the Break-Up Fee and

Expense Reimbursement in this case passes muster. The Debtor's agreement to pay the Break-Up Fee and Expenses Reimbursement (the latter of which is a maximum amount the receipt of which is qualified by evidence that such reimbursement is for reasonable and documented out of pocket expenses) pursuant to the terms of the Purchase Agreement are the product of good faith, arm's-length negotiations between the Debtor and Buyer. The Break-Up Fee is fair and reasonable in amount, and both the Break-Up Fee and Expenses Reimbursement are reasonably intended to compensate for the risk to the Buyer of being used as a stalking horse bidder and ultimately being outbid for the Purchased Assets.

54. Furthermore, the Break-Up Fee and Expense Reimbursement have already encouraged competitive bidding, in that the Buyer would not have entered into the Purchase Agreement without these provisions. The Break-Up Fee and Expense Reimbursement have thus "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." *O'Brien*, 181 F.3d at 537. Similarly, the Buyer's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Purchased Assets will be] sold will reflect [their] true worth." *Id.*

55. For the reasons set forth above, the Debtor respectfully requests approval of the proposed Bid Protections including the Break-Up Fee and the Expense Reimbursement.

**E.      The Buyer is a Good Faith Buyer and is Entitled to the Full Protections of Section 363(m) of the Bankruptcy Code**

56. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

57.     While the Bankruptcy Code does not define "good faith," the Third Circuit has stated:

> [t]he requirement that a Buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted).

58.     Moreover, the Second Circuit has indicated that a party would have to show fraud or collusion between the buyer and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (internal citation omitted).

59.     The Debtor intends to make an appropriate showing at the Sale Hearing that the Purchase Agreement with the Buyer is the result of a negotiated, arm's-length transaction, in which such Buyer at all times acted in good faith.  The Debtor thus requests that the Court find that the Buyer will be purchasing the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**F.      The Court Should Approve the Assumption, Assignment, and Sale of the Assigned Contracts**

60.     As required by the Purchase Agreement, the Debtor requests approval of the assumption, assignment, and sale of the Assigned Contracts to the Buyer.

61.     The Assigned Contracts are those contracts or leases that are to be assumed by the Debtor and assigned to the Buyer as part of the sale transaction under the Purchase Agreement. The Debtor further requests that the Sale Order provide that any Assigned Contracts designated on a final basis as of the date of the Sale Hearing will be assigned to, and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provisions in the Assigned Contracts, including those described in sections 365(b)(2) and (f)(l) and (3) of the Bankruptcy Code, that prohibit such assignment.

62.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. 11 U.S.C. § 365(f)(2).

11 U.S.C. § 365(f)(2).

63.     Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

64.     Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor-in-possession's decision to assume an executory contract, it is well established that the decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor.  *See Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 107 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).  Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate.  *Sharon Steel*, 872 F.2d at 39.

65.     The assumption, assignment, and sale of the Assigned Contracts is an integral part of the Purchase Agreement and, as stated above, will benefit the Debtor's estates.  As explained above, attached hereto as <u>Exhibit B</u> is the Debtor's Cure Notice, which sets forth all amounts the Debtor believes are owed to each Contract Party to an Assumed Contract in order to cure any defaults that exist under such contract according to Debtor's books and records.

66.     To the extent no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the Contract Party to the applicable contract or lease. The payment of the Cure Amounts specified on <u>Exhibit B</u> (or a different amount either agreed to by the Debtor or resolved by the Court as a result of a timely-filed objection filed by a Contract Party) will be in full and final satisfaction of all obligations to cure defaults and compensate the

Contract Parties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code.[4]

67.    Cure Amounts disputed by any Contract Party prior to the Sale Hearing without settlement, will be resolved by the Court at the Sale Hearing.

68.    As set forth in this Motion and the Purchase Agreement, the Buyer is responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of any Assigned Contract. The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). To the extent necessary, the Buyer shall provide evidence of its ability to provide adequate assurance to Contract Parties to the Assigned Contracts at the Sale Hearing. In the event a competitive bidder is successful at the Auction, such Winning Bidder shall be substituted as the Buyer and shall undertake the obligation with respect to the Assigned Contracts as set forth herein.

---

[4]    The Debtor reserves the right to argue that a particular lease or contract included on Exhibit B is not truly executory in nature, that cure is not a precondition to the transfer therof to the Buyer, and to reject any contract that is not an Assumed Contract.

## Request to Shorten Time

69.    Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide its creditors with 20 days' notice of significant events.  Fed R. Bankr. P 2002(a).  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested herein.  Fed R. Bankr. P 2002(c).  In order to preserve and maximize the value of the Debtor's assets through the Purchase Agreement, the Debtor requests the time period for notice pursuant to Bankruptcy Rule 2002(a) be adjusted in order to accommodate the time frames stated herein.

## Notice

70.    The Debtor shall serve notice of this Motion on the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the District of Delaware (Attn: Richard Schepacarter, Esq.); (ii) New Vectrix LLC, as Lender; (iii) Latham & Watkins LLP (Attn: Michael J. Riela) and Duane Morris LLP (Attn: Christopher M. Winter), as counsel for the Lender; (iv) the holders of the 20 largest unsecured claims as set forth in the consolidated list filed with the Debtor's petitions; (v) any known party interested in purchasing the Debtor's assets; (vi) the Office of the United States Attorney General for the District of Delaware; and (vii) the Internal Revenue Service.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  The Debtor submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## No Prior Request

71.    No prior request for the relief sought in this Motion has been made to this or any other court.

## Conclusion

72.     The Debtor's proposed sale of the Purchased Assets as described in this Motion and the Purchase Agreement, including the assumption, assignment, and sale of the Assigned Contracts, is supported by sound business reasons, as set forth herein.  The proposed Sale is proper and necessary, and serves the best interests of the Debtor, its estates, and its creditors. The Debtor thus requests that the Court approve the proposed Sale of the Purchased Assets (including the Assigned Contracts) free and clear of all liens, claims, encumbrances, and Interests, as requested.

73.     Therefore, the Debtor respectfully request that this Court (i) authorize the sale of the Purchased Assets to the Buyer on substantially the terms set forth in the Purchase Agreement; (ii) approve the assumption, assignment, and sale of the Assigned Contracts in accordance with the Purchase Agreement; (iii) approve and implement the Bidding Procedures and Bidding Protections, and the related dates and deadlines described herein in respect of the sale of the Purchased Assets; and (iv) grant other related relief.

WHEREFORE, the Debtor respectfully requests that this Court enter an order granting the relief requested herein and that it grant the Debtor such other and further relief as is just and proper.

Dated:  September 28, 2009
        Wilmington, DE

BIFFERATO GENTILOTTI LLC

/s/ Garvan F. McDaniel
Garvan F. McDaniel (DE Bar No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware  19801
Telephone:  (302) 429-1900
Facsimile:  (302) 429-8600
Email: gmcdaniel@bglawde.com

-and-

Sheppard Mullin Richter & Hampton, LLP
Edward H. Tillinghast, III, Esq
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Telephone:  (212) 653-8700
Facsimile:  (212) 653-8701
Email: etillinghast@sheppardmullin.com
       mcademartori@sheppardmullin.com
       bwolfe@sheppardmullin.com

*Proposed Counsel for the Debtor*
*and Debtor-in-Possession*

**<u>Exhibit A</u>**

**(Purchase Agreement)**

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of September 24, 2009, by and between New Vectrix LLC, a Delaware limited liability company ("**Buyer**"), on the one hand, and Vectrix Corporation, a Delaware corporation ("**Seller**"), on the other hand. Seller and Buyer are referred to, individually, as a "**Party**" and, collectively, as the "**Parties**".

## RECITALS

A.      Seller is engaged, directly and through its affiliates, in developing, inventing, manufacturing and testing mechanical and electronic systems ("**Systems**") to produce electric vehicles ("**Products**") which are then used, sold, leased or otherwise distributed in domestic and international markets (the "**Business**").

B.      Buyer is a Delaware limited liability company formed to purchase certain of the assets of Seller related to the Business as provided herein.

C.      Upon the execution of this Agreement, Seller has agreed to file voluntary petitions for relief (the "**Bankruptcy Case**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on or before September 28, 2009, or one business day thereafter upon mutual agreement of the Parties (the actual date of filing being referred to herein as the "**Petition Date**").

D.      Upon the terms and subject to the conditions set forth herein and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, Buyer desires to acquire from Seller and Seller wishes to transfer, sell, convey, assign and deliver to Buyer, all of Seller's right, title and interest in and to the Purchased Assets (as defined in Section 1.1 below), including without limitation, the assignment of certain leases, licenses and executory contracts as designated herein, and Buyer desires to assume the Assumed Liabilities (as defined in Section 1.3 below), at the price and on the other terms and subject to the conditions specified below (the transactions referred to herein to be collectively referred to as the "**Proposed Transactions**").

E.      Buyer has agreed to make a debtor-in-possession loan to Seller in an amount equal to $300,000 (the "**DIP Loan**") to allow Seller to operate its Business post-petition and prior to consummation of the Proposed Transactions, pursuant to a debtor-in-possession funding agreement to be entered into between Buyer and Seller (the "**DIP Funding Agreement**") simultaneously with this Agreement, and which is subject to approval of the Bankruptcy Court pursuant to a motion for approval of the DIP Loan and DIP Funding Agreement to be filed on the Petition Date.

F.      Seller has made diligent efforts to identify and solicit potential purchasers for the Business and assets prior to the date hereof and has identified Buyer as the party making the highest and best offer for the Business and the Purchased Assets to date.

G. Seller believes, following consultation with Seller's advisors and upon consideration of available alternatives, that in light of the Seller's current liquidity and financial position, a sale of the Purchased Assets pursuant to this Agreement is necessary to maximize value and is in the best interest of Seller, Seller's creditors and Seller's stockholders.

H. The Proposed Transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order (as defined herein) to be entered in the Bankruptcy Case.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the mutual promises set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Transfer of Assets.

      1.1   Purchase and Sale of Purchased Assets. On the Closing Date (as defined in Section 3.1 hereof), in consideration of the covenants, representations and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase and accept from Seller, all of Seller's legal and beneficial right, title and interest of every kind and nature, owned, licensed or leased by the Seller (including indirect and other forms of beneficial ownership), wherever located, real, personal or mixed, tangible or intangible, to the extent owned, leased, licensed, used or held for use in or relating to the Business, as the same shall exist on the Closing Date, free and clear of all liens of any kind (statutory or otherwise), encumbrances, claims (as defined in section 101(5) of the Bankruptcy Code), rights, demands, charges, mortgages, deeds of trust, options, pledges, security interests or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, variances, special use or conditional use permits, security agreements, rights of recovery, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements, or any other claims based on any theory that Buyer is a successor, transferee or continuation of the Seller or the Business, and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever (collectively, "**Encumbrances**") to the fullest extent permitted by sections 105, 363 and 365 of the Bankruptcy Code and applicable law, other than the Assumed Liabilities (as defined in Section 1.3(a) hereof) and other than Permitted Encumbrances (as defined in Section 5.3 hereof), in, to and under the following assets (collectively, the "**Purchased Assets**"):

      (a)   all of Seller's patents and patent applications, including but not limited to the patents and patent applications listed on **Exhibit A** attached hereto (collectively, the "**Patents**");

      (b)   all licenses (including all governmental registrations), permits and pending applications therefor, including but not limited to those listed in Schedule 1.1(b) as such Schedule may be amended, revised or supplemented from time to time prior to the thirtieth day

after the Closing Date (the "**Licenses**"), and all rights of Seller under express or implied warranties from suppliers or contractors with respect to the Purchased Assets;

(c)    the contracts and leases and all rights pursuant thereto, designated by the Buyer for assumption and assignment to Buyer pursuant to section 365 of the Bankruptcy Code, which are set forth in Schedule 1.1(c) as such Schedule may be amended, revised or supplemented from time to time prior to the thirtieth day after the Closing Date, including without limitation grant applications for technical and/or financial support with any governmental entity and various dealer contracts set forth thereon;

(d)    all contracts or agreements (and all causes of action, claims, demands and rights ("**Claims**")) of Seller, whether arising on, before or after the Closing Date, between Seller, on the one hand, and any other person (including all former employees or consultants), on the other hand, relating to such other person's non-disclosure, non-competition and/or assignment of discoveries or inventions (such contracts, the "**NDA Contracts**"). The form of the NDA Contracts and the list of all persons who are parties to the NDA Contracts to be assigned to Buyer are set forth on Schedule 1.1(d), as such Schedule may be amended, revised or supplemented from time to time prior to the thirtieth day after the Closing Date. The contracts, leases and licenses listed on Schedule 1.1(b), Schedule 1.1(c) and Schedule 1.1(d), each as may be amended, revised or supplemented from time to time prior to the thirtieth day after the Closing Date are collectively referred to as the "**Assigned Contracts**");

(e)    all of Seller's trademarks and trademark applications, trade names, and related websites and URLs (collectively, the "**Trademarks**");

(f)    the tools, machinery, furniture, fixtures, computer systems, trucks, trailers and other motor vehicles listed on Schedule 1.1(f) hereto (collectively, the "**Fixed Assets**");

(g)    all inventories of any kind and nature of Seller, including work-in-progress, raw materials, spare parts, supplies, finished goods, packaging materials, samples and other material held for sale or use related to the operation of the Business and the Purchased Assets wherever located (collectively, "**Inventory**"), including the Inventory set forth on Schedule 1.1(g);

(h)    all accounts receivable and other rights to payment from customers of Seller and the full benefit of all security for such accounts receivable or rights to payment, including those consisting of all accounts receivable in respect of goods shipped or products sold or services rendered to customers by Seller, any other miscellaneous accounts receivable of Seller, and any Claim of Seller related to any of the foregoing (the "**Accounts Receivable**");

(i)    all rights of Seller to the funds deposited with Bank of America up to an amount securing Seller's repurchase obligations (the "**Bank of America Deposit**") as collateral security for the Letter of Credit (the "**Letter of Credit**") issued in support of the Floor Plan Financing Agreement, dated January 29, 2008, between the Seller and GE Commercial Distribution Finance Corporation (the "**Floor Plan Financing Agreement**"); and, in connection

with any draw-down of the Letter of Credit by GE Commercial Distribution Finance Corporation, any resulting right of Seller to receive payment for, or to demand the return of, the Inventory that is the subject of the Letter of Credit, from all applicable dealers and other third parties; *provided, however,* that the Parties agree that the value of the Letter of Credit shall not be reduced below $1,475,000 prior to Closing, notwithstanding that additional amounts thereunder may become unrestricted in the ordinary course between the Execution Date and the Closing Date.

        (j)    all worldwide rights, title and interest of Seller in and to all Intellectual Property (as herein defined), as well as all websites, motor vehicle code identifications, software programs and programming protocols and methods, databases and information and/or financial or enterprise management systems relating to the design, development, testing, manufacture, regulatory compliance, and sale and use of Systems or Products or otherwise relating to the Business, including, but not limited to, the source codes, scripts, HTML versions, disks, files and all of the text related thereto and the literary content thereof, and Seller's copyright ownership therein (collectively, the "**Software Assets**"). The term "**Intellectual Property**" shall mean the Patents, Trademarks and Software Assets, together with all copyrights, copyright registrations, proprietary processes and techniques, trade secrets, license rights, specifications, technical manuals and data, sales and marketing materials, demos, prototypes, drawings, artwork, inventions, designs, mask works, service marks, product information and data, know-how and development work-in-progress, vendor and dealer lists, business correspondence and marketing plans and other intellectual or intangible property that comprise or are necessary to design, manufacture or test the Systems or Products or otherwise operate and/or manage and promote the Systems, Products and the Business, whether pending, applied for or issued, whether filed in the United States or in other countries, including, without limitation, all associated goodwill; all things authored, discovered, developed, made, perfected, improved, designed, engineered, acquired, produced, conceived or first reduced to practice by Seller or any of its employees or agents that are embodied in, derived from or relate to the Systems or Products, in any stage of development, including, without limitation, modifications, enhancements, designs, concepts, techniques, methods, ideas, flow charts, coding sheets, notes and all other information relating to the Systems or Products and all rights relating to the protection of the foregoing; and all Claims for any past, present or future infringement, misappropriation or unauthorized use of any of the foregoing rights to the extent not already asserted by Seller against any such party, and the right to all income, royalties, damages and other payments that are now or may hereafter become due or payable with respect to any of the foregoing rights, including without limitation damages for past, present or future infringement, misappropriation or unauthorized use thereof.

        (k)    The name "Vectrix" and any other legal names of Seller, together with copies of all books, tax returns, financial and other records and information which has been reduced to written, recorded or encoded form, including but not limited to those related to Warranty Claims, filings or applications made with any governmental agency relating to the Products being tested to comply with safety or environmental standards or Seller's authority to manufacture, sell or distribute Products in any jurisdiction; dealer lists and leads and originals (to the extent such originals are in Seller's possession or reasonable control) of all NDA Contracts,

in each case to the extent related to the Purchased Assets, but in all cases excluding the Attorney Communications (as defined below) (collectively, the "**Books and Records**").

(l)     all rights of Seller in the shares of capital stock (the "**Subsidiary Shares**") in Vectrix Europe Limited (the "**Subsidiary**");

(m)     all Claims of Seller against third parties relating to warranties for the Inventory or any other Purchased Assets, regardless of whether such causes of action, claims, demands, rights, credits, and privileges arose prior to, on, or after the Closing Date (the "**Warranty Claims**");

(n)     all Claims of Seller against third parties relating to the Purchased Assets arising prior to the Closing Date, which have not been asserted by Seller prior to the Closing Date (the "**Unasserted Claims**");

(o)     all Claims of Seller (the "**Foreign Subsidiary Claims**"), whether arising on, before or after the Closing Date against any of Vectrix Europe Limited, VectrixEurope S.r.l., VectrixRoma S.r.l., Vectrix (UK) Limited, and Vectrix Sp. z.o.o. (the "**Polish Subsidiary**") (collectively, the "**Foreign Subsidiaries**"); *provided, however,* that Seller shall retain all rights and defenses under section 502(d) of the Bankruptcy Code with respect to any Claims which Seller could assert against any Foreign Subsidiary under chapter 5 of the Bankruptcy Code.

(p)     all security deposits belonging to Seller and held by third parties in connection with the Purchased Assets and Assumed Liabilities;

(q)     all rights to proceeds under all insurance policies of Seller relating to any Purchased Asset or Assumed Liability for and up to the amount of any damages incurred and paid by Buyer in connection therewith; *provided, however*, that the Purchased Assets shall not include (i) any director and officer insurance policies of Seller or rights to proceeds thereof (except in connection with any damages incurred by Buyer with respect to any director or officer of Seller) or (ii) any rights to proceeds payable to Seller for matters arising prior to the Closing Date and not otherwise constituting an Assumed Liability hereunder (except to the extent Buyer incurs any losses related to product liability claims in connection with Purchased Assets produced, or products of the Seller sold, prior to the Closing Date, in which case, Buyer will be entitled to the proceeds thereof up to the amount of such losses); and

(r)     all goodwill associated with the Business.

1.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall be limited to the items specifically identified or described in Section 1.1 above and shall not include any other rights, Claims, assets, interests or property of Seller whatsoever (such excluded assets, the "**Excluded Assets**") and, notwithstanding anything to the contrary in this Agreement, none of the following assets, properties, rights or interests of Seller or any of its affiliates shall be Purchased Assets:

(a) all cash and cash equivalents of Seller, including without limitation, all deposits and security deposits in connection with any Excluded Asset or Excluded Liability, any prepaid insurance deposits and any attorney retainer amounts;

(b) all contracts of Seller other than the Assigned Contracts and the Floor Plan Financing Agreement;

(c) except for the Warranty Claims, the Unasserted Claims and the Foreign Subsidiary Claims, all Claims of Seller against third parties relating to Excluded Assets and Excluded Liabilities, or solely related to the Purchased Assets or to the extent related to the Assumed Liabilities that have already been asserted by Seller with respect to the Purchased Assets for periods prior to the Closing Date;

(d) any books and records of Seller (other than the Books and Records described in Section 1.1(k));

(e) other than as may be related to and necessary for the ownership and maintenance of the Purchased Assets and/or relates to any Claims or actions in connection with any Assumed Liabilities, any communications between Seller and any of its attorneys that are subject to the attorney-client privilege and attorney work-product privilege (the "Attorney Communications"), including without limitation advice relating to bankruptcy or insolvency, the sale or other disposition of the Seller's assets, the Bankruptcy Case, the Auction, the Excluded Assets, the Purchased Assets and the Excluded Liabilities; *provided*, that the non-delivery to Buyer of any such Attorney Communications shall have no effect on Buyer's title to any Purchased Assets or on Buyer's ability to prosecute any claims that it may have relating to the Purchased Assets or Assumed Liabilities, or otherwise limit Buyer's defense against any claim asserted against it in connection with the Purchased Assets or Assumed Liabilities;

(f) any assets owned by Seller that are unrelated to ownership of the Purchased Assets;

(g) any tax refunds attributable to the Business for taxable years and periods ending on or prior to the Closing Date; and

(h) all rights of Seller under this Agreement.

