| | |
|---|---|
| In re: | Chapter 11 |
| VECTRIX CORPORATION, | Case No. 09-13347 |
| Debtor. | Hearing Date: TBD<br>Objection Deadline: TBD |

**DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO
OBTAIN INTERIM POSTPETITION FINANCING AND TO GRANT
SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d);
(II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362; AND
(III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Vectrix Corporation, the above-captioned debtor and debtor-in-possession (the "**Debtor**"), by and through its undersigned counsel, respectfully submits this motion (the "**Motion**"), pursuant sections 105(a), 362, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") for the entry of interim (the "**Interim Order**") and final orders (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**"), *inter alia*, (i) authorizing the Debtor to enter into a senior secured superpriority debtor-in-possession term loan in the aggregate principal amount of $300,000 (as amended, modified and otherwise in effect from time to time, the "**DIP Loan**") substantially on the terms set forth in the Secured Super-Priority Debtor-in-Possession Credit Agreement between the Debtor and New Vectrix

LLC ("**Lender**" or "**Buyer**"), annexed hereto as <u>Exhibit A</u>[1] (as amended, supplemented, or otherwise modified and in effect from time to time, the "**DIP Loan Agreement**" and, together with any and all schedules thereto and other related documents and agreements entered into in connection with or related to the DIP Loan, the "**DIP Documents**"), and (ii) scheduling a final hearing pursuant to Rules 4001(b) and (c) of the Bankruptcy Rules. In support of this Motion, the Debtor respectively represents as follows:

<u>**Jurisdiction and Venue**</u>

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. The statutory predicates for the relief sought herein are sections 105(a), 362, 364 and 507 of Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

<u>**Background**</u>

3. On the date hereof (the "**Petition Date**"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 the Bankruptcy Code.

4. The Debtor has continued in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Loan Agreement. All obligations under the DIP Loan Agreement are hereinafter referred to as the "**DIP Obligations**."

6.     The Debtor is a public entity incorporated in the State of Delaware, with offices in Middletown, Rhode Island, and an engineering and testing facility in New Bedford, Massachusetts.   The Debtor is engaged, directly and through its affiliates, in developing, inventing, manufacturing, testing, assembling and selling mechanical and electronic, high performance, zero emission, power, two-wheel electric vehicles (the "**Products**"), which are then used, sold, leased or otherwise distributed to dealers in domestic and international markets for resale (the "**Business**").

7.     The Debtor is also the sole shareholder of Vectrix Europe Limited, an Irish company ("**Vectrix Ireland**"), which in turn holds interests in various other foreign affiliates, including Vectrix Europe S.r.l., Vectrix Roma S.r.l., Vectrix Europe Ltd. (f/k/a Vectrix (UK) Limited), and Vectrix Sp. z.o.o., each of which plays a role in the manufacturing and development of the Products.   These foreign direct and indirect subsidiaries are not a part of this chapter 11 bankruptcy case.

8.     In connection with this bankruptcy case, the Debtor seeks to consummate the sale of substantially all of its assets pursuant to the *Motion of the Debtor for Orders (I)(A) Approving Sale of Certain of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests Pursuant to Sections 105, 363(b), (f), and (m) of the Bankruptcy Code, and (B) Authorizing the Assumption, Assignment, and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Sections 363 and 365 of the Bankruptcy Code; (II) Approving Bidding Procedures, Break-Up Fee, and Other Protections in Advance of Sale; and (III) Granting Related Relief* (the "**Sale Motion**"), filed contemporaneously herewith, and the Purchase Agreement (as defined in the Sale Motion), subject to higher and better offers as

outlined in the Sale Motion and as may be prescribed by the Court in the Bidding Procedures Order (as defined in the Sale Motion).

9. A more detailed factual background of the Debtor's businesses and operations, as well as the facts and circumstances underlying the commencement of this chapter 11 case, is more fully set forth in the *Declaration of Michael J. Boyle in Support of the Debtor's Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## A. Capital Structure

10. From its inception, the Debtor raised capital through equity financing by selling shares of its common stock to investors in various private placements. The Debtor originally invested approximately $85 million on the research and development of its scooter designs, production engineering, tooling, production set-up, a battery joint venture, and marketing. In 2007, the Debtor raised approximately $51.2 million in additional equity capital through a private placement.

11. On May 24, 2007, the Debtor was admitted to the AIM, the London Stock Exchange's international market for smaller, growing companies, under the symbol "VRX." On the same date, the Debtor placed 72,000,000 shares of the Debtor's common stock on the AIM, raising approximately $66.8 million, net of offering costs, which was used for working capital, research and development, and capital expenditures. All of the shares of Debtor's common stock are considered "restricted securities" under U.S. securities laws and are subject to various restrictions on their resale.

12. Pursuant to its Articles of Incorporation, the Debtor is authorized to issue 435,000,000 shares of stock. As of the Petition Date, the Debtor had 283,313,473 shares of

common stock outstanding, of which 114,108,071 were restricted. As of the Petition Date, there were over 300 record holders of the Debtor's stock.