1.3     Assumption of Liabilities.

(a)     Assumed Liabilities.  Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, on the Closing Date, Buyer shall assume from Seller and agree to pay, perform, discharge or otherwise satisfy, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following liabilities, responsibilities, obligations, costs and expenses of the Seller (collectively, but in all cases excluding the Excluded Liabilities, the "**Assumed Liabilities**"), and no others:

(i)     any registration fees relating to the renewal of the Patents;

(ii)    all liabilities, responsibilities, obligations, costs and expenses of Seller under the Assigned Contracts incurred from and after the Closing Date, including, but not limited to, those liabilities, obligations, costs and expenses arising from acts or omissions of Buyer from and after the Closing Date;

(iii)    the amounts required to be paid pursuant to sections 365(f)(2) and (b)(1)(A) of the Bankruptcy Code, as set forth in Schedule 1.1(b), Schedule 1.1(c) and Schedule 1.1(d) for each Assigned Contract (the "**Cure Amounts**") or as may be ordered by the Bankruptcy Court;

(iv)    any liabilities and obligations of Seller relating to warranties for the Inventory or any other Purchased Assets whether existing and asserted or unasserted prior to, on or from and after the Closing Date, in an aggregate amount not to exceed $2,000,000.

(v)    all accounts payable listed on Schedule 1.3(a)(v) hereto;

(vi)    any liabilities incurred in the ordinary course of Business that are identified in writing by the Buyer and notified to Seller three (3) business days prior to the Closing Date as liabilities that the Buyer wishes to assume in the ordinary course; and

(vii)    the obligation to make retention payments to Catherine Meier and John McGuinness pursuant to key employee retention agreements that are acceptable to Buyer in its sole discretion, in an aggregate amount not to exceed $110,000, as set forth on Schedule 1.3(a)(vii) (the "**KERP Payments**").

(b)    Assignment of Contracts and Rights.  Buyer agrees that it will timely provide such information to Seller as is reasonably required by the Seller to provide "adequate assurance" pursuant to and in accordance with section 365 of the Bankruptcy Code with respect to the Assigned Contracts, upon request thereof and in order to facilitate assignment of such Assigned Contracts.  Subject to the approval of the Bankruptcy Court and pursuant to the terms of the Sale Order, the Assigned Contracts will be assumed by Seller and assigned to Buyer on the Closing Date pursuant to section 365(f) of the Bankruptcy Code.

(c)    Excluded Liabilities.  Except for the Assumed Liabilities, Buyer shall not be deemed to have assumed or agreed to be responsible for the liabilities, obligations and commitments of Seller or its affiliates, of whatever kind or nature (whether primary or secondary, direct or indirect, absolute or contingent, known or unknown, accrued or not accrued, or otherwise) whether or not arising out of the ownership of the Business, the Patents or the other Purchased Assets (collectively the "**Excluded Liabilities**").  Without limiting the generality of the preceding sentence, the Excluded Liabilities include (except to the extent constituting Assumed Liabilities):

(i)    liabilities, obligations and commitments for taxes of Seller (whether relating to the Purchased Assets or otherwise) and any and all taxes of any other person

that Seller is liable for as a result of joint and several liability, transferee liability, successor liability, contractual liability, pursuant to any law, or otherwise;

(ii)     liabilities, obligations and commitments of Seller and its affiliates in respect of transaction costs with respect to this Agreement or the Proposed Transactions;

(iii)     except as otherwise provided in Section 3.6 hereof, any taxes, fees, assessments, or similar costs of any kind arising out of, relating to, or in connection with this Agreement;

(iv)     subject to Section 1.3(a)(iv) hereof, any claim of liability for injury or damage to person or property caused by the use or operation of products manufactured, sold, installed, monitored, shipped, delivered or serviced by or on behalf of Seller prior to the Closing;

(v)     liabilities of Seller resulting from the Australian subsidiary litigation;

(vi)     any liabilities of Seller to E-Max ev's Germany Holdings Ltd., E-Max ev's Germany Ltd., E-Max ev's Ltd. or any of its affiliates (collectively, **"E-Max"**) and

(vii)     liabilities, obligations and commitments of Seller arising from the Excluded Assets or from Excluded Liabilities.

1.4     <u>Instruments of Transfer</u>.  The sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer shall be made by the Sale Order and other instruments of transfer and assignment as defined and provided for in Section 3 below and the other provisions of this Agreement.  In addition thereto, Seller shall take such other actions, and execute and deliver any and all other instruments, as may reasonably be requested by Buyer or its counsel to further evidence or effect the transfer, conveyance, assignment and delivery (including, without limitation, instruments for filing with any governmental or quasi-governmental offices) of the Purchased Assets to Buyer free and clear of Encumbrances other than Assumed Liabilities and Permitted Encumbrances and to effectuate and perfect the Proposed Transactions, but in all events only to the extent that the same do not impose any greater than *de minimis* monetary obligations upon Seller or in any other respect increase in any material way the burdens imposed upon Seller by the other provisions of this Agreement or the Sale Order.  From the date hereof until the Closing, Seller shall use commercially reasonable efforts to obtain settlement or stipulations with any party that objects to the assumption and assignment of an Assigned Contract or any related Cure Amount.

1.5     <u>Cure Costs; Updates to Schedules of Assigned Contracts</u>.  The Buyer may (i) include in the definition of Assigned Contracts (pursuant to the applicable Schedule) any contract, lease, license or other agreement of Seller, that was not previously included in the schedules of Assigned Contracts, at any time prior to the thirtieth day after the Closing Date and

require Seller to give notice to the parties to any such Assigned Contract, or (ii) to exclude from the definition of Assigned Contracts (pursuant to the applicable Schedule) any contract, lease, license or other agreement of Seller previously included in the schedules of Assigned Contracts, at any time prior to the thirtieth day after the Closing Date; *provided* that no such change, addition to or deletion from the Schedules of Assigned Contracts shall increase or reduce the amount of the Purchase Price. If any contract, lease, license or other agreement is added to (or excluded from) the Schedules of Assigned Contracts as permitted by this Section 1.5, Seller shall promptly take such steps as are reasonably necessary, including prompt delivery of notice to the non-debtor counterparty, to cause such contracts, leases, licenses or other agreements that become Assigned Contracts prior to the thirtieth day after the Closing Date to be assumed by Seller, and assigned to Buyer; *provided, further*, that Buyer shall have the sole responsibility for any Cure Costs associated with any such Assigned Contract. Without limiting any of Buyer's rights pursuant to this Section 1.5, in the event that the Sale Order does not approve the assignment or transfer of one or more of the Assigned Contracts to Buyer, or if the cure amounts ordered by the Bankruptcy Court exceed the Cure Amounts (as defined in Section 1.3(a)(iii)), Buyer may, in its sole discretion, exclude any or all of such Assigned Contracts from the Schedules of Assigned Contracts as its sole remedy with respect thereto.

1.6   Rejected Contracts. Seller shall not reject any executory contract or unexpired lease in the Bankruptcy Case after the date hereof and prior to the earlier of (a) the thirty-first day after the Closing Date or (b) the date this Agreement is terminated, without the prior written consent of Buyer.

1.7   Seller Copies. Subject to Seller executing a non-disclosure agreement reasonably satisfactory to Buyer, Seller may retain copies of any Assigned Contracts or Books and Records, which are not Excluded Assets and: (a) which relate to properties or activities of Seller in addition to the Business, (b) which are required to be retained pursuant to any law or are subject to the attorney-client privilege, (c) for financial reporting purposes, for tax purposes or for legal defense or prosecution purposes or otherwise in connection with the Excluded Assets or the Excluded Liabilities, or (d) which are reasonably deemed necessary by Seller.

2.   Consideration.

2.1   Purchase Price.

2.1.1   The consideration to be paid by Buyer to Seller for the Purchased Assets shall be equal to $1,750,000 (the "**Cash Consideration**") plus the assumption of the Assumed Liabilities (the "**Purchase Price**").

2.1.2   On the Closing Date, subject to the terms and conditions set forth in this Agreement and the Sale Order, the Purchase Price shall be paid as follows:

(a)   pursuant to section 363(k) of the Bankruptcy Code, the Buyer shall release Seller (and their respective successors and assigns) under the DIP Funding Agreement from any and all obligations, claims, rights, actions, causes of action, suits, liabilities, damages, debts, costs, expenses and demands whatsoever, in law or in equity, arising under, or otherwise

relating to, the DIP Funding Agreement in an aggregate principal amount equal to that portion of the DIP Loan drawn down by Seller as of the Closing Date plus accrued interest thereon (collectively, the "**Credit Bid**");

        (b)      Buyer shall transfer cash in the amount of the Cash Consideration, minus the Credit Bid, minus the Good Faith Deposit (as defined in Section 2.3 below), in immediately available United States funds to the Seller;

        (c)      the Good Faith Deposit shall be released to the Seller, with all interest and earnings thereon; and

        (d)      in addition to the foregoing consideration, as consideration for the grant, sale, assignment, transfer and delivery of the Purchased Assets free and clear of Encumbrances (other than Permitted Encumbrances), the Buyer shall assume the Assumed Liabilities.

        2.2    <u>Cash Consideration Adjustment</u>. The Cash Consideration shall be adjusted, as of the Closing Date, to account for any reduction in physical Inventory occurring after the Execution Date and prior to the Closing, as a result of loss of title, possession or control by Seller, whether by sale or otherwise.

        2.3    <u>Good Faith Deposit</u>. Concurrently with the mutual execution and delivery of this Agreement (the date of such mutual execution and delivery to be referred to herein as the "**Execution Date**"), Buyer shall deposit into an escrow account (the "**Escrow**") with an escrow agent (the "**Escrow Agent**") designated by Seller and reasonably acceptable to Buyer an amount equal to $200,000 (the "**Good Faith Deposit**") in immediately available United States funds (funds delivered in this manner are referred to herein as "**Good Funds**"), pursuant to an escrow agreement (the "**Escrow Agreement**") substantially in the form of **Exhibit B** attached hereto.

    3.    <u>Closing Transactions</u>.

        3.1    <u>Closing Conference; Closing Date</u>. The consummation of the transactions provided for herein (the "**Closing**") shall take place at 10:00 a.m. (Eastern Time) at the offices of Sheppard, Mullin, Richter & Hampton LLP, located in New York, N.Y., on the third business day following the satisfaction or due waiver of the last to occur of the closing conditions set forth in Sections 4.1 and 4.2 hereof, or at such other place and time as Buyer and Seller may mutually agree upon in writing (the "**Closing Date**"). The Closing and the effectiveness of the documents, agreements and certificates delivered in accordance with this Agreement, and the consummation of the Proposed Transactions, shall be deemed to occur at 12:01 a.m. (Eastern Time) on the Closing Date.

        3.2    <u>Drop Dead Date</u>. If the Closing Date does not occur by November 9, 2009 (the "**Drop Dead Date**"), then, subject to the terms of Sections 4.3.5 and 4.4 hereof, either Party may immediately terminate this Agreement upon written notice to the other Party. Alternatively, the Parties may mutually agree to extend the Drop Dead Date and the Closing Date. Until this

Agreement is terminated, the Parties shall diligently continue to work to satisfy all conditions to Closing.

3.3     Seller's Deliveries to Buyer at Closing.  On or prior to the Closing Date, Seller shall make the following deliveries to Buyer:

3.3.1     a counterpart Assignment of Patents dated as of the Closing Date, duly executed by Seller, in substantially the form attached as **Exhibit C** hereto (the "**Patent Assignment**");

3.3.2     a counterpart Assignment of Trademarks dated as of the Closing Date, duly executed by Seller, in substantially the form attached as **Exhibit D** hereto (the "**Trademark Assignment**");

3.3.3.     a counterpart Bill of Sale dated as of the Closing Date, duly executed by Seller, in substantially the form attached as **Exhibit E** hereto (the "**Bill of Sale**");

3.3.4     a counterpart Assignment and Assumption Agreement, duly executed by Seller, in substantially the form attached as **Exhibit F** hereto (the "**Assignment and Assumption**");

3.3.5     original stock certificates or an affidavit of lost stock certificates in lieu thereof, representing the Subsidiary Shares with stock transfer forms duly executed in blank;

3.3.6     a certificate of non-foreign status executed by Seller prepared in accordance with Treasury Regulation Section 1.1445-2(b);

3.3.7     all Books and Records relating to the Purchased Assets or the Business other than Attorney Communications;

3.3.8     a certificate of a duly authorized officer of Seller attesting to Seller's compliance with the conditions set forth in Section 4.2 hereof; and

3.3.9     any such other document or instrument reasonably requested by Buyer and contemplated by this Agreement to be delivered by Seller to Buyer at the Closing; including all documents and instruments that are required to delete the name "Vectrix" from the legal name of the Seller.

3.4     Buyer's Deliveries to Seller at Closing.  On or prior to the Closing Date, Buyer shall make the following deliveries to Seller:

3.4.1     that portion of the Purchase Price to be delivered by Buyer directly to Seller at the Closing under Section 2.1.2;

3.4.2     a counterpart Assignment of Patents dated as of the Closing Date, duly executed by Buyer;

3.4.3    a counterpart Bill of Sale dated as of the Closing Date, duly executed by Buyer;

3.4.4    a counterpart Assignment and Assumption Agreement, duly executed by Buyer;

3.4.5    an executed valid resale certificate for the purchase of the Inventory pursuant to and in accordance with applicable law of the Commonwealth of Massachusetts;

3.4.6    a certificate of a duly authorized officer of Buyer attesting to Buyer's compliance with the conditions set forth in Section 4.1 hereof; and

3.4.7    any such other documents or instruments reasonably requested by Seller and contemplated by this Agreement to be delivered by Buyer to Seller on the Closing Date.

3.5    Sale Order. As a condition to the closing of the Proposed Transactions, the Bankruptcy Court shall have entered an order (which shall not have been stayed and which shall have become a Final Order), in form and substance reasonably acceptable to the Buyer, authorizing the sale, transfer, assignment, conveyance and delivery of the Purchased Assets to Buyer free and clear of all Encumbrances other than Permitted Encumbrances, and authorizing the Seller to consummate the Proposed Transactions with the Buyer (the "**Sale Order**"), pursuant to the motion filed by Seller with the Bankruptcy Court, in form and substance reasonably acceptable to the Buyer on the Petition Date (the "**Sale Motion**") seeking, among other things, authority to sell the Purchased Assets to the Buyer in accordance with this Agreement or to a purchaser or purchasers (jointly bidding) other than Buyer pursuant to a transaction (or series of transactions) making the highest and best bid or bids at an auction to be held pursuant to the Bidding Procedures Order (as defined in Section 10.1 hereof). Buyer further agrees to promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and the Assigned Contracts, demonstrating that Buyer is a "good faith" purchaser under section 363(m) or any other section of the Bankruptcy Code, and that the Purchase Price was not controlled by an agreement in violation of section 363(n) or any other section of the Bankruptcy Code. The Sale Order shall provide that it shall be effective and enforceable immediately upon entry by the Bankruptcy Court notwithstanding Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure. In the event the entry of the Sale Order shall be appealed, Seller and Buyer shall use their respective reasonable efforts to defend such appeal. The term "**Final Order**" shall mean an order of the Bankruptcy Court which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari,* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the

highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

        3.6     Sales, Use and Other Taxes. Any sales, purchases, transfer, stamp, value added, documentary stamp, use or similar taxes, fees, assessments and other costs under the laws of the states or other jurisdiction in which any portion of the Purchased Assets is located, or any subdivision of any such state or other jurisdiction, which may be payable by reason of the sale of the Purchased Assets under this Agreement or the Proposed Transactions shall be borne equally and timely paid by Buyer and Seller. In no event shall any Party be responsible for the income taxes of any other Party that arise as a consequence of the Proposed Transactions.

        3.7     Allocation of Purchase Price for Tax Purposes. Within thirty (30) days after the Closing, Buyer shall deliver to Seller for Seller's review and comment, an allocation schedule(s) (the "**Allocation Schedule(s)**") allocating the Purchase Price (as may be adjusted pursuant to the terms of this Agreement), including the Assumed Liabilities to the extent such liabilities are properly treated as includible in purchase price for federal income tax purposes (and any other relevant items), among the Purchased Assets (and any other relevant items or assets) in accordance with Section 1060 of the Internal Revenue Code and the regulations thereunder. On or before the fifteenth (15th) business day following Seller's receipt of the Allocation Schedule(s) from Buyer as herein provided, Seller shall provide Buyer with any comments Seller may have with respect to the Allocation Schedule(s). Such comments shall be considered in good faith by Buyer. To the extent such comments are material in nature, Seller and Buyer shall thereafter work in good faith to resolve any and all objections set forth therein. If Seller and Buyer are unable to resolve any material differences with regard to the allocation of the Purchase Price within fifteen (15) business days after Seller's delivery of such written comments to the Allocation Schedule(s), then any disputed, material matters will be finally and conclusively determined by an independent certified public accounting firm or independent certified appraisal firm (the "**Valuation Expert**") mutually agreed upon by Buyer and Seller (such agreement not be unreasonably withheld or delayed by Buyer or Seller). The Valuation Expert shall promptly resolve any such matters in dispute and render a written report as to the disputed matters and the resulting allocation. The Valuation Expert's fees and expenses shall be borne equally by Buyer, on the one hand, and Seller, on the other hand. Buyer and Seller will each file all tax returns (including, but not limited to, IRS Forms 8594) consistent with the Allocation Schedule(s) established pursuant to the terms of this Section 3.6. Seller, on the one hand, and Buyer, on the other hand, each agrees to provide the other promptly with any other information required to complete IRS Forms 8594. Neither Buyer nor Seller shall take any tax position inconsistent with such Allocation Schedule(s) and neither Buyer nor Seller shall agree to any proposed adjustment based upon or arising out of Allocation Schedule(s) by any governmental authority without first giving the other party prior written notice; *provided*,

*however*, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any governmental authority based upon or arising out of the Allocation Schedule(s), and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any governmental authority based upon or arising out of such Allocation Schedule(s). The Allocation Schedule(s) shall be revised in accordance with Section 1060 of the Internal Revenue Code and the regulations thereunder to appropriately take into account any payments made under this Agreement.

       3.8   <u>Bulk Transfer Laws</u>. Buyer hereby waives compliance by Seller, and Seller hereby waives compliance by Buyer, with the provisions of any so-called bulk sales or bulk transfer laws of any jurisdiction in connection with the sale of the Purchased Assets.

    4.   <u>Conditions Precedent to Closing</u>.

       4.1   <u>Conditions to Seller's Obligations</u>. In addition to the conditions to Closing set forth in Section 3.5 hereof, Seller's obligation to make the deliveries required of Seller on the Closing Date and otherwise consummate the Proposed Transactions shall be subject to the satisfaction, or waiver by Seller in its sole discretion, of each of the following conditions:

       4.1.1   Buyer shall have performed and complied in all material respects with the covenants and obligations required by this Agreement to be performed or complied with by Buyer at or prior to the Closing Date (except that those covenants and obligations which are qualified as to materiality, Material Adverse Change or similar expressions shall have been performed and complied with in all respects).

       4.1.2   All of the representations and warranties of Buyer contained herein shall have been true and correct in all material respects when made and shall continue to be true and correct on the Closing Date in all material respects (except that those representations and warranties which are qualified as to materiality, Material Adverse Change or similar expressions shall have been true and correct in all respects or shall continue to be true and correct on the Closing Date in all respects, as applicable); *provided*, that representations and warranties that are confined to a specified date shall speak only as of such date.

       4.1.3   Buyer shall have executed and delivered to Seller the Assignment of Patents, the Trademark Assignment, the Bill of Sale, the Assignment and Assumption and the Escrow Agreement.

       4.1.4   Buyer shall have delivered, or shall be prepared to deliver to Seller on the Closing Date, all cash and other documents required of Buyer to be delivered on the Closing Date, including, without limitation, as provided for in Section 3.4 hereof.

       4.1.5   Buyer shall have delivered to Seller appropriate evidence of all necessary entity action by Buyer in connection with the Proposed Transactions, including, without limitation: (i) certified copies of resolutions duly adopted by Buyer approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Buyer of this Agreement; and (ii) a certificate as to the incumbency of the

parties executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

4.1.6    No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority (each, a "**Governmental Authority**") seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction.

4.1.7    The Bankruptcy Court shall have issued the Sale Order which shall be a Final Order and not be subject to any stay.

4.1.8    The Buyer shall have made the KERP Payments under and subject to Section 1.3(a)(vii) hereof.

4.2    Conditions to Buyer's Obligations.    In addition to the conditions to Closing set forth in Section 3.5 hereof, Buyer's obligation to make the deliveries required of Buyer on the Closing Date, and to otherwise close the Proposed Transactions contemplated herein, shall be subject to the satisfaction, or waiver by Buyer in its sole discretion, of each of the following conditions:

4.2.1    Seller shall have performed and complied in all material respects with the covenants and obligations required by this Agreement to be performed or complied with by Seller at or prior to the Closing Date (except that those covenants and obligations which are qualified as to materiality, Material Adverse Change or similar expressions shall have been performed and complied with in all respects).