13.     The Debtor's pre-petition indebtedness consists primarily of unsecured obligations incurred in the operation of the Debtor's business. As of the Petition Date, the Debtor had outstanding principal unsecured indebtedness totaling approximately $26,000,000.00.[2]

14.     Other than secured debt on and in connection with certain vehicles, machinery and other discrete assets, the Debtor has no outstanding pre-petition secured loan facilities and no other secured debt. In addition, and without limiting the generality of the foregoing, there are no pre-petition liens or other encumbrances, including security interests held by any party, in or to any of the Debtor's cash, deposit account or other operational accounts.

**B.     Events Leading to Restructuring**

15.     Until the latter part of 2008, the Debtor had been able to raise sufficient capital to meet its working capital requirements through the series of private investments and its AIM placement, described above. However, starting in late 2008, the Debtor began experiencing a significant lack of working capital resulting from challenging market conditions, including fluctuations in gasoline prices, and difficulty in raising additional capital as financing for green technology disappeared. At the same time, there was an unexpected decline in sales resulting from the global credit crisis, which led to a drop in consumer spending on bigger-ticket retail purchases and a decline in dealer orders as dealers reacted to curtailed credit lines and tighter approval standards for credit purchases by lowering order activity.

---

[2]     The foregoing amount is an approximation only and includes, without limitation, those unsecured claims against the Debtor which are subject to setoff, dispute, liquidation and/or may be contingent as of the date of the filing of this Motion. The Debtor reserves all of its rights to dispute any and all claims included in this calculation.

16.     As a result of this unexpected decline in sales, the Debtor had to accelerate its next round of fund raising.  Starting in 2008, the Debtor explored funding alternatives, and found banks reluctant to offer any form of trade financing or finance alternatives to emerging companies like the Debtor.  Unable to raise funds through loans, the Debtor decided that additional equity capital was necessary to its refinancing success.  Thus, throughout 2009, the Debtor made efforts to secure new equity funding, while also pursuing government-based loan or grant support.  The Debtor engaged in discussions with existing shareholders and other potential investors about temporary financing for operations and new equity financing for working capital, and engaged advisors to introduce it to potential investors.

17.     While it endeavored to raise funds, on March 31, 2009, the Debtor announced it would not be able to publish its Report and Accounts for the year ending September 30, 2008, as required by the AIM Rules for Companies and Nominated Advisers.  As a result, trading of the Debtor's common stock on the AIM market was suspended.

18.     Ultimately, due to its inability to raise new working capital, the Debtor began seeking out other strategic alternatives, including a merger or a sale of the Debtor's assets.  In and after December 2008, the Debtor consulted with various advisors about marketing the company and seeking strategic alternatives to its financing problems.

19.     At the same time, the Debtor implemented cost saving measures to conserve working capital for continuing operations.  For example, in April 2009, the Debtor made drastic cuts to its work force that affected 60 employees, and on July 13, 2009, the Debtor laid off all but essential staff.  Additionally, the Debtor's Board of Directors ceased all salary payments to themselves as of January 2009 and the Debtor ceased payments to Michael J. Boyle as Chief Executive Officer as of July 13, 2009, which cessation has continued through the Petition Date.

C.   **The Proposed Sale**

20.     Based on the foregoing, the Debtor has now determined that an expeditious sale of the operating assets of the Debtor's Business is necessary to maximize available value, and that a reorganization is not a viable option due to the Debtor's liquidity constraints and failing business model.

21.     In August, the Debtor began negotiations for the sale and purchase of its assets with GH Venture Partners, LLC ("**GHV**").  While negotiations with GHV continued, the Debtor received serious and viable expressions of interest from other parties.  Ultimately, the Debtor set September 2, 2009 at 5:00 p.m. as the deadline for all potential purchasers to submit final bids to act as a "stalking horse" purchaser for the Debtor's assets, and received bids from two entities, including GHV.  On September 3, 2009, and after consideration of all options, the Debtor's Board of Directors held a meeting and voted to accept GHV's bid to purchase the Business and Purchased Assets (as defined in the asset purchase agreement between the parties, described below) through New Vectrix, LLC (the "**Buyer**"), a Delaware limited liability company formed for the purpose of purchasing the Debtor's assets, as the best and highest bid.

22.     Once the Buyer had been chosen as the stalking horse bidder, the Debtor and the Buyer entered into further negotiations regarding the terms of the Buyer's proposed transaction documents, including the terms for the final asset purchase agreement and for provision of a debtor-in-possession loan from the Buyer, the amount of which would be considered fully repaid, to the extent drawn down upon, and credited against the purchase price as of the closing date under and pursuant to the asset purchase agreement executed by the parties on September 24, 2009 (the "**Purchase Agreement**").  Negotiations of the Purchase Agreement and the DIP Documents in connection with the DIP Loan for which the Debtor is seeking approval herein, continued with Buyer up until the Petition Date.

23.     The Debtor anticipates that the estate will quickly run out of money and that the value of the Purchased Assets will rapidly diminish if a sale is not quickly consummated.  Thus, the Debtor believes that the competitive bidding process for and sale of substantially all of its assets (the "**Sale**"), as contemplated in the Sale Motion, must take place on an expedited schedule to ensure that the value thereof is maximized.  The Debtor has negotiated with Buyer as Lender under the DIP Documents and pursuant to the Purchase Agreement to present this Motion on a consensual basis in order to expedite this process and achieve the highest value possible for creditors.