4.2.2    All of the representations and warranties of Seller contained herein shall have been true and correct in all material respects when made and shall continue to be true and correct on the Closing Date in all material respects (except that those representations and warranties which are qualified as to materiality, Material Adverse Change or similar expressions shall have been true and correct in all respects or shall continue to be true and correct on the Closing Date in all respects, as applicable); *provided*, that representations and warranties that are confined to a specified date shall speak only as of such date.

4.2.3    Each of the deliveries required to be made to Buyer pursuant to Section 3.3 shall have been so delivered.

4.2.4    Seller shall have executed and delivered to Buyer the Escrow Agreement.

4.2.5    Seller shall have delivered possession of all physical assets which constitute Purchased Assets, and have delivered passcodes and other information that would allow for Buyer to use and possess and protect any Software Assets, together with all other documents reasonably requested by Buyer or required of Seller to be delivered on the Closing

Date, including but not limited to all consents by third parties that may be required in order to transfer good and marketable title to the Purchased Assets.

4.2.6    No action, suit or other proceedings shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, seeking to obtain relief in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Authority having appropriate jurisdiction.

4.2.7    The Bankruptcy Court shall have issued the Sale Order, in form and substance reasonably acceptable to Buyer, which shall be a Final Order.

4.3    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing Date:

4.3.1    by the mutual written consent of Buyer and Seller;

4.3.2    by Buyer (i) upon written notice in the event of a material breach of any representation or warranty, or covenant or agreement to be performed or complied with by Seller pursuant to the terms of this Agreement or any other agreement contemplated hereby, which breach would result in a condition to Closing set forth in Section 4.2 hereof becoming incapable of fulfillment or cure (which condition has not been waived by Buyer in writing) prior to the Drop Dead Date (as may be extended pursuant to Section 3.2 hereof); (ii) if a Material Adverse Change has occurred and is continuing; (iii) if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller and such trustee rejects the transactions contemplated by this Agreement; or (iv) if the Sale Order as entered by the Bankruptcy Court includes changes thereto which are not reasonably acceptable to Buyer;

4.3.3    by Seller upon written notice in the event of a material breach of any representation or warranty, or covenant or agreement to be performed or complied with by Buyer pursuant to the terms of this Agreement or any other agreement contemplated hereby, which breach would result in a condition to Closing set forth in Section 4.1 hereof becoming incapable of fulfillment or cure (which condition has not been waived by Seller in writing) prior to the Drop Dead Date (as may be extended pursuant to Section 3.2 hereof);

4.3.4    by either Buyer or Seller if any Governmental Authority having competent jurisdiction shall have issued a final, non-appealable order, decree, ruling or injunction (other than a temporary restraining order) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement or any other agreement contemplated hereby; *provided*, *however*, that the right to terminate this Agreement under this Section 4.3.4 shall not be available to any Party who shall not have complied with its obligations, if any, hereunder to avoid the issuance of such order, decree, ruling or injunction;

4.3.5    by Buyer or Seller if the Closing shall not have occurred on or before the Drop Dead Date (as may be extended by Section 3.2 hereof); *provided, however*, that the right to terminate this Agreement under this Section 4.3.5 shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Drop Dead Date (for purposes of this Section 4.3.5, the failure or refusal by any Party to provide any waiver that under the terms hereof may be given or withheld in such Party's discretion shall not be deemed a failure to fulfill any obligation under this Agreement);

4.3.6    by Buyer or Seller if the Bankruptcy Court approves a Competing Transaction and it is consummated; and

4.3.7    by Buyer or Seller if no Sale Order has been issued on or before the Drop Dead Date.

4.4    Effect of Termination.  Except as set forth herein, in the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without liability to the Buyer or Seller; *provided, however*, that if this Agreement is terminated pursuant to Sections 4.3.2(i), 4.3.2(iii) or 4.3.6 and Buyer is not in material breach of this Agreement, then Buyer shall be entitled to the Break-Up Fee and the Expense Reimbursement (as defined below); *provided, however,* that in the event of a termination pursuant to Section 4.3.2(iii), the Buyer's claim for payment of the Break-Up Fee and Expense Reimbursement shall be a claim against the chapter 7 estate only.  Upon termination of this Agreement by Seller pursuant to Section 4.3.3, the Good Faith Deposit and all interest or income accrued thereon shall be disbursed to Seller in accordance with the terms of the Escrow Agreement.   If this Agreement is terminated for any other reason, the Good Faith Deposit and all interest or income accrued thereon shall be disbursed to Buyer in accordance with the terms of the Escrow Agreement.

4.5    Failure to Obtain any Required Consents to Assignment.  If the Bankruptcy Court cannot authorize and direct the transfer of any Purchased Asset to Buyer without the consent of or other action by a third party, then Buyer and Seller shall exercise their reasonable best efforts to obtain the necessary consents or other action from such third party.  If any such consent or other action is not obtained, Buyer and Seller will cooperate in a mutually agreeable arrangement under which Buyer would obtain the benefits and be responsible for the obligations thereunder in accordance with this Agreement to the maximum extent permitted by applicable law.

5.    Seller's Representations and Warranties.  In addition to the representations and warranties contained elsewhere in this Agreement, Seller hereby makes the following representations and warranties to Buyer as of the date hereof and the Closing Date:

5.1    Organization, Standing and Power.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite entity power and authority to own, lease and operate its properties and assets, to carry

on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

5.2    Authorization of Seller; No Conflict.  Subject to the entry of the Sale Order and authorization as required by the Bankruptcy Court (a) Seller has the requisite corporate power and authority to execute and deliver this Agreement and the other documents contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Proposed Transactions, (b) the execution and delivery by Seller of this Agreement and the other documents contemplated hereby to which it is a party, the performance of its obligations hereunder and thereunder and the consummation by it of the Proposed Transactions have been duly authorized by all necessary corporate actions on the part of Seller, (c) this Agreement and each other document contemplated hereby to which Seller is a party will constitute, upon the mutual execution and delivery thereof, the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws relating to or affecting creditors generally and by general equity principles (regardless of whether such enforceability is considered in a proceeding in equity or at law), and (d), except as would not result in a Material Adverse Change, the execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Seller do not and will not:  (i) conflict with or result in a breach of any organizational documents of Seller; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or other Governmental Authority; or (iii) result in the creation or imposition of any Encumbrance other than a Permitted Encumbrance (each as defined in Section 5.3 below) upon any of the properties or assets of Seller.  As used herein, "**Material Adverse Change**" shall mean any event, change, condition, development or effect that individually or in the aggregate, results in, or is reasonably expected to result in a material adverse change to (i) the Purchased Assets, the Assumed Liabilities, the Business or the operations, the results of operations or condition (financial or otherwise), of the Seller, taken as a whole or (ii) the ability of the Seller to perform its obligations under this Agreement, prior to the Closing Date, provided, however, that "Material Adverse Change" shall specifically exclude events, changes, conditions developments or effects in connection with or resulting from (A) the entry into this Agreement, the bankruptcy filing of Seller or the public announcement thereof, or (B) changes in general economic conditions, financial markets or conditions generally affecting the Business, to the extent the Business is disproportionately affected by such changes, or (C) the ability of Buyer to gain access to, ownership of, control of, make any claim for or otherwise benefit from any operating losses or other tax events which may exist at or prior to Closing with respect to either of VectrixRoma S.r.l. and/or Vectrix Europe S.r.l.

5.3    Title and Validity.  Seller owns and holds, and on the Closing Date will transfer to Buyer, good and marketable title to all of the equity interests in the Subsidiary Shares free and clear of any Encumbrances other than Assumed Liabilities and imperfections of title, restrictions or encumbrances, if any, that (a) would not involve greater than *de minimis* costs to Buyer to correct or remove, (b) do not materially impair the use and operation of such asset in the Business as currently conducted, or (c) are caused solely by Buyer (collectively "*Permitted*

*Encumbrances*"). To Seller's knowledge, the Subsidiary owns and holds good and marketable title to all of the equity interests in the Foreign Subsidiaries subject to any effect any foreign insolvency proceedings may have on any of the Foreign Subsidiaries. In addition, Seller has provided Buyer with a letter from the Subsidiary representing that the Subsidiary owns and holds good and marketable title to all of the equity interests in the Foreign Subsidiaries; *provided* that the Parties hereto acknowledge and agree that Seller is not making, and shall not be deemed to make, any representation whatsoever, express or implied, with respect to the representations made by the Subsidiary in such letter. The NDA Contracts are legal, valid and binding obligations of the Seller, and to the Seller's knowledge (which consists, for all purposes of this Agreement, of the actual knowledge of Mike Boyle and John McGuinness), are in full force and effect and Buyer will have right on and after the Closing Date to fully enforce such agreements for its benefit to the extent permitted by and subject to applicable law, without the requirement that the Seller or any other party consent or receive notice of any kind.

5.4    Actions. Except as would not result in a Material Adverse Change, there is no Action that questions or challenges the validity of this Agreement or the other documents contemplated hereby or any action taken or proposed to be taken by Seller pursuant hereto or thereto or in connection with the Proposed Transactions. As used herein, "**Action**" means any claim, dispute, demand, cause of action or action asserted in any arbitration, litigation, adversary proceeding, mediation, suit, investigation or other proceeding and any appeal therefrom.

5.5    Compliance with Laws. Except as would not result in a Material Adverse Change, (a) Seller is not in violation of any laws, rules or regulations relating to the Purchased Assets, (b) Seller has not been notified in writing and has no knowledge that it has been charged with or threatened in writing with, any charge concerning any violation of any provision of any law, rule or regulation relating to the Purchased Assets that has not already been resolved, and (c) Seller is not in violation of, or in default under, and no event has occurred which, with the lapse of time or the giving of notice, or both, would result in the violation of or default under, the terms of any judgment, decree, order, injunction or writ of any Governmental Authority relating to the Purchased Assets.

5.6    Approvals. Other than entry of the Sale Order and except (i) for consents required to assign the Assigned Contracts, if any, under section 365 of the Bankruptcy Code, and the Bank of America Deposit and (ii) as would not result in a Material Adverse Change, no approval of any Governmental Authority or other person or entity is required to be made, obtained or given by or with respect to Seller in connection with the execution or delivery by Seller of this Agreement and the other documents contemplated hereby to which it is a party, the performance by it of its obligations hereunder or thereunder or the consummation by it of the Proposed Transactions, including without limitation the transfer of the Purchased Assets to Buyer.

5.7    Broker or Finder's Fee. Except as set forth in Schedule 5.7 hereof, Seller has not authorized any person or entity to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such person or entity to any investment

banking, brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement or any of the other documents contemplated hereby.

       5.8    <u>Ownership of Subsidiary Shares</u>.  Seller owns and controls 100% of the Subsidiary Shares.

       5.9    <u>Environmental and Health and Safety Matters</u>.  To Seller's knowledge and except as set forth on <u>Schedule 5.9</u>, or as would not, individually or in the aggregate, have a Material Adverse Change:

       (a)    the current operations of the Business comply with any legal requirements concerning environmental, health or safety matters ("**Environmental, Health and Safety Laws**"), and Seller has not received written notice alleging that the activities of the Business are in violation of any Environmental Health and Safety Laws;

       (b)    there has been no release of any hazardous substances that requires reporting, investigation or remedial action by Seller under applicable Environmental, Health and Safety Laws; and

       (c)    Seller has made available or provided Buyer with copies of all material documents, records and information in Seller's possession concerning the condition of the environment at any of the properties on which it conducts business, including environmental audits and environmental site assessments.

       5.10    <u>Third Party Rights</u>.  Except as disclosed in <u>Schedule 5.10</u>, to the Seller's knowledge, neither Seller nor any of the Foreign Subsidiaries is party to any contract, agreement or understanding (formal or informal) that would (i) require Buyer to disclose or assign (in whole or in part) any Purchased Asset to any third party, (ii) limit the Buyer's exclusive right to own and use the Purchased Assets, (iii) require the Buyer to pay any royalty, license fee, sales commission, finder's fee or any other fee, cost or charge or any kind or character to any third party, or (iv) require the Buyer to share any revenues or profits with any third party.

       6.    <u>Buyer's Warranties and Representations</u>.  In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Seller as of the date hereof and the Closing Date:

       6.1    <u>Organization, Standing and Power</u>.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all requisite entity power and authority to own, lease and operate the Purchased Assets and carry on the Business from and after the Closing Date, and to execute, deliver and perform this Agreement and all agreements contemplated hereby.

       6.2    <u>Authorization of Buyer; No Conflict</u>.  (a) Buyer has the requisite power and authority to execute and deliver this Agreement and the other documents contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder and to

consummate the Proposed Transactions, (b) the execution and delivery by Buyer of this Agreement and the other documents contemplated hereby to which it is a party, the performance of its obligations hereunder and thereunder and the consummation by it of the Proposed Transactions have been duly authorized by all necessary organizational actions on the part of Buyer, (c) this Agreement and each other document contemplated hereby to which Buyer is a party will constitute, upon the mutual execution and delivery thereof, the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws relating to or affecting creditors generally and by general equity principles (regardless of whether such enforceability is considered in a proceeding in equity or at law), and (d) the execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of any organizational documents of Buyer; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or other Governmental Authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a party or by which Buyer or its assets or properties may be bound.

6.3     Approvals.  Other than entry of the Sale Order, no approval of any Governmental Authority or other person or entity is required to be made, obtained or given by or with respect to Buyer in connection with the execution or delivery by Buyer of this Agreement and the other documents contemplated hereby to which it is a party, the performance by it of its obligations hereunder or thereunder or the consummation by it of the Proposed Transaction.

6.4     Sufficient Funds.  Buyer has cash available on hand, permitted borrowing capacity under existing facilities or firm financing commitments that together are sufficient funds to enable it to pay the Purchase Price in full at Closing, consummate the Proposed Transaction, and to provide adequate assurance of future performance under the Assigned Contracts, and without violating any solvency requirements applicable to or binding upon Buyer.

6.5.    Broker or Finder's Fee.  Buyer has not authorized any person or entity to act as broker, finder, banker, consultant, intermediary or in any other similar capacity which would entitle such person or entity to seek payment from Seller of any investment banking, brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement or any of the other documents contemplated hereby.

7.      "AS IS" Transaction.  Buyer hereby acknowledges and agrees that, except as otherwise set forth in this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including, without limitation, income to be derived or expenses to be incurred in connection with the Purchased Assets, the transferability of Purchased Assets, or any other matter or thing relating to the Purchased Assets or any portion thereof).  Buyer further acknowledges that, at or prior to the Closing Date, Buyer shall have conducted an independent inspection, review, examination and investigation of the Purchased Assets and all matters relating thereto as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Purchased Assets, with the

exception of the representations set forth in this Agreement, Buyer shall do so based solely upon such independent inspection and investigation. Accordingly, except for such representations and warranties set forth herein, Buyer will accept the Purchased Assets on the Closing Date "**AS IS**", "**WHERE IS**," and "**WITH ALL FAULTS.**" Further, Buyer hereby expressly acknowledges and agrees that, subject to Section 4.4, except for any fraud or intentional misrepresentation by Seller in connection with Seller's representations and warranties set forth in Section 5 above, the only remedy for a breach of such representations and warranties shall be Buyer's option not to close in accordance with and subject to the limitations set forth herein and, without limiting the foregoing, Buyer shall have no remedy whatsoever for any such breach after the Closing Date.

8.    Actions Prior to Closing.

8.1    Conduct of Business.  From the date hereof until the Closing Date, Seller shall (a) use commercially reasonable efforts to conduct its business in the ordinary course consistent with past practice, (b) use commercially reasonable efforts to preserve intact the Purchased Assets; and (c) maintain the Books and Records with respect to the Purchased Assets in accordance with the reasonable business practices.

8.2    Access.  Seller shall afford Buyer and its representatives reasonable access during normal business hours throughout any period from and after the date hereof until the Closing Date, upon two (2) business days' prior notice to the Books and Records, files, pleadings, data base, documents, properties, facilities and employees of Seller relating to the Purchased Assets, as Buyer may reasonably request; *provided* that such reasonable access shall not unduly interfere with Seller's ongoing business operations or obligations and shall not include access to Attorney Communications.

9.    INTENTIONALLY OMITTED.

10.    Bankruptcy Court Matters.

10.1    Competing Bids.  This Agreement and the transactions contemplated hereby are subject to Seller's right and ability to consider higher or better competing bids (each a "**Competing Bid**") with respect to the Business and the Purchased Assets pursuant to an order of the Bankruptcy Court approving the Bidding Procedures (as defined below) (the "**Bidding Procedures Order**") and entry of the Sale Order.  Nothing contained herein shall be construed to prohibit Seller and its representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Competing Bids for the purpose of entering into a Competing Transaction once the Bankruptcy Case has been filed.

10.2    Bidding Procedures Order

(a)      Seller agrees promptly following, but no later than five (5) business days after, the execution of this Agreement, to:

(i)      file the Bankruptcy Case; and

(ii)     file the Sale Motion, in form and substance reasonably acceptable to Buyer, requesting a hearing date to approve the Bidding Procedures Order and for a hearing date to approve the Sale Order.

(b)     The Bidding Procedures Order shall be in form and substance reasonably acceptable to Buyer and shall approve procedures for the qualification of Competing Bids and the process for competitive bidding to be agreed upon by Seller and Buyer (the "**Bidding Procedures**"), and which shall, among other things:

(i)     approve the Buyer as the stalking horse bidder and approve the Break-Up Fee and Expense Reimbursement (as defined below), and provide that the Buyer's claim to the Break-Up Fee and Expense Reimbursement shall be entitled to superpriority administrative expense claim treatment in the Bankruptcy Case, senior to all other superpriority claims, and that the Break-Up Fee and Expense Reimbursement shall be paid to Buyer in full upon consummation of a Competing Transaction;

(ii)     provide that the Buyer's bid includes the Credit Bid for the outstanding balance of the DIP Loan as of the date of the Auction pursuant to section 363(k) of the Bankruptcy Code;

(iii)     establish the date by which initial and qualified Competing Bids must be submitted (the "**Bid Deadline**");

(iv)     establish the date and place for an auction be held for auction of the Purchased Assets (the "**Auction**"); and

(v)     establish a date for the hearing to be held before the Bankruptcy Court at which the Sale of the Purchase Assets will be approved (the "**Sale Hearing**").

(c)     The Bidding Procedures Order shall also establish the procedures for the solicitation of higher and/or better offers from potential bidders for the Purchased Assets pursuant to a Competing Transaction or Transactions.

(d)     Seller hereby agrees not to change or modify any of the dates or procedures set forth in the Bidding Procedures Order, including without limitation (i) the dates of the Bid Deadline, Auction and Sale Hearing, (ii) the procedures for determining any qualified bid and qualified bidders to participate in the Auction, or (iii) the initial overbid amount and the incremental bid amount, without the prior written consent of Buyer, except as otherwise ordered by the Bankruptcy Court.

(e)     Seller agrees, and shall represent to the Bankruptcy Court, that Seller actively solicited this "stalking horse" bid from the Buyer.

10.3     Submission to Bankruptcy Court.  Within one (1) day following the Petition Date, Seller shall file with the Bankruptcy Court this Agreement and such notices as may be appropriate in connection therewith.  Buyer shall cooperate with Seller in obtaining Bankruptcy Court approval of the Bidding Procedures Order and the Sale Order.

10.4    Break-Up Fee and Expense Reimbursement

Subject only to approval of the Bankruptcy Court, the Bidding Procedures Order shall provide that:

(a)    Buyer is entitled to be paid a fee in an amount equal to $125,000 as a fair and reasonable break-up fee (the "**Break-Up Fee**") in accordance with the terms of this Agreement;

(b)    Buyer is entitled to reimbursement of reasonable and documented out of pocket expenses, including legal, financial advisor, and consultant fees, as well as travel, meals and other related expenses, up to $325,000 (the "**Expense Reimbursement**") in accordance with the terms of this Agreement; and

(c)    the Break-Up Fee and Expense Reimbursement shall be entitled to superpriority administrative expense claim treatment in the Bankruptcy Case, senior to all other superpriority claims, and that the Break-Up Fee and Expense Reimbursement shall be paid to Buyer in full upon consummation of a Competing Transaction.

10.5    Payment of Break Up Fee and Expense Reimbursement

The Break-Up Fee and Expense Reimbursement, which shall be entitled to superpriority administrative expense claim treatment in the Bankruptcy Case, senior to all other superpriority claims, shall be due and payable to the Buyer only if:

(a)    the Bankruptcy Court approves a Competing Transaction with a qualified bidder other than the Buyer;

(b)    in accordance with Section 4.4, the Seller consummates such Competing Transaction; and

(c)    Buyer is not in material breach of this Agreement.