**D.      The Proposed DIP Loan Agreement**

24.     Subject to the approval of the Bankruptcy Court, the Debtor proposes to enter into a debtor-in-possession financing facility and continue its use of cash on hand to fund the administration of this bankruptcy case post-petition.  The DIP Loan will provide the Debtor with up to $300,000 in additional liquidity to fund operations and the administration of this bankruptcy case through the closing date on the sale of the Debtor's assets and transfer of certain liabilities to Lender under the Purchase Agreement or to a higher or better bidder for the assets, in accordance with and as outlined in the Sale Motion.

25.     The principal terms for the DIP Documents are as follows:[3]

| Borrowers: | The Debtor |
| --- | --- |
| **DIP Lender:** | New Vectrix LLC |
| **DIP Loan Amount:** | $300,000.  Upon the entry of the Interim Order, but prior to the entry of the Final Order, the Debtors will be authorized to obtain financing, pursuant to the terms of the Interim Order and the DIP Documents, equal to the lesser of (i) one third of the value of the Borrower's inventory as of the Petition Date, and (ii) $300,000 (the |

---

[3]  This summary is qualified in its entirety by the actual terms of the DIP Documents.

| | |
|---|---|
| | **"Interim Advance"**). |
| **Maturity Date:** | The DIP Loan shall mature on earlier of (a) the closing date of the sale of all or substantially all of the assets of the Borrower, and (b) November 9, 2009]. |
| **Repayment** | To the extent not previously paid, the amount of the DIP Loan drawn down prior to the Maturity Date, must be paid on the Maturity Date, together with accrued and unpaid interest thereon.[4] |
| **Funding Dates:** | The Debtors shall be funded with Interim Advance after entry of the Interim Order and will receive the remaining portion of the DIP Loan after entry of the Final Order, in each case, in accordance with the Budget and the terms and conditions of the DIP Loan Agreement. |
| **Use of Proceeds:** | The Borrower will use the proceeds of the DIP Loan solely (a) to pay fees and expenses related to the consummation of the Bankruptcy Case and the consummation of this agreement and (b) to provide working capital and other general corporate purposes of the Borrower for the purposes set forth in the Interim Budget or the Final Budget, as applicable. No portion of the DIP Loan or any cash collateral shall be available for any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (i) the Lender or (ii) in connection with challenging, invalidating, disallowing, re-characterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, such secured lenders' liens, claims, interests and adequate protection, the secured creditors of the Borrower as of the Petition Date; *provided*, that proceeds of the DIP Loan in an amount not to exceed $30,000 may be used to pay fees and expenses incurred in connection with the investigation of such claims, and such limitation shall not apply to fees and expenses applicable to the Debtor soliciting or negotiating a sale of the Assets |

---

[4]  The terms of the Purchase Agreement further provide that, in the event that the Lender is the highest and best bidder for the Purchased Assets (as defined in the Purchase Agreement) after the Auction (as defined in the Sale Motion), the Debtor shall be released "from any and all obligations, claims, rights, actions, causes of action, suits, liabilities, damages, debts, costs, expenses and demands whatsoever, in law or in equity, arising under, or otherwise relating to," the DIP Documents, with the "aggregate principal amount equal to that portion of the DIP [Loan] drawn down by Seller as of the Closing Date plus accrued interest amount" being deducted from the Purchase Price under the Purchase Agreement on and as of the Closing Date.

| | |
|---|---|
| | for a higher and better amount. |
| **Facility and Upfront Fee:** | New Vectrix is not requiring a facility or up front fee. |
| **Reimbursement of Lender's Professionals:** | The Debtor will pay the reasonable and actual fees and expenses of the Lender's professionals in connection with the DIP Loan (up to $50,000). |
| **Interest Rate:** | The non-default interest rate shall be 10% per annum calculated on a 360 day year for the actual days elapsed. The default interest rate shall be 5% above the non-default rate. |
| **Security and Priorities:** | Subject to the Carve Out (as defined below), New Vectrix will receive a valid and perfected first-priority lien on all now owned and hereafter acquired Collateral (as defined in the Security Agreement), in the following (each of the following as defined in the Security Agreement): (i) all Documents; (ii) all Equipment; (iii) all Intellectual Property; *provided* that the grant of the Security Interest hereunder shall not include any application for a Trademark that would be deemed invalidated, canceled or abandoned due to the grant and/or enforcement of such Security Interest unless and until such time that the grant and/or enforcement of the Security Interest will not affect the status or validity of such Trademark; (iv) all Inventory; (v) all Goods; (vi) all books and records pertaining to the Collateral; and (vii) to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing; provided that the foregoing shall not include any asset that the Borrower now has or at any time in the future may acquire the right, title or interest of which is (i) the subject of a capital lease (as determined in accordance with GAAP) and (ii) legally or beneficially owned by a person other than the Borrower.[5] |

---

[5] Notwithstanding the foregoing and the DIP Documents, Lender has agreed that it shall be given a junior lien on any of the discrete assets subject to an existing lien asserted by a third party as of the Petition Date. Nothing herein shall be construed to waive the rights of the Debtor to challenge the validity or priority of any such liens. The Debtor reserves all of its rights with respect thereto.