10.6    Timing for Payment. The Break-Up Fee and Expense Reimbursement described in this Article 10 shall be paid upon and subject to the occurrence of a Closing of a Competing Transaction, by the winning qualified bidder other than Buyer or by the Seller.

10.7    Buyer's Back-Up Commitment; Payment of Expense Reimbursement. If a Competing Transaction is approved by the Bankruptcy Court with a qualified bidder other than Buyer, then Buyer shall remain bound to this Agreement on its existing terms and at the Purchase Price set forth herein, as a back-up purchaser, unless and until the earlier of (a) the date the Competing Transaction is consummated and (b) the Drop Dead Date.

11.    Miscellaneous.

11.1    Reasonable Access to Records and Certain Personnel. After the Closing Date, Buyer shall permit Seller and Seller's representatives, agents, counsel and other professionals who execute non-disclosure agreements that are satisfactory to Seller and Buyer (collectively, "**Permitted Access Parties**") reasonable access to the financial and other books and records relating to the Purchased Assets during normal business hours, which access shall include (x) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (y) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent the applicable Permitted Access Party reimburses Buyer for the reasonable costs and expenses thereof.

11.2    Notices. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, or by registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of three (3) days after the date of mailing. Mailed notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this Section 9.3.

| | |
|---|---|
| *To Seller:* | VECTRIX Corporation<br>55 Samuel Barnet Blvd.<br>New Bedford, MA  02745<br>Attn: President and CEO<br>Email Copy to: John McGuinness<br>(jmcguinness@vectrixusa.com) |
| With a copy to: | Sheppard, Mullin, Richter & Hampton LLP<br>1300 I Street, NW, Suite 1100 East<br>Washington, D.C. 20005<br>Attn:  Lucantonio N. Salvi<br><br>-and-<br><br>Sheppard, Mullin, Richter & Hampton LLP<br>30 Rockefeller Plaza, 24th Floor<br>New York, NY 10112<br>Attn:  Edward H. Tillinghast, III<br>      Malani J. Cademartori |
| To Buyer: | New Vectrix LLC<br>1045 First Ave., Suite 120<br>King of Prussia, PA  19406<br>Attn: GH Venture Partners LLC, Managing Member |

|                  |                            |
|------------------|----------------------------|
| With a copy to:  | Latham & Watkins LLP       |
|                  | 99 Bishopsgate             |
|                  | London EC2M 3XF            |
|                  | United Kingdom             |
|                  | Attn: Michael S. Immordino |
|                  |                            |
|                  | Latham & Watkins LLP       |
|                  | 885 Third Avenue           |
|                  | New York, NY 10022         |
|                  | Attn: Michael J. Riela     |

11.3  <u>Entire Agreement</u>.  This Agreement, together with the Confidentiality Agreement, contains the entire agreement between the Parties relating to the subject matter hereof.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing signed by the Parties.

11.4  <u>Modification</u>.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto.

11.5  <u>Closing Date</u>.  All actions to be taken on the Closing Date pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

11.6  <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

11.7  <u>Further Assurances</u>.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the Proposed Transactions or the intentions of the Parties with respect thereto.

11.8  <u>Waiver</u>.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

11.9    Brokerage Obligations. If any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or Seller in connection with the transactions contemplated by this Agreement (other than any claims of Seller's broker, for which Seller shall be solely responsible), all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the other Party), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the Proposed Transaction.

11.10   Payment of Fees and Expenses.  Except as otherwise provided herein, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the Proposed Transaction.  The fees of the Escrow Agent shall be deemed an ordinary course of business expense and shall be borne equally by Buyer and Seller.

11.11   Survival.  The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing Date and no Person shall have any liability for any breach thereof.  The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing Date, if any, shall survive the Closing Date hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

11.12   Assignments.  This Agreement shall not be assigned by any Party hereto without the prior written consent of the other Party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion; provided, however, that Buyer shall be permitted, upon prior notice to Seller, to (i) assign all or part of its rights or obligations hereunder to one or more affiliates of Buyer and, following the Closing, in whole or in part to any successor-in-interest or to any person acquiring all or any portion of the Purchased Assets, and (ii) designate one or more of its affiliates to perform its obligations hereunder (in any or all of which cases referred to in clauses (i) and (ii), Buyer nonetheless shall remain liable with respect to and be responsible for the performance of all of its obligations hereunder); *provided*, that in the event Buyer seeks to assign or so designate its rights and obligations pursuant to this Section 11.12 prior to Closing, the Parties shall file and serve notice of such  proposed assignment or designation in accordance with the Bankruptcy Code, Bankruptcy Rules, and applicable Local Rules, at least 10 days prior to the Sale Hearing.   Any assignment made in contravention of the terms of this Section 11.12 shall be void *ab initio*.

11.13   Binding Effect.  Subject to the provisions of Section 11.12 above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

11.14   Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof.

11.15    Submission to Jurisdiction; Consent to Service of Process.

11.15.1    The Bankruptcy Court shall have and retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Proposed Transactions, and any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.3 hereof; *provided, however,* that if the Bankruptcy Court declines jurisdiction after the Bankruptcy Case has closed or for any other reason, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware and any appellate court thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute maybe enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

11.15.2    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER ACQUISITION DOCUMENTS.

11.16    Good Faith.    The Parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing Date.

11.17    Construction.    In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

11.18    Counterparts.    This Agreement may be signed in counterparts. The Parties further agree that this Agreement may be executed by the exchange of facsimile or pdf signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

11.19    Time is of the Essence.    Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

11.20    Interpretation and Rules of Construction.    In this Agreement, except to the extent that the context otherwise requires:

11.20.1    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

11.20.2    the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

11.20.3    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

11.20.4    the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

11.20.5    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

11.20.6    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

11.20.7    any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

11.20.8    references to a person are also to its permitted successors and assigns; and

11.20.9    the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

11.21  **Public Announcement.**  Prior to the Petition Date, Buyer and Seller shall consult with each other before issuing any press release or making any public statement or other public communication with respect to this Agreement or the Proposed Transaction except as permitted in this Section 11.21.  Buyer and Seller shall not issue any such press release or make any such public statement or public communication without the prior written consent of the other Party, which shall not be unreasonably withheld or delayed; *provided, however,* that a Party may, without the prior consent of the other Party, issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable law, any Governmental Authority with competent jurisdiction or any listing agreement with any national securities exchange.

11.22  **No Third Party Beneficiaries.**  Except as and to the extent otherwise provided herein, nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Parties hereto and their respective successors and permitted assigns.

11.23 <u>Confidentiality</u>.  Buyer agrees to treat as confidential any information (oral, written or otherwise) concerning Seller, whether furnished to Buyer before or after the date of this Agreement, together with any and all analyses or other documents prepared by Seller or Buyer or any of their directors, officers, employees, members, partners, agents, advisors, attorneys, accountants, consultants, subcontractors, representatives or lending institutions, or any of their affiliates and subsidiaries or any of their respective affiliates, directors, officers, employees, members, partners, agents, advisors, attorneys, accountants, consultants, subcontractors, representatives or lending institutions (collectively, the **"Representatives"**), which contain or otherwise reflect such information (collectively, **"Confidential Material"**). Notwithstanding anything to the contrary in this agreement, the term "Confidential Material" does not include information which (a) was already in Buyer's possession prior to the time of disclosure to Buyer by Seller, (b) was or becomes generally available to the public other than as a result of a disclosure by Buyer or its Representatives in violation of this agreement, or (c) becomes available to Buyer on a non-confidential basis from a source other than Seller, provided that such source is not known by Buyer to be bound by a confidentiality agreement with Seller, or otherwise prohibited from disclosing the information to Buyer.  Buyer shall not disclose any Confidential Material except to the extent that disclosure (x) has been consented to by Seller, (y) is required by law, regulation or other applicable judicial or governmental order or legal process., or (z) to Buyer's employees, officers, directors, funding sources, agents, advisors, accountants, attorneys and other representatives who are actively and directly participating in evaluating the transactions contemplated hereby and who will, prior to being provided with the Confidential Material, agree to be bound by the terms of this Section 11.23 to the same extent as if they were parties hereto.  In the event that Buyer is requested or required by law, regulatory authority or other applicable judicial or governmental order or legal process to disclose any Confidential Material, Buyer shall provide Seller with prompt notice of any such request or requirement so that Seller may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this agreement.  Buyer shall furnish only that portion of the Confidential Material which Buyer is advised by counsel is legally required and shall exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded to the Confidential Material.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

In **Witness Whereof**, Buyer and Seller have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER:**

**NEW VECTRIX LLC**

By:_____

Name:

Its:


**SELLER:**

**VECTRIX CORPORATION**


By:_____

Name:

Its:

**In Witness Whereof**, Buyer and Seller have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER:**

**NEW VECTRIX LLC**

By: _____
Name:
Its:


**SELLER:**

**VECTRIX CORPORATION**

By: _____
Name: Michael T Boyle
Its: President, CEO

# SCHEDULES

## TO THE

## ASSET PURCHASE AGREEMENT

## BETWEEN

## NEW VECTRIX LLC

### AS BUYER

## AND

## VECTRIX CORPORATION

### AS SELLER

These disclosure schedules and all attachments hereto (each of which is incorporated herein by this reference) constitute the "Schedules" to the Asset Purchase Agreement (the "Agreement"), dated September [__], 2009, by and between New Vectrix LLC, a Delaware limited liability company, as "Buyer", and VECTRIX Corporation, a Delaware corporation, as "Seller".

Unless the context otherwise requires, all capitalized terms used in these Schedules shall have the respective meanings assigned to them in the Agreement. The Schedules referred to herein shall be construed with and as an integral part of the Agreement to the same extent as if they were set forth verbatim therein. Disclosure of any fact or item in any Schedule referenced by a particular Section in the Agreement shall be deemed to have been disclosed with respect to every other Section in the Agreement to the extent it is reasonably apparent from the text of such disclosure that such inclusion is required or applicable thereto. Neither the specification of any dollar amount in any representation or warranty contained in this Agreement nor the inclusion of any specific item in any Schedule hereto is intended to vary the definition of "Material Adverse Change" or to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no Party to the Agreement shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in any Schedule is or is not material for purposes of this Agreement. Unless the Agreement specifically provides otherwise, neither the specification of any item or matter in any representation or warranty contained in the Agreement nor the inclusion of any specific item in any Schedule hereto is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no Party shall use the fact of the setting forth or the inclusion of any such item or matter in any dispute or controversy between the Parties as to whether any obligation, item or matter not described herein or included in any Schedule is or is not in the ordinary course of business for purposes of the Agreement.

Certain agreements and other matters are listed in the Schedules for informational purposes only, notwithstanding the fact that, because they do not rise above applicable materiality thresholds or otherwise, they are not required to be listed by the terms of the Agreement. Except as set forth in the Agreement or elsewhere in the Schedules, no reference or listing in these Schedules to any agreement or document shall be construed as an admission or indication that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document. References to any document herein do not purport to be complete and are qualified in their entirety by the document itself. The information contained in these Schedules is confidential, proprietary information of the disclosing Parties.

## <u>Schedule 1.1(b)</u>

None.

## Schedule 1.1(c)

| Counterparty Name and Address | Description of Contract | Cure Amount |
|---|---|---|
| Alien Scooters<br>1122 South Lamar Boulevard<br>Austin, TX 78704 | Dealer Agreement | unknown |
| All Seasons Motorsports<br>1510 10th Avenue SW<br>Calgary, AB T3C 0J5<br>Canada | Dealer Agreement | unknown |
| Anderson, Charlotte H.<br>119 Adams Point Road<br>Barrington, RI 02806 | Lease for Nonresidential Real Property<br>April 1, 2007 | $3,094.00 |
| Barnett Harley Davidson<br>8272 Gateway East<br>El Paso, TX 79907 | Dealer Agreement | unknown |
| Barney's M/C and Marine<br>10411 Gandy Boulevard<br>St. Petersburg, FL 33702 | Dealer Agreement | unknown |
| Barney's Yamaha Suzuki of Brandon<br>9820 Adamo Drive<br>Tampa, FL 33619 | Dealer Agreement | unknown |
| Bikers Edge<br>1201 East Central<br>Wichita, KS 67214 | Dealer Agreement | unknown |
| Bill Eddy's Motorsports<br>1205 North Futrall Drive<br>Fayetteville, AR 72703 | Dealer Agreement | unknown |
| Blue Sky Holdings, LLC<br>130 Bellevue Avenue<br>Newport, RI 02842 | Consultant Engagement Agreement<br>December 12, 2008 | unknown |
| BMW Motorcycles of Atlanta<br>1750 Cobb Parkway S.E.<br>Marietta, GA 30043 | Dealer Agreement | unknown |
| BMW Motorcycles of Omaha<br>dba Elite Motor Sports<br>6775 South 118th Street<br>Omaha, NE 68137 | Dealer Agreement | unknown |
| BMW of Oklahoma City<br>417 Hudiburg Circle #C<br>Oklahoma City, OK 73108 | Dealer Agreement | unknown |
| BMW of Santa Cruz County<br>1875 Main Street<br>Watsonville, CA 95076 | Dealer Agreement | unknown |

| | | |
|---|---|---|
| BMW of Tulsa Oklahoma<br>3743 South Peoria<br>Tulsa, OK 74105 | Dealer Agreement | unknown |
| Bossier City Harley Davidson<br>2225 Autoplex Drive<br>Bossier City, LA 71111 | Dealer Agreement | unknown |
| Boyle, Michael J.<br>379 Crepe Myrtle Drive<br>Greer, SC 29651 | Employment Agreement<br>April 23, 2008 | $616,538.00 |
| Brothers Motorsports<br>8194 Fairview Road<br>Baxter, MN 56425 | Dealer Agreement | unknown |
| Cedar Creek Motorsports<br>7518 Highway 60<br>Cedarburg, WI 53012 | Dealer Agreement | unknown |
| Central Coast Mechanics<br>3566 South Higuera #100<br>San Luis Obispo, CA 93401 | Dealer Agreement | $798.92 |
| Coady Diemar Partners, LLC<br>1370 Avenue of the Americas<br>New York, NY 10019 | Financial Advisor Engagement<br>Agreement<br>April 21, 2009 | $305,579.00 |
| Columbia Powersports Center<br>3750 Fernandina Road<br>Columbia, SC 29210 | Dealer Agreement | unknown |
| CQ Consulting Company Inc.<br>40 East 94th Street, Apt. 25A<br>New York, NY 10128 | Independent Contractor Agreement<br>February 16, 2009 | $7,689.00 |
| Cycle World of Athens<br>4225 Atlanta Highway<br>Bogart, GA 30622 | Dealer Agreement | unknown |
| Del Amo Motorsports<br>2500 Marine Avenue<br>Redondo Beach, CA 90278 | Dealer Agreement | unknown |
| Doveri, Marco<br>Via del Chianti 28, c.f.<br>Terricciola (PI)<br>Italy | License Agreement | unknown |
| Eco Moto<br>1050 South State Street<br>Salt Lake City, UT 84111 | Dealer Agreement | unknown |
| Ehlerding Motorsports<br>5505 Highway 930 East<br>Fort Wayne, IN 46803 | Dealer Agreement | unknown |
| The Electric Toy Store<br>671 Highway 179<br>Sedona, AZ 86336 | Dealer Agreement | unknown |

| | | |
|---|---|---|
| E-Max Germany Holdings Ltd.<br>Unit 1110 Lippo Sun Plaza<br>28 Canton Road<br>TST Kowloon<br>Hong Kong | Manufacturing and Supply<br>Agreement<br>September 18, 2008 | $967,112.04 |
| The Engelhart Center<br>1589 Greenway Cross<br>Madison, WI 53713 | Dealer Agreement | unknown |
| Foreign Affairs<br>1681 North Military Trail<br>West Palm Beach, FL 33409 | Dealer Agreement | unknown |
| Full Throttle Motorsports<br>9555 Woodlane Drive<br>Dimondale, MI 48821 | Dealer Agreement | unknown |
| Gateway BMW<br>2690 Masterson Avenue, Suite 300<br>St. Louis, MO 63114 | Dealer Agreement | unknown |
| GE Commercial Distribution Finance<br>Corporation<br>5595 Trillium Boulevard<br>Hoffman Estates, IL 60192 | Vendor Agreement<br>January 29, 2008 | unknown |
| Getrag Gears of North America Inc.<br>1848 Getrag Parkway<br>Newton, NC 28658 | Comprehensive Design,<br>Development and Component<br>Purchase Agreement<br>February 17, 1997 | unknown |
| Getrag Corporation<br>f/k/a Gertrag Gears of North America,<br>Inc.<br>1848 Getrag Parkway<br>Newton, NC 28658 | Letter Agreement<br>April 6, 2005 | unknown |
| Gold Coast Motorsports<br>2070 Jericho Turnpike<br>New Hyde Park, NY 11040 | Dealer Agreement | unknown |
| Goldrush Honda Yamaha Motorsports<br>14301 Mono Way, Suite A<br>Sonora, CA 95370 | Dealer Agreement | unknown |
| GP Batteries International Limited<br>97 Pioneer Road<br>Singapore 639579<br><br>EVB Technology (HK) Limited<br>30 Kwai Wing Road<br>Kwai Chung, New Territories<br>Hong Kong | General Agreement for Supply and<br>Purchase of Batteries<br>March 31, 2008 | $79,686.76 |

| | | |
|---|---|---|
| GP Batteries International Limited<br>97 Pioneer Road<br>Singapore 639579<br><br>EVB Technology (HK) Limited<br>30 Kwai Wing Road<br>Kwai Chung, New Territories<br>Hong Kong | Settlement Agreement<br>March 31, 2008 | $791,200.00 |
| Granny's Motorsports<br>2001 University Parkway<br>Sarasota, FL 34243 | Dealer Agreement | unknown |
| Harley Davidson of Crete<br>3445 Eagle Nest Drive<br>Crete, IL 60417 | Dealer Agreement | unknown |
| Hicklin Power Sports<br>5708 Gateway Drive<br>Grimes, IA 50111 | Dealer Agreement | unknown |
| High Desert Harley Davidson<br>2310 E. Cinema Drive<br>Meridian, ID 83642 | Dealer Agreement | unknown |
| Highland Samuel Barnett Associates<br>Limited Partnership<br>c/o First Highland Management &<br>Development<br>Boston Dedham Commerce Park<br>65 Sprague Street<br>Boston, MA 02136 | Lease for Nonresidential Real<br>Property<br>July 13, 2007 | $5,255.38 |
| J&L Harley-Davidson, Inc.<br>2601 W. 60th Street North<br>Sioux Falls, SD 57107 | Dealer Agreement | unknown |
| Jordan Motors<br>609 E. Jefferson Boulevard<br>Mishawaka, IN 46545 | Dealer Agreement | unknown |
| Laszewski & Sons, Inc.<br>19 Park Ridge Drive<br>Stevens Point, WI 54481 | Dealer Agreement | unknown |
| Leo's South<br>16375 Kenrick Avenue<br>Lakeville, MN 55044 | Dealer Agreement | unknown |
| Lloyd A. Wise Motors Inc.<br>dba Vectrix of San Leandro<br>575 Marina Boulevard<br>San Leandro, CA 94577 | Dealer Agreement | unknown |

| | | |
|---|---|---|
| Lloyd A. Wise C.<br>dba Vectrix of Vacaville<br>671 Orange Drive<br>Vacaville, CA 95687 | Dealer Agreement | unknown |
| Long Beach Motorsports<br>3291 Cherry Avenue<br>Long Beach, CA 90807 | Dealer Agreement | unknown |
| Marin Moto<br>30 Castro Avenue<br>San Rafael, CA 94901 | Dealer Agreement | unknown |
| Matthews Fun Machines<br>11240 East Independence Boulevard<br>Matthews, NC 28105 | Dealer Agreement | unknown |
| Matto Cycle<br>634 Port Carbon, Saint Clair Highway<br>Pottsville, PA 17901 | Dealer Agreement | unknown |
| McGuinness, John<br>72 Gateway Road<br>North Kingstown, RI 02852 | Employment Agreement | $52,500.00 |
| Millville Harley Davidson<br>1131 South 2nd Street<br>Millville, NJ 08332 | Dealer Agreement | unknown |
| Montgomery Cycle Center<br>2901 Bethlehem Pike<br>Hatfield, PA 19440 | Dealer Agreement | $750.00 |
| Mosites Motorsports<br>12671 Route 30<br>N. Huntington, PA 15642 | Dealer Agreement | unknown |
| Naperville Victory Polaris<br>2760 Aurora Avenue, Suite 102<br>Naperville, IL 60540 | Dealer Agreement | unknown |
| NoHo Scooters<br>5144 Vineland Avenue<br>North Hollywood, CA 91601 | Dealer Agreement | unknown |
| Ohio Motorcycle<br>7300 Fair Oaks Road<br>Oakwood Village, OH 44146 | Dealer Agreement | unknown |
| One Two Three Enterprises, Inc.<br>dba Service Systems<br>88 Silva Lane<br>Middletown, RI 02842 | Janitorial Service Agreement<br>July 17, 2007 | unknown |
| Parker-Hannifin Corporation<br>6035 Parkland Boulevard<br>Cleveland, OH 44124-4141 | License Agreement | unknown |