In addition, the Collateral shall not include the Debtor's estate's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law ("**Avoidance Actions**"); *provided, however,* that subject to the hearing on the Final Order and the Court's approval therein, the Collateral shall include the proceeds of any Avoidance Actions and any assets that (footnote continued)

| | |
|---|---|
| **Superpriority Claims:** | Pursuant to section 364(c) of the Bankruptcy Code and the Interim and Final Orders, all obligations of the Borrower under the DIP Documents (including any exposure of the Lender in respect of cash management or hedging transactions incurred on behalf of the Borrower) at all times shall constitute allowed super-priority administrative expense claims in the Bankruptcy Case having priority over all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code, subject only to the Carve-Out. |
| **Carve-Out:** | The term "Carve-Out" under the DIP Documents means: |
| | (i) the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; |
| | (ii) the accrued and unpaid fees and expenses incurred by professionals retained pursuant to an order of the Bankruptcy Court until the earlier of (x) the occurrence of an Event of Default, *provided* that professional fees and expenses incurred after an Event of Default which is waived or cured shall also be included in the Carve-Out (so long as an unwaived or uncured Event of Default has not occurred and is not continuing) or (y) the conversion of the Bankruptcy Case to cases under chapter 7 of the Bankruptcy Code, provided that such fees and expenses incurred pursuant to either (ii)(x) or (ii)(y) must be approved by the Bankruptcy Court; and |
| | (iii) the accrued and unpaid fees and expenses incurred by professionals retained pursuant to an order of the Bankruptcy Court upon and after the occurrence of an Event of Default and during the continuance of such an Event of Default which is not waived or cured, or upon and after the conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, in an aggregate amount not to exceed $25,000 plus any allowed fees and expenses reasonably incurred by professionals retained pursuant to an order of the Bankruptcy Court solely in connection with responding to requests a chapter 7 trustee appointed by order of the Bankruptcy Court for the Bankruptcy Case makes of such professionals for transmittal of documents in their possession. |
| | In no event shall any of the Carve-Out be used to pay any fees or expenses of any person retained in a chapter 7 case under sections 326, 327 or 328 of the Bankruptcy Code). |

were subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code).

| | |
|---|---|
| **Affirmative and Negative Covenants:** | The DIP Documents contain usual and customary affirmative and negative covenants for facilities of this type and nature, including, without limitation:<br><br>(i) affirmative covenants of the Borrower to (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect the legal existence, business and properties of the Borrower, (b) maintain adequate insurance on all insurable properties, and endorse such policies to include lender's loss, (c) pay and discharge when due all taxes, assessments and governmental charges, (d) furnish to Lender a Cash Flow Forecast, a weekly management report, a Final Budget in accordance with the DIP Loan Agreement, (e) furnish to Lender written notice of an Event of Default and other events which could be considered to cause a Material Adverse Change, (f) furnish to Lender prompt notice of any change in the Collateral, (g) keep proper books and records in accordance with GAAP, (h) use the proceeds in accordance with the DIP Loan Agreement, (i) execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Lender may reasonably request, in order to effectuate the transactions contemplated by the DIP Documents, (j) use its best efforts to obtain an order of the Court authorizing the Borrower to enter into the DIP Documents and the sale related motions, and (k) keep the Lender informed at all times on all matters related to the sale and auction process of its assets under section 363 of the Bankruptcy Code.<br><br>(ii) negative covenants of the Borrower not to: (a) incur, create, assume or permit to exist any Indebtedness, except as specifically provided for in the DIP Loan Agreement, (b) create, incur, assume or permit to exist any Lien on any property or assets now owned or hereafter acquired by it, except as specifically provided for in the DIP Loan Agreement, (c) enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, (d) purchase, hold or acquire any Equity Interests, evidences of Indebtedness or other securities or, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, any other person, except as specifically provided for in the DIP Loan Agreement, (e) except as contemplated in the Sale Motion, merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, lease, license, abandon, cancel, permit to lapse, or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets, (f) make any Restrictive Payments or enter into any |

| | |
|---|---|
| | agreement that prohibits, restricts or imposes any condition upon the ability of the Borrower to create, incur or permit to exist any Lien upon any of its property or assets to secure the DIP Obligations or any refinancing thereof, (g) sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except as specifically provided for in the DIP Loan Agreement, (h) engage in any business or business activity other than the business currently conducted by Borrower and reasonable extensions thereof and reasonably incidental thereto, (i) incur any other significant indebtedness or agree to make any distributions or pay any amounts without the consent of Lender, (j) permit the aggregate amount of Capital Expenditures made by the Borrower to exceed $25,000 for the period from the Closing Date until the Maturity Date, without the written consent of the Lender, (k) permit the aggregate cash balances in all accounts of the Borrower with financial and other institutions to be less than $25,000, (l) incur, create, assume or permit to exist any administrative expense, unsecured claim, or other super-priority claim or lien *pari passu* with or senior to the claims of the Lender against the Borrower, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out, and (m) make or permit to be made any change or modification to either the Interim Order of Final Order or any First Day Orders without the prior written consent of the Lender, except for a change or modification that would not adversely affect the Lender. |
| **Conditions Precedent:** | Customary for credit facilities of this nature, including the delivery of certain documents to New Vectrix. |
| **Section 506(c):** | It shall be considered an Event of Default under the DIP Documents if any claims under section 506(c) of the Bankruptcy Code are asserted against the Lender. |
| **Modification of the Automatic Stay:** | Subject solely to any requirement of the giving of notice by the terms of the Interim Order or the Final Order, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court, and the Lender, upon three business days' written notice to the Borrower, shall be entitled to exercise all of their respective rights and remedies under the DIP Documents, including all rights and remedies with respect to the Collateral |
| **Releases:** | Lender, subject to the entry of a Final Order, shall be released by the Debtor from any and all claims, liens, priority, actions or inactions arising hereunder or in any other manner, with such releases being satisfactory to the Lender its discretion. |