| | | |
|---|---|---|
| Paulson's Motorsports<br>4402 6th Avenue SE<br>Lacey, WA 98503 | Dealer Agreement | unknown |
| Proud Eagle International Limited<br>21/F New World Tower 1<br>18 Queen's Road Central<br>Hong Kong | Right to Purchase Agreement | unknown |
| Randy's Cycle<br>11013 Route 47 Box 516<br>Huntley, IL 60152 | Dealer Agreement | unknown |
| Renaissance Motorcycles<br>4411 E. Speedway Boulevard<br>Tucson, AZ 85712 | Dealer Agreement | unknown |
| Riverside Motorsports<br>2 Union Square<br>Somerville, MA 02143 | Dealer Agreement | $1,500.00 |
| Rockridge Two Wheels<br>5291 College Avenue<br>Oakland, CA 94618 | Dealer Agreement | unknown |
| Rocky Mountain Cycle Plaza<br>412 North Chelton Road<br>Colorado Springs, CO 80909 | Dealer Agreement | unknown |
| Roseville Cycle Center<br>900 Riverside Avenue<br>Roseville, CA 95678 | Dealer Agreement | unknown |
| Santa Fe Motorsports<br>2594 Camino Entrada<br>Santa Fe, NM 87507 | Dealer Agreement | $1,500.00 |
| Scoot Around Town<br>1180 East Michigan Avenue<br>Ypsilanti, MI 48193 | Dealer Agreement | unknown |
| Scooter Superstore – Atlanta, GA<br>741 Monroe Drive<br>Atlanta, GA 30308 | Dealer Agreement | unknown |
| Scooter Superstore – Fairburn, GA<br>8460 Senoia Road/West Highway 74<br>Fairburn, GA 30213 | Dealer Agreement | unknown |
| Scooter Superstore – Gainesville, FL<br>203 N.E. 39 Avenue<br>Gainesville, FL 32609 | Dealer Agreement | unknown |
| Scooter Superstore – Hollywood, FL<br>2300 North 23rd Avenue<br>Hollywood, FL 33020 | Dealer Agreement | unknown |
| Scooter Superstore – Jacksonville, FL<br>10100 San Jose Boulevard<br>Jacksonville, FL 32257 | Dealer Agreement | unknown |

| | | |
|---|---|---|
| Scooter Superstore –<br>Jacksonville Beach, FL<br>1128 3rd Street North<br>Jacksonville Beach, FL 32250 | Dealer Agreement | unknown |
| Scooter Superstore – Norcross, GA<br>6135 Jimmy Carter Boulevard, Suite A<br>Norcross, GA 30071 | Dealer Agreement | unknown |
| Scooter Superstore – \|<br>Ormond Beach, FL<br>1459 U.S. Highway 1<br>Ormond Beach, FL 32174 | Dealer Agreement | unknown |
| Scooterville of Minnesota<br>904 19th Avenue South<br>Minneapolis, MN 55404 | Dealer Agreement | unknown |
| Scooterworks USA<br>5410 North Damen Avenue<br>Chicago, IL 60625 | Dealer Agreement | unknown |
| Scuderia West<br>69 Duboce Avenue<br>San Francisco, CA 94103 | Dealer Agreement | unknown |
| Shreveport Harley Davidson<br>805 Brook Hollow Drive<br>Greenwood, LA 71033 | Dealer Agreement | unknown |
| Speed City Cycle LLC<br>3464 West 16th Street<br>Indianapolis, IN 46222 | Dealer Agreement | unknown |
| Sportique Scooters<br>4346 South Broadway<br>Englewood, CO 80113 | Dealer Agreement | unknown |
| St. Croix Harley Davidson – New<br>Richmond<br>2060 Highway 65<br>New Richmond, WI 54017 | Dealer Agreement | unknown |
| Station Park Honda<br>P.O. Box 3008<br>Louisville, KY 40201 | Dealer Agreement | unknown |
| Team Charlotte<br>3004 Freedom Drive<br>Charlotte, NC 28208 | Dealer Agreement | unknown |
| Tech Plaza 2, 3, & 4 LLC<br>P.O. Box 120939<br>Boston, MA 02112 | Lease for Nonresidential Real<br>Property<br>May 10, 2007 | $64,146.88 |
| True Imports<br>dba Vespa of Clarendon Hills<br>427 West Ogden Avenue<br>Clarendon Hills, IL 60514 | Dealer Agreement | unknown |

| | | |
|---|---|---|
| U.S. Golf Cars, Inc.<br>9670 Cherry Valley<br>Caledonia, MI 49316 | Dealer Agreement | $516.92 |
| Valley Fun Source<br>1717 Central Avenue<br>Grand Forks, MN 56721 | Dealer Agreement | unknown |
| Vectrix Sp. z o.o.<br>ul. Magazynowa 7D<br>Bielany Wrocławskie 55-040<br>Poland | Contract Manufacturing<br>Agreement<br>June 1, 2007 | $17,079,156.00<br>May be subject to<br>Setoff |
| Vectrix (UK) Ltd.<br>Unit 2<br>Hazeley Enterprise Park<br>Twyford, Hampshire S021 1QA<br>United Kingdom | Sales and Distribution Agreement<br>(UK)<br>June 1, 2007 | $4,333,995.00<br>May be subject to<br>Setoff |
| Vespa of Portland<br>2318 North Vaughn Street<br>Portland, OR 97210 | Dealer Agreement | unknown |
| Vespa of Seattle (Big People's Scooters)<br>93 Denny Way<br>Seattle, WA 98109 | Dealer Agreement | unknown |
| Vespa of Walnut Creek<br>1813 Mount Diablo Boulevard<br>Walnut Creek, CA 94596 | Dealer Agreement | unknown |
| Wildwood Harley Davidson<br>127 West Rio Grande Avenue<br>Wildwood, NJ 08260 | Dealer Agreement | unknown |
| Willow's Motorsports<br>1555 Highland Avenue (Route 10)<br>Cheshire, CT 06410 | Dealer Agreement | unknown |
| Wilson's Motorcycles<br>2436 Foundry Park Avenue<br>Fresno, CA 93706 | Dealer Agreement | unknown |
| Yamaha-Suzuki of Cool Springs<br>1017 McEwen Drive<br>Franklin, TN 37067 | Dealer Agreement | unknown |

**Schedule 1.1(d)**

| Counterparty Name and Address | Description of NDA Contract | Cure Amount |
|---|---|---|
| A123 Systems<br>One Kingsbury Avenue<br>Watertown, MA 02472 | Confidential Information and Non-Disclosure Agreement | unknown |
| Alberti, Alberto<br>Via Belvedere 38<br>Ghiffa (Verbania) Italy 28823 | Confidential Information and Non-Disclosure Agreement | unknown |
| All Cell Technologies LLC<br>3001 South Michigan Avenue, Suite 1209<br>Chicago, IL 60616 | Confidential Information and Non-Disclosure Agreement | unknown |
| Ansoft Corporation<br>25 Burlington Mall Road, Fifth Floor<br>Burlington, MA 01803 | Confidential Information and Non-Disclosure Agreement | unknown |
| Aurora Resurgence | Confidential Information and Non-Disclosure Agreement | unknown |
| The Bailey Group<br>200 West Germantown Pike, Bldg. B<br>Plymouth Meeting, PA 19462 | Confidential Information and Non-Disclosure Agreement | unknown |
| BergSpyder Marketing<br>L-9 Farmhouse Lane<br>Morristown, NJ 07960 | Confidential Information and Non-Disclosure Agreement | unknown |
| Brammo<br>695A Mistletoe Road<br>Ashland, OR 97520 | Confidential Information and Non-Disclosure Agreement | unknown |
| BRUSA Elektronik AG<br>Neudorf 14, Postfach 55<br>CH-9466 Sennwald<br>Switzerland | Confidential Information and Non-Disclosure Agreement | unknown |
| Columbia Par Car | Confidential Information and Non-Disclosure Agreement | unknown |
| Craton | Confidential Information and Non-Disclosure Agreement | unknown |
| Della Valle, Andrea<br>Via san Michele del Carso 4<br>Milano 20144 Italy | Confidential Information and Non-Disclosure Agreement | unknown |
| Desc Automotriz, Inc.<br>23382 Commerce Drive<br>Farmington, MI 48335 | Confidential Information and Non-Disclosure Agreement | unknown |

| | | |
|---|---|---|
| E-Max ev's Germany Holdings Ltd and its subsidiary companies<br>Unit 1110 Lippo Sun Plaza<br>28 Canton Road, TST Kowloon<br>Hong Kong | Mutual Non-Disclosure Agreement | unknown |
| e-max ev's Germany Ltd.<br>ZNL Oberhaching<br>Kolpingring B<br>8041 Oberhaching<br>Germany | Confidential Information and Non-Disclosure Agreement | unknown |
| ECOAIR Corp.<br>4 Industrial Circle<br>Hamden, CT 06517-3152 | Confidential Information and Non-Disclosure Agreement | unknown |
| EDI snc di Doveri & C<br>Via Molise, 3 Zona industriale di Gello<br>6030 Pontedera (PI)<br>Italy | Confidential Information and Non-Disclosure Agreement | unknown |
| Electric Vehicle Systems, Inc. | Confidential Information and Non-Disclosure Agreement | unknown |
| EVB Technology (HK) Limited/Gold Peak<br>4/F Gold Peak Building<br>30 Kwai Wing Road<br>Kwai Chung, N.T.<br>Hong Kong | Confidential Information and Non-Disclosure Agreement | unknown |
| Fallbrook Technologies, Inc.<br>9444 Waples Street, Suite 410<br>San Diego, CA 92121 | Non-Disclosure Agreement | unknown |
| Far East Sourcing International Limited<br>Xi Zang (North) No. 489<br>Building 10, Suite 1A<br>Shanghai, China 200071 | Confidential Information and Non-Disclosure Agreement | unknown |
| The GCC Group<br>F Block, West Pearl Building No. 1<br>Taoyuan Road, Nanshan District<br>Shenzhen City, China | Proprietary Information and Non-Disclosure Agreement | unknown |
| GH Partners, Inc.<br>712 Fifth Avenue<br>New York, NY 10019 | Confidential Information and Non-Disclosure Agreement | unknown |
| Gonzalez, Hermes<br>25 Castle Avenue<br>Fairhaven, MA 02719 | Employee Proprietary Information and Invention Agreement | unknown |
| Harley | Confidential Information and Non-Disclosure Agreement | unknown |

| | | |
|---|---|---|
| Harpco Systems Inc.<br>28056 Oakland Oaks Court<br>Wixom, MI 48393 | Confidential Information and Non-Disclosure Agreement | unknown |
| Henderson, Ross (consultant)<br>4 Hillview Road<br>North Reading, MA 01864 | Confidential Information and Non-Disclosure Agreement | unknown |
| Ishtronics, Inc.<br>P.O. Box 567<br>Kennesaw GA 30144 | Confidential Information and Non-Disclosure Agreement | unknown |
| ITE Solutions, Inc.<br>8037 Cross Creek Circle<br>Breinigsville, PA 18031-1327 | Confidential Information and Non-Disclosure Agreement | unknown |
| Kaufman, Alan | Confidential Information and Non-Disclosure Agreement | unknown |
| Keating Investments, LLC<br>5251 DTC Parkway, Suite 1000<br>Greenwood Village, CO 80111 | Confidential Information and Non-Disclosure Agreement | unknown |
| MAC Battery Charger<br>555 Spirit of St. Louis Boulevard<br>Chesterfield, MO 63005 | Confidential Information and Non-Disclosure Agreement | unknown |
| MacGowan, Andrew for Blue Skies Holdings L.L.C.<br>92 Esplanade<br>Middletown, RI 20942 | Confidential Information and Non-Disclosure Agreement | unknown |
| Mack, Frank / Project Special Situations | Confidential Information and Non-Disclosure Agreement | unknown |
| Mackay, Richard<br>Little Foxholt, Swingfield Minnis, Dover<br>Kent CT15 7HY<br>England | Letter re Confidential Information and Non-Disclosure Agreement between Vectrix Corp. and Lloyds TSB Asset Finance Division Limited | unknown |
| Micro Sun Technologies, LLC<br>Peter Tamburrino, Director of Sales | Confidential Information and Non-Disclosure Agreement | unknown |
| Moe, Christopher<br>1213 Green End Avenue<br>Middletown RI 02842 | Confidential Information and Non-Disclosure Agreement | unknown |
| Montalto, Daniel<br>15 rue de la Confederation, Genia 1204<br>Switzerland | Confidential Information and Non-Disclosure Agreement | unknown |
| Moore, Elizabeth F.<br>101 Narragansett Avenue<br>Barrington, RI 02806 | Employee Proprietary Information and Invention Agreement | unknown |
| Moving Magnet Technologies<br>1930 Rim Rock Canyon Road<br>Laguna Beach, CA 92651 | Confidential Information and Non-Disclosure Agreement | unknown |

| | | |
|---|---|---|
| Navaretto, Stefano<br>57 Via Paolo Sarpi<br>Milano 20154 Italy | Confidential Information and Non-Disclosure Agreement | unknown |
| Polaris | Confidential Information and Non-Disclosure Agreement | unknown |
| Prins<br>Dvorská 7<br>678 01 Blansko, Czech Republic | Confidential Information and Non-Disclosure Agreement | unknown |
| Rockwell Automation<br>100 Nickerson Road<br>Marlboro, MA 01752 | Confidential Information and Non-Disclosure Agreement | unknown |
| Solon SE | Confidential Information and Non-Disclosure Agreement | unknown |
| Star Asset Management Limited<br>23 Richmond Road<br>Hamilton, Bermuda | Confidential Information and Non-Disclosure Agreement | unknown |
| Tesla Motors Inc. | Mutual Nondisclosure Agreement | unknown |
| Vision Capital Advisors, LLC | Confidential Information and Non-Disclosure Agreement | unknown |
| Voigt, Alexander<br>Schiff bauderdamm<br>40 Berlin 10117<br>Germany | Confidential Information and Non-Disclosure Agreement | unknown |
| Well Done Company<br>No. 181, AnMei Street<br>Taipei City, Taiwan 11484 | Proprietary Information and Non-Disclosure Agreement | unknown |
| Yellowstone Energy Ventures II, L.P.<br>5555 San Felipe, Suite 1650<br>Houston, TX 77056 | Confidential Information and Non-Disclosure Agreement | unknown |
| ZLKL s.ro.<br>Moravičanská 581, P.O. Box 4<br>789 83 Loštice, Czech Republic | Confidential Information and Non-Disclosure Agreement | unknown |

**<u>Schedule 1.1(f)</u>**

| **<u>Description of Asset</u>** | **<u>Location</u>** |
|---|---|
| **Automobiles, trucks, trailers, and other vehicles** | |
| 2 x GMC 5.2L Marketing Truck | New Bedford, MA |
| 1 x Chevy Cargo Van | |
| 1 x GMC 2500 Pickup Truck<br>2 x Ford F250 Pickup Truck<br>1 x 2007 Chevy 2500 HD Pickup Truck | |
| 2 x Interstate Cargo Trailer<br>1 x Avenger Cargo Trailer<br>1 x Load Runner Cargo Trailer<br>1 x Legend Cargo Trailer | |
| 1 x Chevy Silverado Pickup Truck | Atlanta, GA |
| 1 x Pace Cargo 16 foot Trailer | |
| 1 x Chevy Silverado Pickup Truck | Minneapolis, MN |
| 1 x Pace Cargo 16 foot Trailer | |
| **Office equipment, furnishings, and supplies.** | |
| Computer Equipment | New Bedford, MA and/or Middletown, RI |
| Computer Software | New Bedford, MA and/or Middletown, RI |
| Office Furniture & Fixtures | New Bedford, MA and/or Middletown, RI |
| **Machinery, fixtures, equipment and supplies used in business.** | |
| Marketing booth | New Jersey |
| Machinery and Equipment | New Bedford, MA |
| VX-2 Tooling | China |

**Schedule 1.1(g)**

| **Description of Inventory** | **Quantity** | **Location** |
|---|---|---|
| Finished VX-1 Model Scooters | 230 | New Bedford, MA |
| Marketing Scooters | 66 | New Bedford, MA |
| Parts | Unknown | New Bedford, MA |

| Payee Name and Address | Amount Due |
|---|---:|
| Access North East<br>34 St. Martin Drive, Suite 3<br>Marlborough, MA 01752 | 6,775 |
| Baker Tilly Poland Sp z.o.o.<br>ul. Krolewska 27<br>00-060 Warsaw<br>Poland | 6,715 |
| CPA Global.<br>Liberation House<br>Castle Street<br>St. Helier, Jersey, JE1 1BL<br>Channel Islands | 10,000 |
| CQ Consulting Company, Inc.<br>40 East 94th Street, Apt 8F<br>New York, NY 10128 | 7,600 |
| E-Max ev's Germany Holding Ltd.<br>Unit 1110, Lippo Sun Plaza<br>28 Canton Road, TST Kowloon<br>Hong Kong | 128,362 |
| EVB Technology (HK) Ltd.<br>4/F, Gold Peak Building<br>30 Kwai Wing Road<br>Hong Kong | 79,686 |
| EVB Technology (HK) Ltd.<br>4/F, Gold Peak Building<br>30 Kwai Wing Road<br>Hong Kong | 791,200 |
| Genesys Technology Solutions LLC<br>9155 Little Farm Drive<br>White Lake, MI 48386 | 2,000 |
| I-Site, Inc.<br>15 South 3rd Street, Suite 200<br>Philadelphia, PA 19106 | 81,497 |

| | |
|---|---:|
| Kimball Communications, LLC<br>529 Mixsell Street<br>Easton, PA 18042 | 17,179 |
| MHQ Municipal Headquarters<br>401 Elm Street<br>Marlborough, MA 01752 | 14,664 |
| Par-Tech Inc.<br>139 Premier Drive<br>Lake Orion, MI 48359 | 24,600 |
| Unishippers<br>P.O. Box 844033<br>Boston, MA 02284-4033 | 11,687 |
| VCA North America<br>41000 West Seven Mile Road, Suite 140<br>Northville, MI 48167 | 14,080 |
| Miscellaneous A/P for Critical Vendors | 404,845 |
| Warranty Liabilities | 2,000,000 |
| Key Employee Retention Payments | 110,000 |

## Schedule 5.4

Vectrix Australia Pty Ltd. ("VA") alleges damages against Vectrix Corporation ("Vectrix") in the amount of AUD $28,109,332.00. VA alleges that representations made by Vectrix prior to the entry into one or more distribution agreements and a promissory note violated certain provisions of the Trade Practices Act, including misleading or deceptive conduct, unconscionable conduct, and accessory contravention. VA further alleges that it may "claw back" its payment of the installment under the promissory note in the amount of USD $111,332.00 under the Trade Practices Act and the doctrine of unjust enrichment. Vectrix denies each and every allegation, and alleges that VA is indebted to Vectrix for a sum in excess of USD $1,200,000.00 for goods shipped and not paid for by VA.

## Schedule 5.5(c)

Seller may be in default in connection with certain collection claims asserted by Seller against dealers in Australia and France.

## Schedule 5.7

| Broker Name and Address |
|---|
| Blue Sky Holdings, LLC<br>130 Bellevue Avenue<br>Newport, RI 02842 |
| Coady Diemar Partners, LLC<br>1370 Avenue of the Americas<br>New York, NY 10019 |

## <u>Schedule 5.9</u>

None.

## **Schedule 5.10**

None.