| Events of Default: | Events of Default under the DIP Loan Agreement, include: |
|---|---|
| | (i) any representation or warranty made or deemed made in or in connection with any DIP Document shall prove to have been false or misleading in any material respect when so made, deemed made or furnished; |
| | (ii) a default in the payment of any principal under the DIP Loan when and as the same shall become due and payable; |
| | (iii) a default in the payment of any interest due under any DIP Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of five business days; |
| | (iv) a default in the due observance or performance by the Borrower of any covenant, condition or agreement as specified therein; |
| | (v) a default in the due observance or performance by the Borrower of any covenant, condition or agreement contained in any DIP Document (other than as otherwise specified therein) and such default shall continue unremedied for a period of 30 days after notice thereof from the Lender to the Borrower; |
| | (vi) the Borrower shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Indebtedness arising after the Petition Date (other than the Obligations), when and as the same shall become due and payable, or (ii) any other event or condition occurs that results in any such Indebtedness becoming due prior to its scheduled maturity; |
| | (vii) one or more judgments for the payment of money in an aggregate amount in excess of $100,000 of post-Petition Date liability shall be rendered against the Borrower (to the extent not covered by insurance) as shall remain undischarged for a period of 30 consecutive days; |
| | (viii) the DIP Documents and the Orders shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein pursuant to section 364 of the Bankruptcy Code; |
| | (ix) the Debtor's bankruptcy case shall be dismissed (or the Court shall make a ruling requiring the dismissal of the bankruptcy case), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or application shall be filed by the Borrower for the approval of, or there shall arise, (i) any other claim having priority senior to |

or *pari passu* with the claims of the Lender under the DIP Documents or any other claim having priority over any or all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except as expressly provided herein;

(x) the Court shall enter an order appointing (i) a chapter 11 trustee in the Bankruptcy Case or (ii) a responsible officer or an examiner with powers (A) to operate or manage the financial affairs of the Borrower, or (B) beyond the duty to investigate and report;

(xi) (a) the Interim Order shall (1) not have been entered by the Court within 15 days of the Petition Date or (2) once issued, cease to be in full force and effect and the Final Order shall not have been entered prior to such cessation, (b) the Final Order shall not have been entered by the Court on or before the thirtieth (30th) day following the Closing Date, (c) from and after the date of entry thereof, the Final Order shall cease to be in full force and effect, (d) the Borrower shall fail to comply with the terms of the Interim Order or the Final Order in any material respect, or (e) the Interim Order or the Final Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified without the written consent of the Lender;

(xii) the Court shall enter an order (a) approving payment of any pre-petition claim other than a Permitted Pre-petition Claim Payment, (b) approving a First Day Order not approved by the Lender, (c) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets, or (d) except to the extent the same would not constitute an Event of Default under the DIP Loan Agreement approving any settlement or other stipulation with any creditor of the Borrower, other than the Lender, or otherwise providing for with respect to such pre-petition claim that payments as adequate protection or otherwise to such creditor with respect to such pre-petition claim that individually or in the aggregate is in excess of $100,000 for any and all such creditors;

(xiii) there shall not occur: (a) the filing of the Sale Motion on the Petition Date (b) the entry of the Bidding Procedures Order (as defined in the Sale Motion) on or before the date that is [ten] days following the Petition Date, or (c) the entry of the Sale Order (as defined in the Asset Purchase Agreement) on or before the date that is sixty days following the Petition Date;

| | (xiv) the period of exclusivity in the bankruptcy case terminates or exclusivity is otherwise lifted in the bankruptcy case;<br><br>(xv) claims arising under section 506(c) of the Bankruptcy Code are asserted against the Lender or other actions adverse to the Lender or its respective rights and remedies under any other DIP Documents or any Court order, shall be commenced;<br><br>(xvi) there shall occur any event or circumstances (or series of events or circumstances) that would have a Material Adverse Effect in the aggregate since the Petition Date; or<br><br>(xvii) the Borrower shall consummate a sale of all or substantially all of their respective assets without the consent of the Lender; |
|---|---|

### E.  Cash Management System and Use of DIP Loan

26.    The Debtor proposes to use its cash and the proceeds of the DIP Loan to fund operations and maintain the "ordinary course" of the Business, and to administer the bankruptcy case up to the date of closing on the Sale (and to thereafter utilize the proceeds of the Sale to prepare and propose a plan).  The continued performance of the ordinary course operations of the Debtor at least through the closing of a Sale is critical to ensure the Debtor's ability to provide a distribution to creditors out of the proceeds of such Sale.  As set forth above, prior to the Petition Date, the Debtor had no loan facilities or other secured debt, except in connection with specific vehicles, machinery and other discrete assets described further below.  Accordingly, the Debtor respectfully asserts that all or substantially all of the Debtor's cash, including cash in deposit and/or operational accounts, may be used by the Debtor in the administration of this bankruptcy case and in the ordinary course of the Debtor's Business without the need for approval of the Court pursuant to section 363 of the Bankruptcy Code.