**Exhibit A**

**SCHEDULE OF PATENTS**

# VECTRIX CORPORATION

## U.S. FILINGS

| Docket ID | Client Matter | Title | Country | Status | App. Date/ App. No. | Grant No. Grant Date |
|---|---|---|---|---|---|---|
| 190511/US | 485324-2 | Regenerative Braking System for an Electric Vehicle | US | Granted | 10/093,717 11-Mar-2002 | 6,724,165 20-Apr-2004 |
| 190594/US/2 | 485324-13 | Electric Vehicle Air Cooling System | US | Pending Published | 11/762,626 13-Jun-2007 | |
| 190595/US/2 | 485324-14 | Vehicle with Contactless Throttle Control | US | Pending | 11/762,596 13-Jun-2007 | |
| 190633/US | 485324-15 | Composite Construction Vehicle Frame | US | Granted | 10/697,871 31-Oct-2003 | 7,255,191 14-Aug-2007 |
| 190635/US | 485324-17 | Electric Scooter With On-Board Charging System | US | Granted | 09/679,408 04-Oct-2000 | 6,326,765 04-Dec-2001 |
| 190639/US | 485324-19 | Vehicle Drive Wheel Assembly | US | Granted | 08/988,675 11-Dec-1997 | 6,199,652 13-Mar-2001 |
| 190640/US/2 | 485324-22 | Vehicle with Lockable Tilt System | US | Pending | 12/298,752 25-Apr-2007 | |
| 190641/US | 485324-96 | Electric Vehicle and Frame Therefor | US | Granted | 08/988,968 11-Dec-1997 | 6,047,786 11-Apr-2000 |
| 190647/US/2 | 485324-97 | Vehicle Drive Wheel Assembly | US | Granted | 09/074,468 08-May-1998 | 6,199,651 13-Mar-2001 |
| 190648/US | 485324-95 | Scooter Body | US | Granted | 29/080,621 11-Dec-1997 | 4,039,90 12-Jan-1999 |
| 190649/US | 485324-94 | Electrical Scooter Having an Equalization Circuit for Charging Multiple Batteries | US | Granted | 08/989,174 11-Dec-1997 | 5,965,996 12-Oct-1999 |

| Docket ID | Client Matter | Title | Country | Status | App. Date/ App. No. | Grant No. Grant Date |
|---|---|---|---|---|---|---|
| 190511/EP | 485324-2 | Regenerative Braking System for an Electric Vehicle | EPO | Pending | 06-Mar-2003 03711395.8 | |
| 190511/HK | 485324-12 | Regenerative Braking System for an Electric Vehicle | HK | Pending | 06-Mar-2003 05105227.9 | |
| 190511/IN | 485324-13 | Regenerative Braking System for an Electric Vehicle | IN | Pending | 06-Mar-2003 3025/DELNP/2004 | |
| 190511/JP | 485324-14 | Regenerative Braking System for an Electric Vehicle | JP | Pending | 06-Mar-2003 2003-576226 | |
| 190511/MX | 485324-15 | Regenerative Braking System for an Electric Vehicle | MX | Pending | 06-Mar-2003 PA/a/2004/008792 | |
| 190511/TW | 485324-17 | Regenerative Braking System for an Electric Vehicle | TW | Granted | 11-Mar-2003 092105223 | I271026 11-Jan-2007 |
| 190593/TW | 485324-19 | Vehicle Propulsion System Activation Device | TW | Pending | 13-Jun-2007 096121351 | |
| 190594/TW | 485324-22 | Electric Vehicle Air Cooling System | TW | Pending | 13-Jun-2007 096121356 | |
| 190595/CA | 485324-96 | Vehicle with Contactless Throttle Control | CA | Pending | 12-Jun-2007 | |
| 190595/CN | 485324-97 | Vehicle with Contactless Throttle Control | CN | Pending | 12-Jun-2007 | |
| 190595/EP | 485324-95 | Vehicle with Contactless Throttle Control | EPO | Pending | 12-Jun-2007 | |
| 190595/SG | 485324-94 | Vehicle with Contactless Throttle Control | SG | Pending | 12-Jun-2007 | |
| 190595/TW | 485324-24 | Vehicle with Contactless Throttle Control | TW | Pending | 13-Jun-2007 096121349 | |
| 190596/PCT | 485324-87 | Lockable Tilt System for a Three-Wheeled Vehicle | PCT | Pending | 31-Oct-2008 PCT/US08/81946 | |
| 190633/BS | 485324-25 | Composite Construction Vehicle Frame | BS | Pending | 05-Nov-2004 1743 | |
| 190633/CN | 485324-26 | Composite Construction Vehicle Frame | CN | Pending | 14-Oct-2004 200480031907.9 | |
| 190633/EP | 485324-27 | Composite Construction Vehicle Frame | EPO | Pending | 14-Oct-2004 04794922.1 | |

| Docket ID | Client Matter | Title | Country | Status | App. Date/ App. No. | Grant No. Grant Date |
|---|---|---|---|---|---|---|
| 190633/HK | 485324-28 | Composite Construction Vehicle Frame | HK | Pending | 14-Oct-2004 07100442.7 | |
| 190633/IN | 485324-29 | Composite Construction Vehicle Frame | IN | Pending | 14-Oct-2004 2548/DELNP/2006 | |
| 190633/JP | 485324-30 | Composite Construction Vehicle Frame | JP | Pending | 14-Oct-2004 2006-538048 | |
| 190633/MX | 485324-31 | Composite Construction Vehicle Frame | MX | Pending | 14-Oct-2004 PA/a/2006/004628 | |
| 190633/SG | 485324-33 | Composite Construction Vehicle Frame | SG | Pending | 14-Oct-2004 200602326-1 | |
| 190633/TW | 485324-34 | Composite Construction Vehicle Frame | TW | Pending | 29-Oct-2004 093133075 | |
| 190635/CN | 485324-37 | Electronic Scooter With On-Board Charging System | CN | Granted | 25-Sep-2001 01816784.5 | ZL01816784.5 Dec.28-2008 |
| 190635/EP | 485324-38 | Electronic Scooter With On | EPO | Pending | 25-Sep-2001 01973549.7 | |
| 190635/HK | 485324-39 | Electronic Scooter With On-Board Charging System | HK | Pending | 25-Sep-2001 04100382.2 | |
| 190635/IN | 485324-40 | Electronic Scooter With On-Board Charging System | IN | Pending | 25-Sep-2001 00495/DELNP/2003 | |
| 190635/JP | 485324-41 | Electronic Scooter With On-Board Charging System | JP | Pending | 25-Sep-2001 2002-533458 | |
| 190635/KR | 485324-42 | Electronic Scooter With On-Board Charging System | KR | Pending | 25-Sep-2001 2003-7004697 | |
| 190635/MX | 485324-43 | Electronic Scooter With On-Board Charging System | MX | Granted | 25-Sep-2001 PA/a/2003/002885 | 236783 12-May 2006 |
| 190635/TW | 485324-45 | Electronic Scooter With On-Board Charging System | TW | Granted | 04-Oct-2001 90124512 | NI-176981 |
| 190639/CN | 485324-47 | Vehicle Drive Wheel Assembly | CN | Granted | 10-Dec-1998 98813389.X | ZL98813389.X |
| 190639/EP | 485324-48 | Vehicle Drive Wheel Assembly | EPO | Granted | 10-Dec-1998 98963102.3 | 1035982 04-Aug-2004 |
| 190639/EP/BE | 485324-49 | Vehicle Drive Wheel Assembly | BE | Granted | 10-Dec-1998 98963102.3 | 1035982 04-Aug-2004 |
| 190639/EP/DE | 485324-50 | Vehicle Drive Wheel Assembly | DE | Granted | 10-Dec-1998 98963102.3 | 69825476.7 04-Aug-2004 |

| Docket ID | Client Matter | Title | Country | Status | App. Date/ App. No. | Grant No. Grant Date |
|---|---|---|---|---|---|---|
| 190639/EP/FR | 485324-52 | Vehicle Drive Wheel Assembly | FR | Granted | 10-Dec-1998 98963102.3 | 1035982 04-Aug-2004 |
| 190639/EP/GB | 485324-53 | Vehicle Drive Wheel Assembly | GB | Granted | 10-Dec-1998 98963102.3 | 1035982 04-Aug-2004 |
| 190639/EP/IE | 485324-54 | Vehicle Drive Wheel Assembly | IE | Granted | 10-Dec-1998 98963102.3 | 1035982 04-Aug-2004 |
| 190639/EP/IT | 485324-55 | Vehicle Drive Wheel Assembly | IT | Granted | 10-Dec-1998 98963102.3 | 103598204-Aug-2004 |
| 190639/EP/NL | 485324-56 | Vehicle Drive Wheel Assembly | NL | Granted | 10-Dec-1998 98963102.3 | 1035982 04-Aug-2004 |
| 190639/EP/PT | 485324-57 | Vehicle Drive Wheel Assembly | PT | Granted | 10-Dec-1998 98963102.3 | 1035982 04-Aug-2004 |
| 190639/IN | 485324-58 | Vehicle Drive Wheel Assembly | IN | Granted | 10-Dec-1998 IN/PCT/2000/144/CHE | 202277 14-Feb-2007 |
| 190639/TW | 485324-59 | Vehicle Drive Wheel Assembly | TW | Granted | 11-Dec-1998 87120664 | NI-130936 20-Aug-2001 |
| 190640/EP | 485324-88 | Vehicle with Lockable Tilt System | EP | Pending | 25-Apr-2007 | |
| 190640/TW | 485324-62 | Vehicle with Lockable Tilt System | TW | Pending | 25-Apr-2007 096114645 | |
| 190641/CN | 485324-64 | Electric Vehicle and Frame Therefor | CN | Granted | 10-Dec-1998 98813452.7 | ZL98813452.7 |
| 190641/EP | 485324-65 | Electric Vehicle and Frame Therefor | EP | Pending | 10-Dec-1998 98963103.1 | |
| 190641/IN | 485324-66 | Electric Vehicle and Frame Therefor | IN | Granted | 10-Dec-1998 IN/PCT00/00146/CHE | 211034 |
| 190641/TW | 485324-68 | Electric Vehicle and Frame Therefor | TW | Granted | 11-Dec-1998 87120668 | NI-120510 06-Feb-2001 |
| 190647/CN | 485324-70 | Vehicle Drive Wheel Assembly | CN | Granted | 10-Dec-1998 98813390.3 | ZL98813390.3 |
| 190647/EP | 485324-71 | Vehicle Drive Wheel Assembly | EPO | Pending | 10-Dec-1998 98963104.1 | |
| 190647/IN | 485324-72 | Vehicle Drive Wheel Assembly | IN | Granted | 10-Dec-1998 IN/PCT00/00145/che | 205640 |

| Docket ID | Client Matter | Title | Country | Status | App. Date/ App. No. | Grant No. Grant Date |
|---|---|---|---|---|---|---|
| 190647/TW | 485324-74 | Vehicle Drive Wheel Assembly | TW | Granted | 11-Dec-1998 087120651 | NI-175085 29-Jul-2003 |
| 190648/BR | 485324-77 | Scooter Body | BR | Granted | 09-Jun-1998 MI 5800969.8 | DI 5800969.8 23-Nov-1999 |
| 190648/DE | 485324-78 | Scooter Body | DE | Granted | 10-Jun-1998 M9805750.2 | M9805750.2 09-Dec-1998 |
| 190648/ES | 485324-79 | Scooter Body | ES | Granted | 10-Jun-1998 142960 | 142960 17-Feb-1999 |
| 190648/FR | 485324-80 | Scooter Body | FR | Granted | 10-Jun-1998 983451 | 983451 16-Oct-1998 |
| 190648/MC | 485324-82 | Scooter Body | MO | Granted | 10-Jun-1998 PV785 | 785 25-Aug-1998 |

Exhibit B

ESCROW AGREEMENT

CH\1119562.13**1119562.16**

**THIS ESCROW AGREEMENT,** dated as of September 25, 2009 (this "Escrow Agreement"), is by and among **NEW VECTRIX LLC**, a Delaware limited liability company ("Buyer"); **VECTRIX Corporation**, a Delaware corporation ("Seller"); and **U.S. BANK NATIONAL ASSOCIATION,** a national banking association, as Escrow Agent hereunder ("Escrow Agent").

## BACKGROUND

A.   Buyer and Seller have entered into an Asset Purchase Agreement (as amended, the "Purchase Agreement"), dated as of even date herewith, pursuant to which Buyer has agreed to acquire from Seller and Seller has agreed to transfer, sell, convey, assign and deliver to Buyer, all of Seller's right, title and interest in and to the Purchased Assets (as defined in the Purchase Agreement), at the price and on the other terms and subject to the conditions specified therein.

B.   In accordance with Section 2.3 of the Purchase Agreement, Buyer hereby agrees to deposit the Escrow Funds (as defined below) in a segregated escrow account to be held by Escrow Agent as the "Good Faith Deposit" (as defined in the Purchase Agreement) pursuant to the terms hereof.

C.   Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and the earnings thereon in accordance with the terms of this Escrow Agreement.

D.   Pursuant to the Purchase Agreement, Buyer and Seller have appointed the Representatives (as defined below) to represent them for all purposes in connection with the funds to be deposited with Escrow Agent and this Escrow Agreement.

E.   In order to establish the escrow of funds and (as between Buyer and Seller only) to effect the provisions of the Purchase Agreement (including Sections 2.3, 4.1.3 and 4.2.4 thereof), the parties hereto have entered into this Escrow Agreement.

## STATEMENT OF AGREEMENT

**NOW THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.   Definitions. The following terms shall have the following meanings when used herein:

"Buyer Representative" shall mean the person so designated on Schedule A hereto or any other person designated in a writing signed by Buyer and delivered to Escrow Agent and

-1-

the Seller Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

"Escrow Funds" shall mean the funds deposited with Escrow Agent pursuant to Section 3 of this Agreement, together with any interest and other income thereon.

"Escrow Period" shall mean the period commencing on the date the Escrow Funds are transferred to Escrow Agent pursuant to Section 3 hereof and ending on the date all of the Escrow Funds are disbursed pursuant to Section 4 hereof.

"Joint Written Direction" shall mean a written direction executed by the Representatives and directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking an action pursuant to this Escrow Agreement.

"Representatives" shall mean the Buyer Representative and the Seller Representative.

"Seller Representative" shall mean the persons so designated on Schedule A hereto or any other person designated in a writing signed by Seller and delivered to Escrow Agent and the Buyer Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

2.    Appointment of and Acceptance by Escrow Agent. Buyer and Seller hereby appoint Escrow Agent to serve as escrow agent hereunder. Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds in accordance with Section 3 below, agrees to hold, invest and disburse the Escrow Funds in accordance with this Escrow Agreement.

3.    Deposit of Escrow Funds. After the execution and delivery of this Escrow Agreement and after delivery of this Escrow Agreement is acknowledged by Escrow Agent, Buyer (or another person on its behalf) will transfer the Escrow Funds in the amount set forth on Schedule A hereto to Escrow Agent, by wire transfer of immediately available funds, to the account of Escrow Agent referenced on Schedule A hereto.

4.    Disbursements of Escrow Funds.

(a)    Escrow Agent shall disburse Escrow Funds at any time and from time to time, upon receipt of, and in accordance with, a Joint Written Direction. Such Joint Written Direction shall contain wiring instructions or an address to which a check shall be sent.

-2-

(b)     If the Closing occurs, at such Closing, Buyer and Seller shall cause their respective Representatives to execute and deliver a Joint Written Direction to Escrow Agent directing Escrow Agent, as promptly as practicable, to disburse the Escrow Funds to Seller.

(c)     In the event that the Asset Purchase Agreement is terminated pursuant to Section 4.3 thereof prior to the Closing, the Escrow Funds shall be disbursed by the Escrow Agent in accordance with either (i) a Joint Written Direction to Escrow Agent directing Escrow Agent, as promptly as practicable, to disburse the Escrow Funds to Seller or Buyer, as applicable, or (ii) a Final Decree delivered to the Escrow Agent by either Buyer or Seller.  For purposes of this Escrow Agreement, the term "**Final Decree**" means a final order, decree or judgment of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (the time for appeal having expired with no appeal having been taken).

(d)     Notwithstanding any Joint Written Direction or Final Decree, Escrow Agent shall report and, as required, withhold from any payments or disbursements made pursuant to this Escrow Agreement from the Escrow Funds any taxes as may be required by any law or regulation then in force and actually known to Escrow Agent.

(e)     Notwithstanding any Joint Written Directions or Final Decree, all disbursements of funds from the Escrow Funds shall be subject to the fees and claims of Escrow Agent and the Indemnified Parties (as defined below) pursuant to Section 9 and Section 10 below.

(f)     As promptly as practicable following any disbursement of Escrow Funds in accordance with this Escrow Agreement, Escrow Agent shall send a written confirmation statement to each of Buyer and Seller stating the amount and recipient of each such disbursement.

5.      Suspension of Performance; Disbursement Into Court.  If, at any time, (a) there shall exist any dispute between Buyer, Seller or the Representatives with respect to the holding or disposition of all or any portion of the Escrow Funds or any other obligations of Escrow Agent hereunder that has not been resolved pursuant to a Joint Written Instruction or a Final Decree within 45 days of the Escrow Agent's receipt of notice from either Buyer or Seller regarding such dispute, (b) Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, or (c) the Representatives have not within 30 days of the furnishing by Escrow Agent of a notice of resignation pursuant to Section 7 hereof, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole discretion, take either or both of the following actions:

-3-

(i)     suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Escrow Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed (as the case may be); or

(ii)    petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction in any venue convenient to Escrow Agent, for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Escrow Agent shall have no liability to Buyer, Seller, their respective shareholders or members or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of Escrow Agent.

6.      <u>Investment of Funds.</u>  Escrow Agent is herein directed and instructed to initially invest and reinvest the Escrow Funds in the investment indicated on <u>Schedule A</u> hereto. With the execution of this document, the parties hereto acknowledge receipt of prospectuses and/or disclosure materials associated with the investment vehicle, either through means of hardcopy or via access to the website associated with the investment selected by the parties to this Escrow Agreement.  The parties hereto acknowledge that they have discussed the investment and are in agreement as to the selected investment.  The Buyer and Seller may provide instructions changing the investment of the Escrow Funds (subject to applicable minimum investment requirements) by the furnishing of a Joint Written Direction to Escrow Agent; *provided, however,* that no investment or reinvestment may be made except in the following:

(a)     direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United State of America;

(b)     certificates of deposit issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its affiliates);

-4-

(c)     repurchase agreements with any bank, trust company, or national banking association (including Escrow Agent and its affiliates); or

(d)     any institutional money market fund offered by Escrow Agent, including any institutional money market fund managed by Escrow Agent or any of its affiliates; or

(e)     money market deposit accounts of any bank, trust company, or national banking association (including the U.S. Bank Money Market Deposit Account offered by Escrow Agent and its affiliates).

Each of the foregoing investments shall be made in the name of Escrow Agent. No investment shall be made in any instrument or security that has a maturity of greater than six (6) months. Notwithstanding anything to the contrary contained herein, Escrow Agent may, without notice to the Representatives, sell or liquidate any of the foregoing investments at any time if the proceeds thereof are required for any disbursement of Escrow Funds permitted or required hereunder. All investment earnings shall become part of the Escrow Funds and investment losses shall be charged against the Escrow Funds. Escrow Agent shall not be liable or responsible for loss in the value of any investment made pursuant to this Escrow Agreement, or for any loss, cost or penalty resulting from any sale or liquidation of the Escrow Funds. With respect to any Escrow Funds received by Escrow Agent after ten o'clock, a.m., New York, New York, time, Escrow Agent shall not be required to invest such funds or to effect any investment instruction until the next day upon which banks in New York, New York are open for business.

All entities entitled to receive interest on the Escrow Funds shall provide Escrow Agent with a W-9 or W-8 IRS tax form prior to the disbursement of interest and Escrow Agent will file the appropriate 1099 or other required forms pursuant to Federal and applicable state laws. A statement of citizenship will be provided if requested by Escrow Agent.

7.     <u>Resignation of Escrow Agent</u>. Escrow Agent may resign as escrow agent hereunder at any time by giving fifteen (15) days prior written notice to the Buyer and Seller specifying a date when such resignation shall take effect. Upon such resignation or the placement of the Escrow Funds in the possession of a court of competent jurisdiction pursuant to this <u>Section 7</u>, the retiring Escrow Agent shall be absolved from any duties as Escrow Agent hereunder. Upon receipt of any such notice of resignation, Buyer and Seller shall use their reasonable best efforts jointly to appoint a successor Escrow Agent hereunder prior to the effective date of such resignation. If Buyer and Seller do not agree upon a successor escrow agent within fifteen (15) days after the receipt by the parties of the Escrow Agent's resignation notice, Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent, or for other appropriate relief and any such resulting appointment shall be binding upon all parties hereto. By mutual agreement, Buyer and Seller shall have the right at any time upon not less than fifteen (15) days written notice to terminate their appointment of the

-5-

Escrow Agent, or any successor escrow agent, as escrow agent hereunder. The Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all fees and expenses (including court costs and attorneys' fees and expenses) payable to, incurred by, or expected to be incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder. After any retiring Escrow Agent's resignation, the provisions of this Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Escrow Agreement. Any corporation or association into which Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of Escrow Agent's corporate trust line of business may be transferred, shall be Escrow Agent under this Escrow Agreement without further act.

8. <u>Liability of Escrow Agent</u>. Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement. Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to the Buyer or Seller. Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement. Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same. In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages (including, but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding. Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and, subject to the second sentence of this paragraph, shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel. Buyer and Seller, jointly and severally, shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel. Each of Buyer and Seller agree as between themselves to contribute one-half of any amounts payable pursuant to this <u>Section 8</u>.