27.    The use of cash and the DIP Loan post-petition, shall be in accordance with and pursuant to the cash management system outlined in the attached budget (the "**DIP Budget**") attached hereto as Exhibit B.

W02-EAST:7BXL1\200257835.1

### F.     Compliance with Rule 4001-2 of the Local Rules

28.     Rule 4001-2 of the Local Rules requires that certain provisions contained in the financing documents and/or Interim Order be highlighted, and that the Debtor must provide justification for the inclusion of such highlighted provision(s). The Debtor believes that certain provisions of the DIP Loan implicate Local Rule 4001-2, and that such provisions are justified and necessary in the context and circumstances of this bankruptcy case. Accordingly, the Debtor has set forth each of the sub-sections of Rule 4001-2 of the Local Rules and have detailed whether or not the DIP Documents, this Motion and/or the DIP Orders contain or contemplate provisions which would fall within the ambit thereof:

- Local Rule 4001-2(a)(i)(A): The Motion and the DIP Documents do not contemplate the cross-collateralization of pre-petition and post-petition obligations.

- Local Rule 4001-2(a)(i)(B): The DIP Orders do not contemplate the acknowledgement of the Debtor with respect to the validity, enforceability and perfection of any pre-petition liens which would be binding on the Debtor or its estate.

- Local Rule 4001-2(a)(i)(C): The DIP Loan Agreement provides that it shall be considered an Event of Default thereunder if any claims under section 506(c) of the Bankruptcy Code, are asserted against the Lender, and thus provides for an effective waiver of whatever rights the estate may have against the Lender under 11 U.S.C. § 506(c). **See DIP Loan Agreement Article VII, sub-section (p)**.

- Local Rule 4001-2(a)(i)(D): The Motion and the DIP Documents do not seek to grant any liens on the Debtor's chapter 5 rights and remedies to any pre-petition secured lender, if any.

- Local Rule 4001-2(a)(i)(E): The Motion and DIP Documents do not contemplate or seek to deem pre-petition secured debt to be post-petition secured debt, or contemplate the use of post-petition loans from a pre-petition secured creditor to pay part or all of any such pre-petition creditor's debt.

- Local Rule 4001-2(a)(i)(F): The Motion and the DIP Documents do not propose disparate treatment for professionals retained by a statutorily appointed creditors' committee, if any, from professionals retained by the Debtors with respect to a professional fee carve-out.

- Local Rule 4001-2(a)(i)(G):  The Motion and the DIP Documents do not propose to prime any known secured liens without the consent of such lien holder.

### Requested Relief and Basis Therefor

29.     The Motion requests, pursuant to sections 105, 362, 364 and 507 of the Bankruptcy Code and Rules 4001 and 9014 of the Bankruptcy Rules, entry of the proposed Interim Order and Final Order authorizing (i) borrowing, with priority over administrative expenses (other than the Carve-Out as defined in the DIP Loan Agreement) and secured by liens on property of the Debtor's estate, on an interim basis in an amount up to $300,000, and on a final basis in the aggregate committed amount of $300,000; (ii) modifying the automatic stay; and (iii) giving notice of the final hearing on the motion (the "**Final Hearing**").  Pending the Final Hearing, the DIP Loan will be implemented on an interim basis pursuant to the terms of the DIP Documents attached hereto as <u>Exhibit A</u> and the proposed Interim Order attached hereto as <u>Exhibit C</u>.

30.     The "**Collateral**" securing the DIP Loan shall include (each as defined in the DIP Loan Agreement) (i) all Documents; (ii) all Equipment; (iii) all Intellectual Property, subject to certain conditions outlined in the DIP Loan Agreement; (iv) all Inventory; (v) all Goods; (vi) all books and records pertaining to the collateral; and (vii) to the extent not otherwise included, all proceeds and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.  The Collateral shall not include any asset that the Borrower now has or at any time in the future may acquire the right, title or interest of which is (i) the subject of a capital lease (as determined in accordance with GAAP), and (ii) legally or beneficially owned by a person other than the Borrower.  As noted above, the Lender has agreed that it will be given a lien which is junior in priority to those liens on the discrete assets which are subject to liens held by third parties as of the Petition Date.

31.     The credit provided under the DIP Loan will enable the Debtor to continue to operate its Businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest pending confirmation of a plan under section 1129 of the Bankruptcy Code.  The availability of credit under the DIP Loan will also provide confidence to the Debtor's creditors and counterparties that will enable and encourage them to continue their relationships with the Debtor.

32.     Finally, the implementation of the DIP Loan will be viewed favorably by the Debtor's remaining employees, dealers and vendors, thereby promoting consummation of a sale of all or substantially all of the Debtor's assets pursuant to and in accordance with the Sale Motion and, in turn, enabling the Debtor to provide a distribution to the Debtor's remaining creditors thereafter.  Accordingly, the timely approval of the relief requested herein is imperative.