-6-

Escrow Agent is authorized, in its sole discretion, to comply with orders issued or process entered by any court with respect to the Escrow Funds, without determination by Escrow Agent of such court's jurisdiction in the matter. If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

9.    Indemnification of Escrow Agent. From and at all times after the date of this Escrow Agreement, Buyer and Seller, jointly and severally (and as between Buyer and Seller, Buyer as to one-half, and Seller, as to one-half), shall, to the fullest extent permitted by law, defend, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and affiliate of Escrow Agent (collectively, the "Indemnified Parties") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation Buyer or Seller, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Escrow Agreement or any transactions contemplated herein, whether or not any such Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; *provided, however*, that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party. Each Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable out-of-pocket fees and expenses of such counsel shall be paid upon demand by Buyer and Seller, jointly and severally. Each of Buyer and Seller agree as between themselves to contribute one-half of any amounts payable pursuant to this Section 9. The obligations of Buyer and Seller under this Section 9 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

-7-

The parties agree that neither the payment by Buyer or Seller of any claim by Escrow Agent for indemnification hereunder nor the disbursement of any amounts to Escrow Agent from the Escrow Funds in respect of a claim by Escrow Agent for indemnification shall impair, limit, modify, or affect, as between Buyer and Seller, the respective rights and obligations of Buyer, on the one hand, and Seller, on the other hand, under the Purchase Agreement.

10.    <u>Compensation to Escrow Agent</u>.

(a)    <u>Fees and Expenses</u>.  Buyer and Seller shall compensate Escrow Agent for its services hereunder in accordance with <u>Schedule A</u> attached hereto and, in addition, shall reimburse Escrow Agent for all of its reasonable out-of-pocket expenses, including attorneys' fees, travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), copying charges and the like.  The additional provisions and information set forth on <u>Schedule A</u> are hereby incorporated by this reference, and form a part of this Escrow Agreement.  All of the compensation and reimbursement obligations set forth in this <u>Section 10</u> shall be payable by Buyer and Seller, jointly and severally, upon demand by Escrow Agent.  Each of Buyer and Seller agree as between themselves to contribute one-half of any amounts payable pursuant to this <u>Section 10</u>. The obligations of Buyer and Seller under this <u>Section 10</u> shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

(b)    <u>Disbursements from Escrow Funds to Pay Escrow Agent</u>.  Escrow Agent is authorized to, and may, disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable hereunder (including any amount to which Escrow Agent is entitled to seek indemnification pursuant to <u>Section 9</u> hereof).  Escrow Agent shall notify the Representatives of any disbursement from the Escrow Funds to itself in respect of any compensation or reimbursement hereunder and shall furnish to the Representatives copies of all related invoices and other statements.

11.    <u>Representations and Warranties</u>.  Each of Buyer and Seller respectively makes the following representations and warranties to Escrow Agent:

(i)    It is duly organized, validly existing, and in good standing under the laws of the state of its incorporation or organization, and has full power and authority to execute and deliver this Escrow Agreement and to perform its obligations hereunder.

(ii)    This Escrow Agreement has been duly approved by all necessary action, including any necessary shareholder or membership approval, has been executed by its

-8-

duly authorized officers, and constitutes its valid and binding agreement enforceable in accordance with its terms.

(iii) The execution, delivery, and performance of this Escrow Agreement is in accordance with the Purchase Agreement and will not violate, conflict with, or cause a default under its articles of incorporation, articles of organization, bylaws, management agreement or other organizational document, as applicable, or any applicable law or regulation, any court order or administrative ruling or decree to which it is a party or any of its property is subject.

(iv) The applicable persons designated on <u>Schedule A</u> hereto have been duly appointed to act as its representatives hereunder and have full power and authority to execute and deliver any Joint Written Direction, to amend, modify or waive any provision of this Escrow Agreement and to take any and all other actions as the Representatives under this Escrow Agreement, all without further consent or direction from, or notice to, it or any other party.

(v) All of its representations and warranties contained herein are true and complete as of the date hereof and will be true and complete at the time of any disbursement of the Escrow Funds.

12. <u>Identifying Information</u>. Buyer and Seller acknowledge that a portion of the identifying information set forth on <u>Schedule A</u> is being requested by Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "<u>Act</u>"). To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust, or other legal entity, Escrow Agent asks for documentation to verify its formation and existence as a legal entity. Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

13. <u>Consent to Jurisdiction and Venue; WAIVER OF JURY TRIAL</u>. In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Escrow Agreement, the parties hereto agree that the United States Bankruptcy Court for the District of Delaware shall have the sole and exclusive personal jurisdiction over any such proceeding. If such court lacks federal subject matter jurisdiction, the parties agree that the state courts of the State of New York located in the Borough of Manhattan, New York City shall have sole and exclusive jurisdiction. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute maybe

-9-

enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS ESCROW AGREEMENT.

14.    <u>Notice</u>.  All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be deemed to have been given when the writing is delivered if given or delivered by hand, overnight delivery service or facsimile transmitter (with confirmed receipt) to the address or facsimile number set forth on <u>Schedule A</u> hereto, or to such other address as each party may designate for itself by like notice, and shall be deemed to have been given on the date deposited in the mail, if mailed, by first-class, registered or certified mail, postage prepaid, addressed as set forth on <u>Schedule A</u> hereto, or to such other address as each party may designate for itself by like notice.

15.    <u>Amendment or Waiver</u>.  This Escrow Agreement may be changed, waived, discharged or terminated only by a writing signed by Buyer, Seller and Escrow Agent. No delay or omission by any party in exercising any right with respect hereto shall operate as a waiver. A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

16.    <u>Severability</u>.  To the extent any provision of this Escrow Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Escrow Agreement.

17.    <u>Governing Law</u>.  This Escrow Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of laws principles thereof.

18.    <u>Entire Agreement</u>.  This Escrow Agreement constitutes the entire agreement among the parties relating to the holding, investment and disbursement of the Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to the Escrow Funds.

19.    <u>Binding Effect</u>.  All of the terms of this Escrow Agreement, as amended from time to time, shall be binding upon, inure to the benefit of and be enforceable by the respective successors and assigns of Buyer, Seller and Escrow Agent.

20.    <u>Execution in Counterparts</u>.  This Escrow Agreement and any Joint Written Direction may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction. The parties further agree that this Escrow Agreement

-10-

and Joint Written Direction may be executed by the exchange of facsimile or pdf signature pages.

21. <u>Termination.</u>  Upon the first to occur of the termination of the Escrow Period, the disbursement of all amounts in the Escrow Funds pursuant to Joint Written Directions or the disbursement of all amounts in the Escrow Funds into court pursuant to <u>Section 5</u> or <u>Section 8</u> hereof, this Escrow Agreement shall terminate and Escrow Agent shall have no further obligation or liability whatsoever with respect to this Escrow Agreement or the Escrow Funds.

22. <u>Dealings.</u>  Escrow Agent and any stockholder, director, officer or employee of Escrow Agent may buy, sell, and deal in any of the securities of the Buyer or Seller and become pecuniarily interested in any transaction in which the Buyer or Seller may be interested, and contract and lend money to the Buyer or Seller and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement.  Nothing herein shall preclude Escrow Agent from acting in any other capacity for the Buyer or Seller or for any other entity.

23. <u>Brokerage Confirmations.</u>  The parties acknowledge that to the extent regulations of the Comptroller of Currency or other applicable regulatory entity grant a right to receive brokerage confirmations of security transactions of the escrow, the parties waive receipt of such confirmations, to the extent permitted by law.  Escrow Agent shall furnish a statement of security transactions on its regular monthly reports.  This language eliminates the need to send investment confirmations each time a trade is executed in the escrow account, and also eliminates the need for a separate letter from the parties waiving this requirement.

*[Signature Page Follows]*

-11-

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed as of the date first above written.

NEW VECTRIX LLC

By: _____

Title: _____

VECTRIX Corporation

By: _____

Title: President and Chief Executive Officer

U.S. BANK NATIONAL ASSOCIATION
as Escrow Agent

By: _____

Title: _____

-12-

1.  <u>Escrow Funds</u>.

    Escrow Funds amount:                  $200,000

    Escrow Funds wiring instructions:      **U.S. BANK**
    **ABA #: 091 000 022**
    **BNF: U.S. Bank Trust N.A.**
    **A/C 173103321092**
    **SEI No. 133788000**
    **Attn: John Doherty**
    **212-361-4385**
    **Ref: New Vectrix - Vectrix**

2.  <u>Escrow Agent Fees</u>.

    Acceptance Fee:               $0
    Annual Escrow Fee:          $4,000
    Out-of-Pocket Expenses:    At Cost

The Acceptance Fee and the Annual Escrow Fee are payable upon execution of the escrow documents. In the event the escrow is not funded, the Acceptance Fee and all related expenses, including attorneys' fees, remain due and payable, and if paid, will not be refunded. Annual fees cover a full year in advance, or any part thereof, and thus are not pro-rated in the year of termination.

The fees quoted in this schedule apply to services ordinarily rendered in the administration of an Escrow Account and are subject to reasonable adjustment based on final review of documents, or when Escrow Agent is called upon to undertake unusual duties or responsibilities, or as changes in law, procedures, or the cost of doing business demand. Services in addition to and not contemplated in this Agreement, including, but not limited to, document amendments and revisions, non-standard cash and/or investment transactions, calculations, notices and reports, and legal fees, will be billed as extraordinary expenses.

Unless otherwise indicated, the above fees relate to the establishment of one escrow account. Additional sub-accounts governed by the same Escrow Agreement may incur an additional charge. Transaction costs include charges for wire transfers, checks, internal transfers and securities transactions.

<u>SCHEDULE A</u>, continued ·

3.    <u>Investment Instructions</u>

Certificate of Deposit maturing on November 9, 2009.

4.    <u>Representatives</u>.

The following person is hereby designated and appointed as Buyer Representative under the Escrow Agreement:

X  _____      ✓  _____
   Name                                Specimen signature

The following person is hereby designated and appointed as Seller Representative under the Escrow Agreement:

   _____         _____
   Name                                Specimen signature

5.    <u>Notice Addresses</u>.

If to Buyer at:        New Vectrix LLC
                       1045 First Ave., Suite 120
                       King of Prussia, PA 19406
                       Attn: GH Venture Partners LLC, Managing Member

                       With a copy to:

                       Latham & Watkins LLP
                       99 Bishopsgate
                       London EC2M 3XF
                       United Kingdom
                       Attn:  Michael S. Immordino

                       and to

                       Latham & Watkins LLP
                       885 Third Avenue
                       New York, NY 10022
                       Attn:  Michael J. Riela

-2-

CH\11217393

With a copy to:

Latham & Watkins LLP
99 Bishopsgate
London EC2M 3XF
United Kingdom
Attn: Michael S. Immordino

and to

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attn: Michael J. Riela

If to Seller at:        VECTRIX Corporation
55 Samuel Barnet Blvd.
New Bedford, MA 02745
Attention: President and CEO
with an email copy to:
John McGuiness (jmcguiness@vectrixusa.com)

and a copy to:

Sheppard, Mullin, Richter & Hampton LLP
1300 I Street, NW, Suite 1100 East
Washington, D.C. 20005
Attention: Lucantonio N. Salvi
Facsimile: (202) 312-9454

and to:

Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza, 24th Floor
New York, NY 10112
Attn: Edward Tillinghast, III

If to the Escrow
Agent at:

U.S. Bank National Association, as Escrow Agent
100 Wall Street, 16th floor
New York, NY 10005
ATTENTION: Corporate Trust Services
Facsimile: 212-514-6841

**Exhibit C**

**ASSIGNMENT OF PATENTS**

**Exhibit D**

**ASSIGNMENT OF TRADEMARKS**

CH\1119562.131119562.16

**Exhibit E**

**BILL OF SALE**

**Exhibit F**

**ASSIGNMENT AND ASSUMPTION**

CH\1119562.131119562.16

**Exhibit B**

**(Cure Notice)**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

VECTRIX CORPORATION,

          Debtor.

Chapter 11

Case No. 09-13347

OBJECTION DEADLINE: OCTOBER __, 2009, AT 5:00 P.M.
HEARING: OCTOBER __, 2009, AT __:__ _.M.

## NOTICE OF CURE AMOUNTS IN CONNECTION WITH THE ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

      **PLEASE TAKE NOTICE THAT** on ____ __, 2009, the above-captioned debtor and debtor-in-possession (the "**Debtor**"),[1] filed the *Motion of Debtor for Orders (I)(A) Approving Sale of Certain all of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests Pursuant to Sections 105, 363(b), (f), and (m) of the Bankruptcy Code; and (B) Authorizing the Assumption, Assignment, and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Sections 363 and 365 of the Bankruptcy Code; (II) Approving Bidding Procedures, Break-Up Fee, and Other Protections in Advance of Sale; and (III) Granting Related Relief* (the "**Motion**").

      **PLEASE TAKE FURTHER NOTICE THAT** by their Motion, the Debtor sought entry of an order (the "**Bidding Procedures Order**") (A) approving procedures for (i) submitting bids (the "**Bids**") for the purchase of substantially all of the Debtors' assets or businesses (the "**Purchased Assets**"); (B) authorizing the Debtors to (i) enter into a "stalking horse" asset purchase agreement(s) (the "**Purchase Agreement**") with New Vectrix LLC (the "**Stalking Horse Bidder**") for the purpose of establishing a minimum acceptable bid at which to begin the Auction; and (ii) offer the Stalking Horse Bidder with a fee (the "**Breakup Fee**") of $125,000.00 plus a maximum of $325,000.00 in expense reimbursements (the "**Expense Reimbursement**") as set forth in the Purchase Agreement, subject to Court approval; and (C) scheduling the Auction and a sale hearing (the "**Sale Hearing**") with respect to any competing bid(s) received by the Debtor.

      **PLEASE TAKE FURTHER NOTICE THAT** the Sale Hearing, at which the Debtor shall seek approval of the Winning Bid(s), shall be held on **[October 22, 2009 at _____[ ].m.]** before the United States Bankruptcy Court for the District of Delaware, at 824 Market Street, 5th Floor Courtroom, Wilmington, Delaware 19801. The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

---

[1] Capitalized terms not otherwise defined here in shall have the meanings ascribed to them in the Bidding Procedures Order.

**IF YOU ARE A PARTY TO AN UNEXPIRED LEASE OR AN UNEXPIRED EXECUTORY CONTRACT WITH THE DEBTOR THIS PROCESS MAY AFFECT YOUR RIGHTS AND REQUIRES YOUR IMMEDIATE ATTENTION.**

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures Order, attached hereto as **Exhibit A** is a list (the "**Cure Schedule**") of the unexpired leases and executory contracts that the Debtor may[2] assume and assign to the prevailing bidder for the assets (the "**Winning Bidder**"), showing the amount, if any, that the Debtor asserts is necessary to cure defaults on each respective lease (the "**Cure Amount**").

**PLEASE TAKE FURTHER NOTICE** that, upon conclusion of the Auction for the Purchased Assets identification by the Debtor of the Winning Bidder(s), the Debtor shall provide proof of adequate assurance of future performance relating to such Winning Bidder(s) upon all applicable landlords and parties to unexpired executory contracts and their counsel for those unexpired leases and executory contracts that may be assumed or assumed and assigned at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that prior to the Sale Hearing, the Debtor shall work to resolve disputes with any landlords and parties to executory contracts regarding the proposed assumption and assignment of any unexpired leases and executory contracts. Landlords and parties to unexpired leases and executory contracts who wish to object to the cure amount or the proposed assumption and assignment of an unexpired lease or executory contract (including, cure amount and adequate assurance of future performance as applicable) must file, and serve upon counsel to the Debtor (Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Malani J. Cademartori, Esq., 30 Rockefeller Plaza, 24th Floor, New York, New York 10112, Facsimile (212) 653-8701, and Garvan F. McDaniel, Esq., Bifferato Gentilotti LLC, 800 N. King Street, Plaza Level, Wilmington, Delaware 19801, Facsimile: (302) 429-8600), an objection such that it is **received** by no later than ten (10) days after receipt of this Notice. To the extent filed and served prior to the Sale Hearing, such objections shall be heard at the Sale Hearing.

---

[2] The Debtor reserves the right to add to or subtract from the list of leases and contracts to be assumed and assigned.

Dated: September 28, 2009
Wilmington, DE

BIFFERATO GENTILOTTI LLC

/s/ Garvan F. McDaniel
Garvan F. McDaniel (DE Bar No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600
Email: gmcdaniel@bglawde.com

-and-

Sheppard Mullin Richter & Hampton, LLP
Edward H. Tillinghast, III, Esq
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701
Email: etillinghast@sheppardmullin.com
        mcademartori@sheppardmullin.com
        bwolfe@sheppardmullin.com

*Proposed Counsel for the Debtor*
*and Debtor-in-Possession*

**Exhibit A**
**(Unexpired Leases and Executory Contracts)**

**Exhibit C**

**(Notice of Bid Procedures)**

| In re: | | |
|---|---|---|
| VECTRIX CORPORATION, | | Chapter 11 |
| | | Case No. 09-13347 |
| Debtor. | | |

## NOTICE OF (A) BIDDING PROCEDURES
## FOR SALE OF CERTAIN ASSETS AND (B) AUCTION

**PLEASE TAKE NOTICE** that, on October [_], 2009, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered an Order (the "**Order**") on the motion (the "**Motion**") filed with the Court by the above-captioned debtor and debtor-in-possession (the "**Debtors**") for an order (I)(A) approving sale of certain of the Debtor's assets (the "**Purchased Assets**") free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), and (m) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and approving the form of Asset Purchase Agreement, as such agreement may have been amended (the "**Purchase Agreement**"),[1] by and between the Debtor and the Buyer, and (B) authorizing the assumption, assignment, and sale of certain executory contracts and unexpired leases pursuant sections 363 and 365 of the Bankruptcy Code, (II) approving bidding procedures, break-up fee, and other protections in advance of sale, and (III) granting related relief.

Pursuant to the Order, an auction for the Purchased Assets will take place on October __, 2009 at the law offices of Sheppard Mullin Richter & Hampton LLP, 30 Rockefeller Plaza, 24th Floor, New York, New York 10112, beginning at [10:00 a.m.]  The Auction will be transcribed.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

The Auction may adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

1.     **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Order, the following procedures (the "**Bid Procedures**") shall govern the sale of the Assets:

a.     <u>**Due Diligence**</u>.   Parties interested in conducting due diligence in contemplation of making a bid for the purchase of some or all of the Purchased Assets will be required to execute a confidentiality agreement in form and substance acceptable to the Debtor, prior to gaining access to the due diligence materials.

b.     <u>**Deadline for Submission of Bids**</u>.   The deadline for submitting any and all competing bids shall be no later than October 27, 2009 at 5:00 p.m. (Prevailing Eastern Time) or, such other date as is established by the Court (the "**Bid Deadline**").

c.     <u>**Advertising Sale and Auction**</u>.   The Debtor shall place an advertisement giving public notice of the sale of the Purchased Assets and the Auction in a nationwide publication upon entry of the Order approving these Bidding Procedures.

d.     <u>**Submission of Bids**</u>.   In order to qualify as a potential Qualified Bidder (as defined below) of the Purchased Assets, an interested bidder must timely submit a written bid (a "**Qualified Bid**") for the Purchased Assets that:

i.     exceeds the Purchase Price by at least $500,000, representing (A) the amount of the Break-Up Fee and Expense Reimbursement as outlined in the Purchase Agreement, plus (B) an additional $50,000, and is accompanied by a cash deposit in an amount equal to 10% of the aggregate value of such Qualified Bid;

ii.     is accompanied by an executed Purchase Agreement in substantially the form of the Purchase Agreement attached hereto as <u>Exhibit A</u> and a blackline showing any such modifications the bidder is proposing, and that:

(a)     indicates which of the Purchased Assets such bidder proposes to acquire pursuant to the Purchase Agreement;

(b)     indicates which of the Debtor's executory contracts and unexpired leases such bidder intends to take assignment of pursuant to the Purchase Agreement and/or that the bidder will have up to 30 days after the closing date to designate or remover Assigned Contracts from the requisite Schedules; and

(c)     does not contain any conditions to closing which are not contained in the Purchase Agreement (including financing and due diligence) or is based on terms or conditions any less favorable, or

otherwise more burdensome or conditional than those set forth in the Purchase Agreement;

iii.    includes financial statements of such entity (or the entity that will furnish the funding required to consummate and perform under the Purchase Agreement) establishing such entity's financial wherewithal to timely close the transactions contemplated thereunder;

iv.    contains written evidence demonstrating adequate assurance of future performance by the acquiring entity to the non-Debtor parties under the unexpired leases and executory contracts to be assumed and assigned pursuant to the Purchase Agreement, which may include, without limitation, a representation as to the solvency of the bidder post-Closing;[2] and

v.    contains a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereby.

vi.    is delivered to the following parties such that they are received by the close of business on the Bid Deadline: (i) the Debtor's President and Chief Executive Officer, Michael J. Boyle, Vectrix Corporation, 55 Samuel Barnet Boulevard, New Bedford, MA 02745; (ii) the Debtor's counsel, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Malani J. Cademartori, Esq., 30 Rockefeller Plaza, 24th Floor, New York, New York 10112; (iii) counsel for the DIP lenders, Latham & Watkins LLP, Attn: Michael Immordino, Esq. and Michael Riela, Esq., 885 Third Avenue, New York, New York 10022.