**A.     The DIP Loan Should be Approved**

33.     Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Bankruptcy Code section 503(b) or 507(b); (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

34.     The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See also In re Crouse Group Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  Courts have applied the

following three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code:

> (i) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> (ii) the credit transaction is necessary to preserve the assets of the estate; and
>
> (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Crouse Group*, 71 B.R. at 549. As discussed below, each of these elements is satisfied.

### a. The Debtor is Unable to Obtain Unsecured Credit

35. The Debtor requires working capital financing, beyond the small amount of cash available to it from current operations, in order to preserve and maintain its Business during the bankruptcy case up to the date on which it consummates the Sale pursuant to the Sale Motion. In making the decision to sell its assets under section 363 of the Bankruptcy Code, and seek financing as a part of that transaction, the Debtor considered many factors.

36. First, in order to complete a sale of its assets and create value for the Debtor's creditors, the Debtor would need financing. The only parties willing to discuss and negotiate the terms of financing for the continued operation of the Debtor's Business and to fund the administration of a bankruptcy case so as to preserve value for creditors were those parties who had an interest in purchasing the Debtor's assets. As explained above, prior to and simultaneously with exploring the possibility of selling its assets, the Debtor sought additional financing without having to sell assets. The Debtor was not able to secure any such "stand-alone" financing.

37.     Second, in light of the Debtor's inability to obtain alternative post-petition financing proposals from other lenders through credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under sections 364(a) and 364(b) of the Bankruptcy Code, or credit secured by liens on the Debtor's assets junior to the pre-petition liens, as is contemplated by section 364(c)(3) of the Bankruptcy Code, the Debtor does not believe that any lender would be willing to loan new money to the Debtor other than on terms similar to (or worse than) those contained in the DIP Loan Agreement.

38.     In short, the Debtor determined that a consensual DIP Loan with the proposed Buyer will save expense, time, and costly valuation litigation at the outset of this chapter 11 cases, thereby allowing the Debtor to preserve value and focus on the Sale of its assets in an effort to provide a distribution to those creditors who are not otherwise satisfied as part of the assumption of liabilities by Lender pursuant to the Purchase Agreement.  Moreover, the obligations of the Debtor under the DIP Loan will be released upon consummation of the Sale and automatic satisfaction of the amounts owed thereunder.

39.     Accordingly, the Debtor has determined that the DIP Loan offered by the Lender as part of its overall bid for the Debtor's assets is the best and only option for post-petition financing.

**b.**     **The Transactions Under the DIP Documents are Necessary to Preserve the Estate**

40.     Without access to post-petition financing, the Debtor will be unable to operate the Business as a going concern, which would, in turn, significantly impair the value of the Debtor's assets and jeopardize the Debtor's ability to sell its assets to the detriment of all creditor constituencies.  The Debtor has very little cash and, as described above, almost no liquidity with which to consummate the Sale.

41.     By obtaining the DIP Loan, the Debtor will be in a position to preserve the value of its assets during the chapter 11 process for the benefit of all creditors and work towards confirming a plan.  It is vital to the success of the bidding process outlined under the Sale Motion and confirmation of a plan that the Debtors obtain approval to immediately access the DIP Loan, on an interim and final basis, as contemplated by the DIP Loan Agreement.

42.     Absent approval of the relief sought herein, the Debtor faces a substantial risk of irreparable damage to the value of its assets and the probability of conversion of the bankruptcy case to a case under chapter 7 without the ability to sell its assets in an orderly manner for the benefit of the Debtor's creditors.  *See In re Sun Healthcare Group, Inc.*, 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates").  Accordingly, the Debtor needs sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all creditors.

**c.      The Terms of the DIP Loan are Fair and Reasonable**

43.     Moreover, the terms of the DIP Loan are fair and reasonable under the circumstances, particularly given the current economic and lending environment.  As discussed above, the Debtor made efforts to obtain credit on the most favorable terms available while simultaneously considering whether the bid made by the potential lender (and buyer) for its assets was the highest and best during the pre-petition process, in order to maximize return for the creditors of the Debtor.

44.     Against this backdrop, the Debtor engaged in negotiations with the Lender regarding the proposed terms, worked with its advisors to obtain the best possible terms from the Lender and, eventually, reached an agreement with the Lender, not only for the provision of the DIP Loan, but also for the Sale of the Debtor's assets and for a consensual competitive bidding

process as outlined in the Sale Motion and Purchase Agreement. Thus, the terms and conditions

of the DIP Loan Agreement were negotiated by the parties in good faith and at arms' length and,

as outlined above, were instituted for the purpose of enabling the Debtor to meet ongoing

operational expenses while in chapter 11 to preserve the going concern status of the Debtor as

well as the value of the Collateral for the Sale of the assets pursuant to the Sale Motion.

45.     A debtor need only demonstrate that, notwithstanding its good faith efforts, credit

was unavailable without the protections afforded to potential lenders by sections 364(c) and (d)

of the Bankruptcy Code. *See Bray v. Shenandoah Fed. Savs. & Loan Assoc.* (*In re Snowshoe

Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626,

630-31 (Bankr. S.D.N.Y. 1992) (noting that, although "the debtor must make an effort to obtain

credit" it does not need "to seek alternate financing from every possible lender."). In short, the

Debtor concluded that adequate alternative financing terms more favorable than those to be

provided under the DIP Documents by the Lender as part of an overall Sale transaction, are

currently unavailable.