e.    **Qualification of Bid**.  After a potential bidder has delivered a bid, the Debtor, in consultation with any official Committee (if one is appointed), will determine whether (i) the potential bidder has demonstrated the financial capacity to consummate the purchase of the Purchased Assets; (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions; and (iii) has otherwise timely satisfied the requirements described above.  If so, the Debtor shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**."  Promptly after making such determination, the Debtor will advise such bidder of this determination and, if a bid is not designated as a Qualified Bid, provide a brief statement as to why it is not a Qualified Bid.

f.    **Auction**.  In the event that competitive Qualified Bids are received, the Debtor will conduct an auction to determine the highest or best bid for the Purchased Assets on October 29, 2009 or, such other date as may be established by the Court, at the

---

[2] Such information may be made available to the non-Debtor parties to the Debtor's unexpired leases and executory contracts, to assist such parties in analyzing the financial wherewithal of the potential bidder.

law offices of Sheppard Mullin Richter & Hampton LLP, 30 Rockefeller Plaza, 24th Floor, New York, New York 10112, beginning at 10:00 a.m. EST. The Auction will be transcribed. The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

       g.    **Auction Procedures**. Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction. At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids. The bidding at the Auction shall begin with the highest and best offer for the Purchased Assets received by the Bid Deadline and continue in increments of no less than $100,000 in excess of the preceding highest or best offer for the Purchased Assets at the Auction. The Buyer shall have the right, but not the obligation to participate in the Auction. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of other party making the then highest or best bid. The Debtor may conduct the Auction in the manner they determine will maximize the value of the Purchased Assets. If the only Qualified Bidder is the Buyer, the Auction may be cancelled and the Buyer be declared the Winning Bidder.

       h.    **Successful Bid**. At the conclusion of the bidding, the Debtor shall announce its determination as to the Qualified Bidder or Qualified Bidders (which may include the Buyer) making the highest or otherwise best offer at the Auction for the Purchased Assets and such Qualified Bidder or Qualified Buyer shall be declared by the Debtor to be the "**Winning Bidder**" or "**Winning Bidders**". The Winning Bid(s) shall be determined by the Debtor in consultation with any Committee. The Debtor may designate the next highest or best bidder or bidders for the Purchased Assets at the Auction as the "**Backup Bidder**" or "**Backup Bidders**".

       i.    **Sale Hearing**. The Court will hold a hearing to approve the Sale of the Purchased Assets to the Winning Bidder or Winning Bidders (the "**Sale Hearing**") in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware, 19801, on or before October 30, 2009, or such other date as is established by the Court. Each of the Winning Bidder or Winning Bidders and the Backup Bidder or Backup Bidders must produce a competent witness at the Sale Hearing (and any subsequent hearing) to provide testimony, if necessary, to establish adequate assurance of future performance by each such bidder under the unexpired leases and executory contracts to be assigned to such bidder, to the extent required by sections 365(b)(1)(c) and 365(f)(2)(b) of the Bankruptcy Code. At the Sale Hearing, the Debtor will request that the Court approve the sale of the Purchased Assets to the Backup Bidder or Backup Bidders in the event the contemplated sale to the Winning Bidder or Winning Bidders does not timely close; in which case such Backup Bidder or Backup Bidders shall become the Winning Bidder or Winning Bidders without further order of the Court. The Winning Bidder (if other than the Buyer) should be substituted for the Buyer under the Purchase Agreement (as amended to reflect terms of the Winning Bidder's bid) and the proposed Sale Order.

j.    **Closing.**  Closing shall take place promptly after the Sale Hearing and entry of the Sale Order and in no event later than November 9, 2009, subject to extension as provided in the Purchase Agreement.

k.    **Return of Deposits**.  The Debtor shall return the deposit of any Qualified Bidder that is not declared a Winning Bidder 2 business days after the Closing of the sale or sales of the Purchased Assets.  In the event a declared Winning Bidder fails to timely perform any material obligation under its Purchase Agreement, the declared Winning Bidder shall forfeit all deposits made, without regard to the Debtor's ultimate damages occasioned by such failure; such deposits shall be applied to the Debtor's damages, if any, and shall not constitute liquidated damages; and, notwithstanding the foregoing, the Debtor and the bankruptcy estates shall retain all other rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief. Notwithstanding the foregoing, the Deposit made by the Buyer under the Purchase Agreement shall be dealt with and returned as provided in the Purchase Agreement.

l.    **Reservation of Rights**.  The Debtor reserves the right, in consultation with its professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as they may determine reasonably appropriate to maximize the value realized by the estates.

m.    **Damages for Controlling of Sales Price**.  The proposed form of Notice of Bidding Procedures shall advise potential bidders that, under section 363(n) of the Bankruptcy Code and applicable law, the Debtor and/or its estate may avoid a transaction and recover damages (actual and possibly punitive) if the sale price for the Purchased Assets was controlled by an agreement among the potential bidders, Qualified Bidders or Winning Bidder(s).

n.    **Bid Protections**.  The Buyer, if outbid, and if the Bankruptcy Court approves a competing transaction with a Qualified Bidder and the Debtor consummates such transaction shall be entitled to reimbursement of reasonable, documented expenses (the "**Expense Reimbursement**"), not to exceed the amount of $325,000 incurred in connection with the transaction contemplated by the Purchase Agreement, including amounts in connection with the Buyer's legal and advisory fees.  The Buyer shall also be entitled to the payment of a break-up fee (the "**Break-Up Fee**") of $125,000 upon the closing of an alternative transaction with an entity other than the Buyer.  The terms and payment of the Expense Reimbursement and Break-Up Fee are governed by the Purchase Agreement.  In addition, the Buyer would be entitled to the Break-Up Fee and the Expense Reimbursement in the event of a material breach of any representation or warranty, or covenant or agreement to be performed or complied with by Seller pursuant to the terms of the Purchase Agreement or any other agreement contemplated hereby, which breach would result in a condition to closing becoming incapable of fulfillment or cure (and which condition has not been waived by Buyer in writing) prior to November 9, 2009.  Moreover, the Buyer would be entitled to the Break-Up Fee and the Expense Reimbursement if the Debtor's chapter 11 case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly

contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller and such trustee rejects the transactions contemplated by the Purchase Agreement.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion, the Order and the form of Purchase Agreement can be obtained from the Bankruptcy Court docket for this case.

Dated:   September 28, 2009
         Wilmington, DE

BIFFERATO GENTILOTTI LLC

/s/ Garvan F. McDaniel
Garvan F. McDaniel (DE Bar No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware  19801
Telephone:  (302) 429-1900
Facsimile:  (302) 429-8600
Email: gmcdaniel@bglawde.com

-and-

Sheppard Mullin Richter & Hampton, LLP
Edward H. Tillinghast, III, Esq
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Telephone:  (212) 653-8700
Facsimile:  (212) 653-8701
Email: etillinghast@sheppardmullin.com
         mcademartori@sheppardmullin.com
         bwolfe@sheppardmullin.com

*Proposed Counsel for the Debtor*
*and Debtor-in-Possession*

**<u>Exhibit D</u>**

**(Proposed Bidding Procedures Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VECTRIX CORPORATION, | Case No. 09-13347 |
| Debtor. | |

## ORDER APPROVING BIDDING PROCEDURES AND RELATED RELIEF
## REGARDING THE SALE OF THE DEBTOR'S ASSETS, AND NOTICE THEREOF

Upon the motion, dated September 28, 2009 (the "**Motion**"),[1] filed by Vectrix Corporation, as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**"), requesting entry of an order (I)(A) approving sale of certain of the Debtor's assets (the "**Purchased Assets**") free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), and (m) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and approving the form of Asset Purchase Agreement, as such agreement may have been amended (the "**Purchase Agreement**"), by and between the Debtor and New Vectrix, LLC (the "**Buyer**"), and (B) authorizing the assumption, assignment, and sale of certain executory contracts and unexpired leases pursuant sections 363 and 365 of the Bankruptcy Code; (II) approving bidding procedures, break-up fee, and other protections in advance of sale; and (III) granting related relief, and the *Declaration of Michael J. Boyle in Support of the Debtor's Chapter 11 Petitions and Requests for First Day Relief*, filed contemporaneously with the Motion; and the Court having held a hearing to consider the relief requested herein on September __, 2009 (the "**Hearing**") with the appearances of all interested

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Purchase Agreement.

parties noted in the record of the Hearing; and the Court having read and considered the Motion, objections to the Motion, if any, and arguments of any counsel appearing regarding the relief requested in the Motion at the Hearing, the Court finds and determines the following:

A.      Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

B.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334.

D.      The Debtor has provided due and proper notice of the Motion and the Hearing and the Interim Order to (i) the Office of the United States Trustee for the District of Delaware (Attn: Richard Schepacarter, Esq.); (ii) New Vectrix LLC, as Lender; (iii) Latham & Watkins LLP (Attn: Michael J. Riela) and Duane Morris LLP (Attn: Christopher M. Winter), as counsel for the Lender; (iv) the holders of the 20 largest unsecured claims as set forth in the consolidated list filed with the Debtor's petitions; (v) any known party interested in purchasing the Debtor's assets; (vi) any known holder of an alleged lien on the Debtor's assets; (vii) the Office of the United States Attorney General for the District of Delaware; and (viii) the Internal Revenue Service, and no further notice is necessary.

E.      The legal and factual bases set forth in the Motion establish just and sufficient cause to grant the relief requested therein.

F.      The relief granted herein is in the best interests of the Debtor, its estate, creditors, and all parties in interest.

THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED in all respects and as set forth below.  All objections to the Motion that have not been withdrawn are hereby overruled.

2.      The time period for notice pursuant to Bankruptcy Rule 2002(a) of a sale of certain of the Debtors' assets is hereby reduced to accommodate the sale as set forth in the Motion.

3.      The following deadlines, protections, and procedures (the "**Bidding Procedures**") are approved and established in connection with the Debtor's contemplated sale of the Purchased Assets:

    a.      **Due Diligence**.   Parties interested in conducting due diligence in contemplation of making a bid for the purchase of some or all of the Purchased Assets will be required to execute a confidentiality agreement in form and substance acceptable to the Debtor, prior to gaining access to the due diligence materials.

    b.      **Deadline for Submission of Bids**.  The deadline for submitting any and all competing bids shall be no later than October 27, 2009 at 5:00 p.m. (Prevailing Eastern Time) or, such other date as is established by the Court (the "**Bid Deadline**").

    c.      **Advertising Sale and Auction**.  The Debtor shall place an advertisement giving public notice of the sale of the Purchased Assets and the Auction in a nationwide publication upon entry of the Order approving these Bidding Procedures.

    d.      **Submission of Bids**.  In order to qualify as a potential Qualified Bidder (as defined below) of the Purchased Assets, an interested bidder must timely submit a written bid (a "**Qualified Bid**") for the Purchased Assets that:

        i.      exceeds the Purchase Price by at least $500,000, representing (A) the amount of the Break-Up Fee and Expense Reimbursement as outlined in the Purchase Agreement, plus (B) an additional $50,000, and is accompanied by a cash deposit in an amount equal to 10% of the aggregate value of such Qualified Bid;

        ii.      is accompanied by an executed Purchase Agreement in substantially the form of the Purchase Agreement attached hereto as Exhibit A and a blackline showing any such modifications the bidder is proposing, and that:

        iii.      indicates which of the Purchased Assets such bidder proposes to acquire pursuant to the Purchase Agreement;

iv.   indicates which of the Debtor's executory contracts and unexpired leases such bidder intends to take assignment of pursuant to the Purchase Agreement and/or that the bidder will have up to 30 days after the closing date to designate or remove Assigned Contracts from the requisite Schedules; and

v.   does not contain any conditions to closing which are not contained in the Purchase Agreement (including financing and due diligence) or is based on terms or conditions any less favorable, or otherwise more burdensome or conditional than those set forth in the Purchase Agreement;

vi.   includes financial statements of such entity (or the entity that will furnish the funding required to consummate and perform under the Purchase Agreement) establishing such entity's financial wherewithal to timely close the transactions contemplated thereunder;

vii.   contains written evidence demonstrating adequate assurance of future performance by the acquiring entity to the non-Debtor parties under the unexpired leases and executory contracts to be assumed and assigned pursuant to the Purchase Agreement, which may include, without limitation, a representation as to the solvency of the bidder post-Closing;[2] and

viii.   contains a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereby.

ix.   is delivered to the following parties such that they are received by the close of business on the Bid Deadline: (i) the Debtor's President and Chief Executive Officer, Michael J. Boyle, Vectrix Corporation, 55 Samuel Barnet Boulevard, New Bedford, MA 02745; (ii) the Debtor's counsel, Sheppard Mullin Richter & Hampton LLP, Attn: Edward H. Tillinghast, III, Esq. and Malani J. Cademartori, Esq., 30 Rockefeller Plaza, 24th Floor, New York, New York 10112; (iii) counsel for the DIP lenders, Latham & Watkins LLP, Attn: Michael Immordino, Esq. and Michael Riela, Esq., 885 Third Avenue, New York, New York 10022.

e.   **Qualification of Bid**.  After a potential bidder has delivered a bid, the Debtor, in consultation with any official Committee (if one is appointed), will determine whether (i) the potential bidder has demonstrated the financial capacity to consummate the purchase of the Purchased Assets; (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions; and (iii) has otherwise timely satisfied the

---

[2] Such information may be made available to the non-Debtor parties to the Debtor's unexpired leases and executory contracts, to assist such parties in analyzing the financial wherewithal of the potential bidder.

requirements described above. If so, the Debtor shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**." Promptly after making such determination, the Debtor will advise such bidder of this determination and, if a bid is not designated as a Qualified Bid, provide a brief statement as to why it is not a Qualified Bid.

        f.     **Auction**. In the event that competitive Qualified Bids are received, the Debtor will conduct an auction to determine the highest or best bid for the Purchased Assets on October 29, 2009 or, such other date as may be established by the Court, at the law offices of Sheppard Mullin Richter & Hampton LLP, 30 Rockefeller Plaza, 24th Floor, New York, New York 10112, beginning at 10:00 a.m. EST. The Auction will be transcribed. The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

        g.     **Auction Procedures**. Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction. At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids. The bidding at the Auction shall begin with the highest and best offer for the Purchased Assets received by the Bid Deadline and continue in increments of no less than $100,000 in excess of the preceding highest or best offer for the Purchased Assets at the Auction. The Buyer shall have the right, but not the obligation to participate in the Auction. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of other party making the then highest or best bid. The Debtor may conduct the Auction in the manner they determine will maximize the value of the Purchased Assets. If the only Qualified Bidder is the Buyer, the Auction may be cancelled and the Buyer be declared the Winning Bidder.

        h.     **Successful Bid**. At the conclusion of the bidding, the Debtor shall announce its determination as to the Qualified Bidder or Qualified Bidders (which may include the Buyer) making the highest or otherwise best offer at the Auction for the Purchased Assets and such Qualified Bidder or Qualified Buyer shall be declared by the Debtor to be the "**Winning Bidder**" or "**Winning Bidders**". The Winning Bid(s) shall be determined by the Debtor in consultation with any Committee. The Debtor may designate the next highest or best bidder or bidders for the Purchased Assets at the Auction as the "**Backup Bidder**" or "**Backup Bidders**".

        i.     **Sale Hearing**. The Court will hold a hearing to approve the Sale of the Purchased Assets to the Winning Bidder or Winning Bidders (the "**Sale Hearing**") in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware, 19801, on or before October 30, 2009, or such other date as is established by the Court. Each of the Winning Bidder or Winning Bidders and the Backup Bidder or Backup Bidders must produce a competent witness at the Sale Hearing (and any subsequent hearing) to provide testimony, if necessary, to establish adequate assurance of future performance by each such bidder under the unexpired leases and executory contracts to be assigned to such bidder, to the extent required by sections

365(b)(1)(c) and 365(f)(2)(b) of the Bankruptcy Code. At the Sale Hearing, the Debtor will request that the Court approve the sale of the Purchased Assets to the Backup Bidder or Backup Bidders in the event the contemplated sale to the Winning Bidder or Winning Bidders does not timely close; in which case such Backup Bidder or Backup Bidders shall become the Winning Bidder or Winning Bidders without further order of the Court. The Winning Bidder (if other than the Buyer) should be substituted for the Buyer under the Purchase Agreement (as amended to reflect terms of the Winning Bidder's bid) and the proposed Sale Order.

j.    **Closing.**  Closing shall take place promptly after the Sale Hearing and entry of the Sale Order and in no event later than November 9, 2009, subject to extension as provided in the Purchase Agreement.

k.    **Return of Deposits**.  The Debtor shall return the deposit of any Qualified Bidder that is not declared a Winning Bidder 2 business days after the Closing of the sale or sales of the Purchased Assets.  In the event a declared Winning Bidder fails to timely perform any material obligation under its Purchase Agreement, the declared Winning Bidder shall forfeit all deposits made, without regard to the Debtor's ultimate damages occasioned by such failure; such deposits shall be applied to the Debtor's damages, if any, and shall not constitute liquidated damages; and, notwithstanding the foregoing, the Debtor and the bankruptcy estates shall retain all other rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief. Notwithstanding the foregoing, the Deposit made by the Buyer under the Purchase Agreement shall be dealt with and returned as provided in the Purchase Agreement.

l.    **Reservation of Rights**.  The Debtor reserves the right, in consultation with its professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as they may determine reasonably appropriate to maximize the value realized by the estates.

m.    **Damages for Controlling of Sales Price**.  The proposed form of Notice of Bidding Procedures shall advise potential bidders that, under section 363(n) of the Bankruptcy Code and applicable law, the Debtor and/or its estate may avoid a transaction and recover damages (actual and possibly punitive) if the sale price for the Purchased Assets was controlled by an agreement among the potential bidders, Qualified Bidders or Winning Bidder(s).

n.    **Bid Protections**.  The Buyer, if outbid, and if the Bankruptcy Court approves a competing transaction with a Qualified Bidder and the Debtor consummates such transaction shall be entitled to reimbursement of reasonable, documented expenses (the "**Expense Reimbursement**"), not to exceed the amount of $325,000 incurred in connection with the transaction contemplated by the Purchase Agreement, including amounts in connection with the Buyer's legal and advisory fees.  The Buyer shall also be entitled to the payment of a break-up fee (the "**Break-Up Fee**") of $125,000 upon the closing of an alternative transaction with an entity other than the Buyer.  The terms and payment of the Expense Reimbursement and Break-Up Fee are governed by the Purchase Agreement.  In addition, the Buyer would be entitled to the Break-Up Fee and the

Expense Reimbursement in the event of a material breach of any representation or warranty, or covenant or agreement to be performed or complied with by Seller pursuant to the terms of the Purchase Agreement or any other agreement contemplated hereby, which breach would result in a condition to closing becoming incapable of fulfillment or cure (and which condition has not been waived by Buyer in writing) prior to November 9, 2009. Moreover, the Buyer would be entitled to the Break-Up Fee and the Expense Reimbursement if the Debtor's chapter 11 case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller and such trustee rejects the transactions contemplated by the Purchase Agreement.

4.     Not later than three days after the entry of this Order, the Debtor will cause a notice of Bid Procedures and Auction, substantially in the form attached to the Motion as <u>Exhibit C</u>, to be sent by first-class mail postage prepaid to (i) the United States Trustee for the District of Delaware (Attn: Richard Schepacarter Esq.); (ii) counsel for the Committee, if any; (iii) the Buyer; (iv) counsel for the Buyer; (v) all of the Debtor's known creditors; (vi) all entities known to have expressed a *bona fide* interest in acquiring the assets being sold; (vii) federal, state and local regulatory authorities (including taxing authorities) with jurisdiction over the Debtor; (viii) the Office of the United States Attorney for the District of Delaware; (ix) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002); and (x) shall publish notice of the Auction and Sale in a nationally distributed newspaper publication. Such notice of the proposed sale shall be good and sufficient for purposes of Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

5.     The Debtor is authorized to disseminate written notice of these Bidding Procedures as set forth herein.

6.     Any party objecting to the Sale of the Purchased Assets shall file with the Court (with a courtesy copy to chambers) its written objection and serve such objection (so as to be received) no later than [October 27], 2009 by [5:00 p.m.] EST (the "**Objection Deadline**"), on

(i) counsel to the Debtor, Bifferato Gentilotti LLC, 800 North King Street, Plaza Level, Wilmington, Delaware 19801, Attn: Garvan F. McDaniel, Esq., and Sheppard Mullin Richter & Hampton, LLP, 30 Rockefeller Plaza, 24th Floor, Attn: Edward H. Tillinghast, III, Esq. and Malani J. Cademartori, Esq., (ii) counsel to the Lender, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attn: Michael J. Riela, and Duane Morris LLP, Suite 1200, 1100 North Market Street, Wilmington, Delaware 19801, Attn: Christopher M. Winter; and (iii) the United States Trustee for the District of Delaware, 844 King Street, Suite 2313, Wilmington, Delaware 19801, Attn: Richard Shepacarter, Esquire.

7.      Objections to the Sale will be heard at the Sale Hearing to be held before this Court on [October 30, 2009] at _____ EST.

8.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: _____, 2009
Wilmington, Delaware


_____
UNITED STATES BANKRUPTCY JUDGE