46.     Moreover, the Debtor believes that, in its business judgment, entry into the DIP

Documents is in its best interests. Provided that a debtor's business judgment does not run afoul

of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor

considerable deference in acting in accordance therewith. *See, e.g., Trans World Airlines, Inc. v.

Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994),

*rev'd on other grounds* by 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables

facility and asset-based facility based upon prudent business judgment of the debtor); *In re Ames

Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the

court's discretion under section 364 is to be utilized on grounds that permit reasonable business

judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also Funding Sys. Asset Mgmt. Corp. v. Key Capital Corp. (In re Funding Sys. Asset Mgmt. Corp.)*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

47.     Accordingly, the Debtor respectfully asserts that its has satisfied the requirements of sections 364(c) and (d) of the Bankruptcy Code, that alternative credit on more favorable terms was and is unavailable to the Debtor, and requests that the Court enter the Interim Order approving the DIP Loan Agreement and related DIP Documents to immediately preserve the Debtor's estate, and enter the Final Order to ensure that the Debtor's estate is maintained through the consummation of the Sale.

**B.      The Debtor is Not Required to Provide Adequate Assurance Payments**

48.     As stated above, there are only a few discrete assets of the Debtor which are allegedly subject to existing liens and secured claims, including specifically, a truck, a forklift, the Debtor's phone system and a small number of copiers.  Each of these items is subject to a vehicle or equipment lease, as appropriate, wherein the lessor has an alleged security interest in the vehicles or equipment subject thereto and evidenced by a lien thereon.[6]

49.     The DIP Lender has agreed that it will be given a lien on these discrete assets which is junior in priority to any existing lien thereon.  Accordingly, the Debtor respectfully asserts that the lienholders on such assets do not require adequate assurance payments or other

---

[6]  Nothing in this Motion shall be construed or shall otherwise act as a waiver of the Debtor's rights to oppose or otherwise challenge the validity and/or priority of any lien asserted by any third party, other than the Lender, on any of the Debtor's assets, including those described herein.

forms of adequate protection with respect to their interested therein since no senior lien is sought to be placed thereon pursuant to this Motion.

## C.     The Automatic Stay Should Be Modified on a Limited Basis

50.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.  The Debtor further requests that the automatic stay be vacated and modified, to the extent necessary, to permit the Lender, to exercise, immediately upon the occurrence of an Event of Default or otherwise as prescribed therein, all rights and remedies under the DIP Documents or the Interim Order or Final Order, as applicable.[7]

51.     Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

## D.     Interim Approval Should Be Granted

52.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than 15 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

---

[7]   In any hearing regarding the Lender's exercise of rights or remedies in accordance with the DIP Documents, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtor hereby waives any right to seek relief, including without limitation, under Bankruptcy Code section 105, to the extent such relief would in any way impair or restrict the rights and remedies of the Lender set forth in the Interim Order or Final Order, as applicable, or the DIP Documents.

53.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this motion and (i) authorize the Debtor to borrow up to $300,000 under and subject to the terms of the DIP Loan Agreement on an interim basis, pending entry of a final order, in order to (a) maintain and finance the ongoing operations of the Debtor; (b) fund the administration of this case; and (c) avoid immediate and irreparable harm and prejudice to the Debtor's estate, business operations and all parties in interest, and (ii) schedule the Final Hearing.

54.     The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate its business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed. The availability of interim loans under the DIP Loan Agreement will provide necessary assurance of the Debtor's ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtor's Business, to the detriment of all parties in interest. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating its reorganization efforts.

## Notice

55.     The Debtor shall serve notice of this Motion on the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the District of Delaware (Attn: Richard Schepacarter, Esq.); (ii) New Vectrix LLC, as Lender; (iii) Latham & Watkins LLP (Attn: Michael J. Riela) and Duane Morris LLP (Attn: Christopher M. Winter), as counsel for the Lender; (iv) the holders of the 20 largest unsecured claims as set forth in the consolidated list filed with the Debtor's petitions; (v) any known party interested in purchasing

the Debtor's assets; (vi) the Office of the United States Attorney General for the District of Delaware; (vii) the Internal Revenue Service; and (viii) all known holders of liens, encumbrances, or security interests in the Collateral. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). The Debtor submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

### No Prior Request

56. No prior request for the relief sought in this Motion has been made to this or any other court.

## Conclusion

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order, substantially in the form attached hereto as Exhibit C, (i) approving the Debtor's post-petition financing; (ii) authorizing the Debtors' use of cash collateral; (iii) granting adequate protection; (iv) modifying the automatic stay; (v) scheduling a Final Hearing; and (vi) granting such other and further relief as the Court deems appropriate.

Dated:   September 28, 2009
        Wilmington, DE

BIFFERATO GENTILOTTI LLC

/s/ Garvan F. McDaniel
Garvan F. McDaniel (DE Bar No. 4167)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600
Email: gmcdaniel@bglawde.com

-and-

Sheppard Mullin Richter & Hampton, LLP
Edward H. Tillinghast, III, Esq
Malani J. Cademartori, Esq.
Blanka K. Wolfe, Esq.
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701
Email: etillinghast@sheppardmullin.com
      mcademartori@sheppardmullin.com
      bwolfe@sheppardmullin.com

*Proposed Counsel for the Debtor
and Debtor-in-Possession*